IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

TAMORI MORGAN,
Defendant–Appellee.

On Appeal from the United States District Court
for the District of Kansas, No. 6:23-CR-10047
(Hon. John W. Broomes)

**OPENING BRIEF FOR THE UNITED STATES**

KATE E. BRUBACHER
United States Attorney

JAMES A. BROWN
Assistant United States Attorney
District of Kansas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................. iii

STATEMENT OF RELATED CASES ..................................... xvi

INTRODUCTION .............................................................. 1

STATEMENT OF JURISDICTION ......................................... 2

ISSUE PRESENTED ........................................................... 2

STATEMENT OF THE CASE ................................................ 3

    A.   Procedural History ................................................ 3

    B.   Relevant Facts ..................................................... 3

    C.   Ruling Under Review ............................................ 5

SUMMARY OF ARGUMENT .............................................. 7

ARGUMENT ................................................................. 11

I.   The District Court Erred by Holding That 18 U.S.C. § 922(o) Is Unconstitutional. .......................................................... 11

    A.   Standard of review .............................................. 13

    B.   Statutory background ........................................... 13

    C.   The Second Amendment does not protect firearms that are not typically possessed by law-abiding citizens for lawful purposes. . 14

    D.   Machineguns are not in common use for lawful purposes. ......... 17

    E.   Section 922(o) is consistent with the historical principle that the government may ban dangerous and unusual weapons. ............. 23

    F.   The district court's reasoning is flawed. ..................... 31

CONCLUSION ............................................................... 36

STATEMENT REGARDING ORAL ARGUMENT.................................. 37

CERTIFICATE OF COMPLIANCE .......................................................... 38

ADDENDUM ....................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ................................................................. 13

*Blodgett v. Holden,*
    275 U.S. 142 (1927) ............................................................................. 11

*Cox v. United States,*
    No. 11-CR-22, 2023 WL 4203261 (D. Alaska June 27, 2023) ................. 12

*DeWilde v. Attorney General,*
    No. 24-CV-84, 2024 WL 4643681 (D. Wyo. Oct. 16, 2024) ..................... 11

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...................1, 5, 7, 14, 15, 16, 17, 22, 23, 24, 32, 33, 34

*Friedman v. City of Highland Park,*
    136 S. Ct. 447 (2015) ........................................................................... 18

*Hamblen v. United States,*
    591 F.3d 471 (6th Cir. 2009) ................................................................ 18

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) .................................................17, 20, 22, 35

*National Federation of Indep. Business v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................. 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022)................. 1, 4, 6, 14, 15, 16, 17, 23, 24, 26, 29, 30, 31, 32

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) .............................................................17, 18

*United States v. Alsenat,*
    --- F. Supp. 3d ---, No. 0:23-CR-60209, 2024 WL 2270209 (S.D.
    Fla. May 20, 2024) ............................................................................... 12

*United States v. Bachmann,*
    No. 8:23-CR-304, 2024 WL 730489 (M.D. Fla. Feb. 22, 2024) ............... 12

*United States v. Barrow,*
    No. 1:23-CR-236, 2024 WL 3814041 (N.D. Ga. Aug. 13, 2024) ............. 12

*United States v. Berger,*
    715 F. Supp. 3d 676 (E.D. Pa. 2024) ...................................................... 12

*United States v. Berríos-Aquino,*
    No. 22-CR-473, 2024 WL 1468488 (D.P.R. Apr. 4, 2024) ...................... 12

*United States v. Brown,*
    No. 0:23-CR-186, 2024 WL 4241959 (D.S.C. Sept. 19, 2024) ................. 11

*United States v. Caldwell,*
    No. 1:24-CR-70, 2024 WL 2784340 (N.D. Ohio May 30, 2024) ............. 12

*United States v. Chan,*
    No. 22-CR-109, 2024 WL 4028019 (D. Haw. Sept. 3, 2024) ................... 11

*United States v. Cooperman,*
    No. 22-CR-146, 2023 WL 4762710 (N.D. Ill. July 26, 2023) .................. 12

*United States v. Cousar,*
    No. 23-CR-10004, 2024 WL 1406898 (D. Kan. Apr. 2, 2024) ................ 12

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) ............................................................... 13

*United States v. Delafose,*
    No. 2:23-CR-185, 2023 WL 7368239 (W.D. La. Nov. 7, 2023) ............... 12

*United States v. Dixon,*
    No. 22-CR-140, 2023 WL 2664076 (N.D. Ill. Mar. 28, 2023) ................. 12

*United States v. Elliott,*
    No. 21-CR-88, 2024 WL 3161879 (E.D. La. June 24, 2024) ................... 12

*United States v. Fincher,*
    538 F.3d 868 (8th Cir. 2008) ...........................................................17, 22

*United States v. Fisher*,
No. 1:23-CR-45, 2024 WL 589115 (W.D.N.C. Feb. 13, 2024) ................ 12

*United States v. Hart*,
No. 23-CR-293, 2024 WL 893335 (D. Minn. Mar. 1, 2024) ..................... 12

*United States v. Henry*,
688 F.3d 637 (9th Cir. 2012) ........................................................... 18, 22

*United States v. Hernandez*,
721 F. Supp. 3d 310 (D. Del. 2024) ...................................................... 12

*United States v. Hicks*,
No. 23-CR-65, 2024 WL 1840326 (W.D. La. Apr. 26, 2024) .................. 12

*United States v. Jackson*,
No. 4:23-CR-62, 2024 WL 1160304 (N.D. Miss. Mar. 18, 2024) .............. 12

*United States v. Johnson,*
No. 24-CR-20083, 2024 WL 4612888 (E.D. Mich. Oct. 29, 2024) ........... 11

*United States v. Kelley*,
No. 23-CR-267, 2024 WL 264588 (D. Minn. Jan. 24, 2024) ................... 12

*United States v. Kenney*,
91 F.3d 884 (7th Cir. 1996) ................................................................. 29

*United States v. Kittson*,
No. 3:21-CR-75, 2023 WL 5015812 (D. Or. Aug. 7, 2023) ..................... 12

*United States v. Lane*,
689 F. Supp. 3d 232 (E.D. Va. 2023) ..................................................... 12

*United States v. Miller*,
307 U.S. 174 (1939) ................................................................. 5, 15, 16

*United States v. Mitchell*,
--- F. Supp. 3d ---, No. 1:24-CR-9, 2024 WL 2272275 (N.D. Ohio
May 20, 2024) ....................................................................................... 12

v

*United States v. O'Brien,*
560 U.S. 218 (2010) .................................................................. 18

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame,*
822 F.3d 136 (3rd Cir. 2016) ............................................17, 22

*United States v. Rahimi,*
602 U.S. 680 (2024) ......................... 1, 10, 14, 17, 23, 24, 29, 30, 31, 33, 35

*United States v. Simien,*
655 F. Supp. 3d 540 (W.D. Tex. 2023) ................................... 12

*United States v. Simpkins,*
90 F.4th 1312 (10th Cir. 2024) ............................................... 32

*United States v. Smith,*
No. 23-CR-28, 2023 WL 6880423 (E.D. Ky. Oct. 18, 2023) ................... 12

*United States v. Sturgeon,*
No. 23-CR-6, 2023 WL 6961618 (E.D. Ky. Oct. 20, 2023) ................... 12

*United States v. Williams,*
No. 21-CR-745, 2024 WL 308460 (N.D. Ill. Jan. 26, 2024) ................... 12

*United States v. Wilson,*
No. 2:23-CR-20081, 2023 WL 8288989 (W.D. Tenn. Nov. 7, 2023) ........ 12

*United States v. Wilson,*
No. 4:24-CR-027, 2024 WL 1144251 (N.D. Tex. Mar. 15, 2024) ............ 12

*United States v. Zaleski,*
489 F. App'x 474 (2d Cir. 2012) ............................................ 18

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. II ................................................................ 14

18 U.S.C. § 921 ......................................................................... 13

18 U.S.C. § 922 ...............................................................1, 2, 4, 13, 29

18 U.S.C. § 3231 .................................................................................. 2

18 U.S.C. § 3731 .................................................................................. 2

26 U.S.C. § 5801 ................................................................................ 28

26 U.S.C. § 5802 ................................................................................ 28

26 U.S.C. § 5811 ............................................................................28, 29

26 U.S.C. § 5812 ................................................................................ 28

26 U.S.C. § 5821 ................................................................................ 28

26 U.S.C. § 5822 ................................................................................ 28

26 U.S.C. § 5841 ................................................................................ 28

26 U.S.C. § 5842 ................................................................................ 28

26 U.S.C. § 5845 ......................................................................4, 13, 28

Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449
    (1986) ............................................................................................ 29

18 Pa. Cons. Stat. § 908 .................................................................... 20

720 Ill. Comp. Stat. 5/24-1 ............................................................... 19

Alaska Stat. § 11.61.200 .................................................................... 19

Ariz. Rev. Stat. Ann. § 13-3101 ........................................................ 19

Ariz. Rev. Stat. Ann. § 13-3102 ........................................................ 19

Ark. Code Ann. § 5-73-204 ............................................................... 19

Ark. Code Ann. § 5-73-205 ............................................................... 19

Cal. Penal Code § 32625 ................................................................... 19

Colo. Rev. Stat. § 18-12-102 ............................................................. 19

Conn. Gen. Stat. § 53-202 ................................................................ 19

D.C. Code Ann. § 22-4514 .............................................................. 19

Del. Code Ann. tit. 11, § 1444 ........................................................ 19

Fed. R. App. P. 4 ............................................................................... 2

Fla. Stat. § 790.221 ........................................................................ 19

Ga. Code Ann. § 16-11-122 ........................................................... 19

Ga. Code Ann. § 16-11-124 ........................................................... 19

Haw. Rev. Stat. § 134-8 ................................................................. 19

Ind. Code § 35-47-5-8 ................................................................... 19

Ind. Code § 35-47-5-10 ................................................................. 19

Iowa Code § 724.1 ........................................................................ 19

Iowa Code § 724.3 ........................................................................ 19

Kan. Stat. Ann. § 21-6301 ............................................................. 19

La. Stat. Ann. § 40:1752 ............................................................... 19

Mass. Gen. Laws ch. 140, § 131 ................................................... 19

Md. Code Ann., Criminal Law § 4-403 ........................................ 20

Md. Code Ann., Criminal Law § 4-404 ........................................ 20

Md. Code Ann., Criminal Law § 4-405 ........................................ 20

Me. Stat. tit. 17-A, § 1051 ............................................................ 19

Me. Stat. tit. 17-A, § 1052 ............................................................ 19

Mich. Comp. Laws § 750.224 ....................................................... 19

Minn. Stat. § 609.67, subd. 2 ........................................................ 19

Mo. Rev. Stat. § 571.020 ............................................................... 19

N.C. Gen. Stat. § 14-409 ............................................................... 19

N.D. Cent. Code § 62.1-05-01 ........................................................ 19

N.J. Stat. Ann. § 2C:39-5 .............................................................. 19

N.Y. Penal Law § 265.02 ............................................................... 19

Neb. Rev. Stat. § 28-1203 .............................................................. 19

Nev. Rev. Stat. § 202.350 .............................................................. 19

Ohio Rev. Code Ann. § 2923.11 ...................................................... 19

Ohio Rev. Code Ann. § 2923.17 ...................................................... 20

Or. Rev. Stat. § 166.272 ................................................................ 20

R.I. Gen. Laws § 11-47-8 ............................................................... 19

S.C. Code Ann. § 16-23-230 .......................................................... 20

S.C. Code Ann. § 16-23-250 .......................................................... 20

S.C. Code Ann. § 23-31-330 .......................................................... 20

S.D. Codified Laws § 22-1-2 .......................................................... 20

S.D. Codified Laws § 22-14-6 ........................................................ 20

Tenn. Code Ann. § 39-17-1302 ...................................................... 20

Tex. Penal Code Ann. § 46.05 ........................................................ 20

Va. Code Ann. § 18.2-290 ............................................................. 20

Va. Code Ann. § 18.2-291 ............................................................. 20

Va. Code Ann. § 18.2-295 .......................................................................... 20

W. Va. Code § 61-7-9 .................................................................................. 20

Wash. Rev. Code § 9.41.190 ..................................................................... 20

Wis. Stat. § 941.26 ...................................................................................... 19

**Other Authorities**

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) .......... 24

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ........................ 24

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ................................................................................................. 24

ATF, Current Processing Times ................................................................. 22

Blackstone's *Commentaries* and *State v. Langford*, 3 Hawks 381 (N.C. 1824) .................................................................................................... 34

Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of the 630,000 in the U.S.* (Dec. 21, 2018) ......................... 21

Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021 (Exhibit 8) ............................................................................................ 35

H.R. Rep. No. 83-1337 (1954) .................................................................. 19

H.R. Rep. No. 99-495 (1986) .................................................................... 19

John Berrigan, et al., *The Number and Type of Private Firearms in the United States*, Annals of the American Academy of Political and Social Science, Vol. 704, Issue 1 (Nov. 2022) ......................................... 20

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. ..................................................................... 29

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273 (2022) ...................................................................................... 22

Pew Research Center, Key facts about Americans and guns ......................... 21

Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ........................... 30

Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) .................. 27, 31

S. Rep. No. 73-1444 (1934) .......................................................................... 28

Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers (June 2018) ............................................................................. 20

The Trace, *How Many Guns are Circulating in the U.S.?* ........................... 20, 21

U.S. Census Bureau, Happy New Year 2024! ............................................... 21

W. Kip Viscusi & Kyle J. Blasinsky, *Leveraging Public Support for Gun Laws to Reduce Mass Shootings*, 2024 U. Ill. L. Rev. 707 (2024) ................. 28

**Historical Statutes**

2 Edw. 3, c. 3 (1328) (Eng.) ........................................................................ 23

Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869) ................................................................. 25

Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904) ................................................................... 25

Act of Dec. 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346 ............................ 27

Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force 33* (1794) ............................................................................................ 25

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436 .......................................... 25

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 ................................................ 26

Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200 ........................ 26

Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76....................................... 26

Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148 ................... 26

Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404................................... 26

Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 ..................................... 26

Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137 .......................................... 27

Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148 ............................. 26

Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129 .................................. 26

Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56............................................... 26

Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115................................... 26

Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95........... 27

Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35 ................................... 27

Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50 ................................. 27

Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25 ......................26, 27

Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17 ..................................... 26

Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724............... 26

Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709 ......................... 26

Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57 ....................................26, 27

Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136......................... 27

Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175 ................................ 26

Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231 ............................. 26

Act of May 24, 1879, § 1, 1879 Ill. Laws 114 .............................................. 26

Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447 .............................. 26

Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74 ............................................. 26

Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191 ................................... 26

Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73 ............................................... 27

Act of Apr. 16, 1881, § 4, 1881 Ill. Laws 74 ............................................... 26

Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233 ................................ 26

Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ......................... 26, 27

Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74 .................................. 27

Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33 .............................................. 26

Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602 ................................ 26

Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144 ..................... 26

Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231 ..................... 26, 27

Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51 ................................ 26

Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450 .............................. 27

Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973 ....................... 27

Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442 ............................. 27

Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61 .......................... 27

Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339 ................................ 27

Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180 .............................. 27

Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870 ................................... 27

Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42 ..................................... 27

Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24 ........................................... 28

Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469 .................................. 28

Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181 ................................. 28

Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201 ................................ 28

Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257 ....................... 28

Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413 ............................... 28

Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938 ................................. 28

Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888 ....................... 28

Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777 ................................. 28

Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674 ............................... 28

Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157 ............................... 28

Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170 ............................... 28

Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813 ................................ 28

Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78 .................................... 27

Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306 ................................ 28

Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033 ............................. 28

Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671 .................. 27

Act of July 2, 1931, § 2, 1931 Ill. Laws 452 ................................................. 28

Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337 ........................................ 28

Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335 ................................. 28

Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189 ......................................... 28

Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233 ............................. 28

Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245 ........................... 28

Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489 ................................. 28

Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219 ............................. 28

Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76 ................................... 28

Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288 ........................... 28

Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138 ................................. 28

An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming &
     Jacob Spicer, *Grants, Concessions, and Original Constitutions of the
     Province of New Jersey* 289-90 (2d ed. 1881) ............................................... 25

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d
     ed. 1792) ............................................................................................................ 24

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) .......... 24

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) ............. 24

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish
     Officer*, 12-13 (1773) ...................................................................................... 24

Penal Code, § 7094, 1895 N.D. Rev. Codes 1259 ......................................... 27

William Waller Hening, *The New Virginia Justice* 18 (1795) ........................... 24

xv

## STATEMENT OF RELATED CASES

The government is aware of two other appeals before this Court involving Second Amendment challenges to 18 U.S.C. § 922(o):

- *DeWilde v. Attorney General*, No. 23-8054 (10th Cir.)

- *United States v. Shobert*, No. 24-8058 (10th Cir.)

**INTRODUCTION**

With limited exceptions, federal law makes it unlawful to possess a machinegun. 18 U.S.C. § 922(o). Tamori Morgan was charged with violating that law after he possessed a Glock switch and an automatic AR-style pistol. The district court dismissed the indictment, holding that § 922(o) violates the Second Amendment as applied to Morgan.

That was error. As the Supreme Court has recently and repeatedly affirmed, the Second Amendment applies only to firearms that are "in common use . . . for lawful purposes like self-defense," rather than firearms "not typically possessed by law-abiding citizens for lawful purposes," such as "dangerous and unusual weapons." *District of Columbia v. Heller*, 554 U.S. 570, 624-25, 627 (2008) (quotation omitted); *accord New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022) ("Drawing from this historical tradition, we [have] explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'"); *United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("At the founding, the bearing of arms was subject to regulations" that included "ban[s on] the carrying of 'dangerous and unusual weapons.'"). Machineguns are not typically possessed by law-abiding citizens for lawful purposes. Instead, they are uniformly restricted, highly lethal and

well suited to criminal purposes. States and Congress have heavily regulated machineguns since the first decade of their entering the civilian market in the mid-1920s. Legally registered machineguns represent a tiny fraction of the firearms possessed in this country today, and those legal machineguns are very expensive and time-consuming to acquire. And § 922(o)'s longstanding prohibition is entirely consistent with the principles underlying our nation's historical tradition, recognized in *Heller*, of regulating dangerous and unusual weapons. The district court's contrary holding was error.

## STATEMENT OF JURISDICTION

The United States appeals from the district court's order dismissing the indictment against Defendant–Appellee Tamori Morgan. The district court (Broomes, J.) had jurisdiction under 18 U.S.C. § 3231. The district court entered a memorandum and order dismissing the indictment on August 21, 2024, App. 5, and it entered a corrected "nunc pro tunc" order August 26, 2024, App. 65-74. The government filed a timely notice of appeal on September 20, 2024. App. 75; *see* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## ISSUE PRESENTED

Whether the federal prohibition on possession of a machinegun, 18 U.S.C. § 922(o), violates the Second Amendment as applied to the defendant.

2

# STATEMENT OF THE CASE

## A. Procedural History

A grand jury in the District of Kansas indicted Morgan on two counts of possessing a machinegun, in violation of 18 U.S.C. § 922(o). App. 7-8. The district court dismissed the indictment, holding that § 922(o) is unconstitutional under the Second Amendment. App. 65-74. The United States appealed. App. 75.

## B. Relevant Facts

An officer with the Wichita Police Department who was monitoring Tamori Morgan's Snapchat account saw a video of people firing what appeared to be a machinegun along the Arkansas River near 54th and West Streets in Sedgwick County.[1] App. 36. In October 2022, authorities stopped the vehicle in which Morgan was riding. App. 36-38, 47-48. Authorities conducted a search and found a Glock .357 handgun, a machinegun-conversion device known as a "Glock switch," and an Anderson Manufacturing AM-15 (an AR-style pistol) chambered for .300 Blackout ammunition. App. 37-38, 40; *see* App. 60-64. The Glock .357 had been modified to allow the Glock switch to function, App. 39, and a Snapchat video

---

[1] Because the district court dismissed the indictment before trial and the parties did not introduce the arrest reports as exhibits, there are very few facts in the record.

showed Morgan discharging a Glock pistol that appeared to be firing automatically.  App. 39-40.  Because of the way its parts fit together, the AM-15 was also able to fire automatically.  App. 52.

A grand jury in the District of Kansas indicted Morgan on two counts of possessing a machinegun, in violation of 18 U.S.C. § 922(o)—Count 1 based on the AM-15 and Count 2 based on the Glock switch.  App. 7-8; *see* 26 U.S.C. § 5845(b) (defining "machinegun" to include "any part designed and intended . . . for use in converting a weapon into a machinegun").  Morgan moved to dismiss the indictment, arguing that § 922(o) violates the Second Amendment, both on its face and as applied to him, under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).  App. 11-20.  He argued that machineguns are "arms" protected by the Second Amendment's plain language and that the government could not show a historical tradition of banning machinegun possession.  App. 14-19.

The government responded that machineguns are not protected by the Second Amendment's plain text because they are not "in common use" by private citizens.  App. 24-26.  And it argued that § 922(o) is, in any event, consistent with the historical tradition of regulating dangerous and unusual weapons.  App. 27-28.  The government also cited many district court decisions upholding § 922(o) after *Bruen*, which all reasoned that machineguns

are not typically possessed by law-abiding citizens for lawful purposes but are instead dangerous and unusual weapons.  App. 29-30.

## C.    Ruling Under Review

The district court granted the motion to dismiss.  App. 65-74.  The court first concluded that "the [AM-15] machinegun and Glock switch are bearable arms within the plain text of the Second Amendment."  App. 68.  It rejected the government's reliance on *United States v. Miller*, 307 U.S. 174 (1939), which upheld against a Second Amendment challenge the prohibition on possession of an unregistered short-barreled shotgun in the National Firearms Act, 26 U.S.C. §§ 5801-5872.  App. 68-69.  The court observed that the National Firearms Act does not "categorically prohibit" the possession of short-barreled shotguns or machineguns, but simply "restrict[s] possession to those who comply with the registration and taxation requirements."  App. 69.  The court also rejected as "dicta" the Supreme Court's statement in *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008), that it would be "startling" to conclude that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." App. 68.

The district court next determined that the government had failed to meet its burden of showing that § 922(o) is "consistent with the nation's history of firearms regulation."  App. 73.  The court rejected the government's reliance

on the common-law prohibition, which was adopted by statute in some American colonies, on going armed with dangerous or unusual weapons. App. 70-71. The court reasoned that those laws focused on "the manner in which arms were carried or displayed," whereas § 922(o) "criminalizes the mere possession" of machineguns. App. 71-72.

The district court said, "[T]o the extent that the Second Amendment would allow weapons to be prohibited solely on the basis that they are 'dangerous and unusual' or 'highly unusual in society at large,'" the government had "not made that showing here." App. 72 (quoting *Bruen*, 597 U.S. at 47). It observed that there are over 740,000 legally registered machineguns in the United States. App. 72. It pointed out that Congress "did not outright prohibit possession of machineguns until passage of the Firearm Owners Protection Act in 1986." App. 72. And it observed that even that Act did not prohibit possession of pre-1986 machineguns "so long as [the possessor] complies with the National Firearms Act's requirements." App. 73. Thus, the court said, "machineguns are not unusual." App. 73.

The district court ultimately concluded that the government had "barely tried" to meet its burden under *Bruen*. App. 73. But the court "expresse[d] no opinion as to whether the government could, in some other case, meet its burden to show a historically analogous restriction that would justify

§ 922(o)."  App. 73-74.  Accordingly, the court held that the statute was unconstitutional as applied to Morgan.  *See* App. 68 (saying it would "analyze Defendant's as-applied challenge"), App. 72 (pointing out that, "importantly in an as-applied challenge," the indictment "alleges nothing more" than "possession").

## SUMMARY OF ARGUMENT

The district court erred by holding that § 922(o) is unconstitutional as applied to Morgan.  Machineguns are not protected by the Second Amendment's plain text, and § 922(o)'s prohibition is consistent with the principles underlying our historical tradition because it prohibits possession of weapons that are not typically possessed by law-abiding citizens for lawful purposes, such as dangerous and unusual weapons.

1. The Second Amendment applies to weapons that are "in common use" for lawful purposes, but it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008) (quotation omitted).  Machineguns are not in common use for lawful purposes like self-defense.  Multiple circuits have reached that conclusion since *Heller*, and their reasoning is supported by the firearm's features, the legislative landscape, and statistical evidence.

Machineguns are particularly useful for criminal activity, such as intimidating rival drug traffickers or terrorizing the public, because they can fire hundreds or even thousands of rounds per minute and can kill many people within seconds. For this reason, machineguns are heavily regulated even apart from § 922(o). Twelve states and the District of Columbia prohibit private possession of machineguns that are properly registered under the National Firearms Act. Twenty-five more states ban or regulate private machinegun possession that fails to comply with federal law. And two states require registration without mentioning federal law.

Indeed, there are fewer than 176,000 legally registered machineguns in civilian hands, a number that pales in comparison to the 300 million to 500 million privately owned firearms in the United States. A legally transferable machinegun costs anywhere from $10,000 to $30,000, and the transfer is subject to a sometimes months-long approval process. And even assuming (counterfactually) that the 176,000 registered civilian machineguns were owned by 176,000 different citizens, only one in 1,908 Americans would legally own a machinegun, compared to the roughly one in three Americans who owns any type of firearm. Unlike firearms such as handguns, machineguns are not in common use for lawful purposes like self-defense. All

the circuits to consider the question have instead concluded that machineguns are dangerous and unusual weapons.  This Court should too.

2. The Supreme Court has already established that limiting the Second Amendment's protections to firearms "in common use" accords with the historical tradition of regulating "dangerous and unusual" weapons.  So this Court need not conduct any further historical inquiry once it concludes that machineguns are not in common use for lawful purposes.  But, in any event, the historical tradition of regulating dangerous and unusual weapons simply confirms that principle.  Before the founding, the common law and several colonial statutes punished those who carried dangerous or unusual weapons.  After the founding, states prohibited the possession or carry of various dangerous and unusual weapons, such as Bowie knives, dirks, slung shots, brass knuckles, billy clubs, and trap guns.  And when light, portable machineguns entered the civilian market in the mid-1920s, many states and Congress responded swiftly by passing laws strictly regulating such weapons.  Thus, § 922(o) is consistent with the principles underlying the nation's historical regulations on dangerous and unusual firearms.  Even if no identical laws existed at the founding, that is easily explained by significant technological and societal changes that began in the 1920s and 1930s.  Section 922(o) is consistent with historical tradition.

3. The district court's reasons for striking down § 922(o) were flawed. The court failed to take seriously the Supreme Court's repeated admonitions that firearms not typically possessed by law-abiding citizens for lawful purposes are not protected by the Second Amendment. Instead of assessing whether machineguns are in common use today, the district court required the government to produce specific historical analogues for § 922(o) that prohibited possession, rather than carrying, of similar weapons. But the proper historical inquiry looks at the "principles underlying the Second Amendment" and "permits more than just those regulations identical to ones that could be found in 1791." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Indeed, the Supreme Court in *Rahimi* relied on historical prohibitions on public *carry* to uphold a modern law prohibiting private *possession*. So the district court misunderstood the historical inquiry.

The district court also erred in concluding that machineguns are not unusual. The court wrongly focused on the total number of registered machineguns in the United States (more than 740,000), even though less than a quarter of those machineguns (just under 176,000) are registered to civilian owners. And the court placed too much weight on the *possibility* of legally possessing a pre-1986 machinegun, despite evidence that legally possessing such machineguns is not *common*.

**ARGUMENT**

## I. The District Court Erred by Holding That 18 U.S.C. § 922(o) Is Unconstitutional.

The district court erred by concluding that 18 U.S.C. § 922(o)'s prohibition on machinegun possession is unconstitutional. "[T]o declare an Act of Congress unconstitutional . . . is the gravest and most delicate duty that [a c]ourt is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring). The Supreme Court has said that "[p]roper respect for a coordinate branch of the government requires that [the Court] strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *National Federation of Indep. Business v. Sebelius*, 567 U.S. 519, 538 (2012) (brackets and quotation omitted).

The district court wrongly held that § 922(o) violates the Second Amendment as applied to Morgan even though that provision restricts a category of firearms that are not protected by the Second Amendment. More than two dozen other federal courts have considered § 922(o)'s constitutionality after *Bruen* and have unanimously upheld the statute.[2] This

---

[2] *See United States v. Johnson,* No. 24-CR-20083, 2024 WL 4612888, at *9-14 (E.D. Mich. Oct. 29, 2024) (criticizing the decision in this case as "flawed"); *DeWilde v. Attorney General*, No. 24-CV-84, 2024 WL 4643681, at *5-7 (D. Wyo. Oct. 16, 2024); *United States v. Brown*, No. 0:23-CR-186, 2024 WL 4241959, at *2-3 (D.S.C. Sept. 19, 2024); *United States v. Chan*, No. 22-CR-109, 2024 WL 4028019, at *5-6 (D. Haw. Sept. 3, 2024); *United States v.*

Court should follow those courts' sound analysis and reverse the decision

below.

---

*Barrow*, No. 1:23-CR-236, 2024 WL 3814041, at *2 (N.D. Ga. Aug. 13, 2024);
*United States v. Elliott*, No. 21-CR-88, 2024 WL 3161879, at *2 (E.D. La. June
24, 2024); *United States v. Caldwell*, No. 1:24-CR-70, 2024 WL 2784340, at *5
(N.D. Ohio May 30, 2024); *United States v. Mitchell*, --- F. Supp. 3d ---, No.
1:24-CR-9, 2024 WL 2272275, at *2-5 (N.D. Ohio May 20, 2024); *United States
v. Alsenat*, --- F. Supp. 3d ---, No. 0:23-CR-60209, 2024 WL 2270209, at *2-10
(S.D. Fla. May 20, 2024); *United States v. Hicks*, No. 23-CR-65, 2024 WL
1840326, at *2-5 (W.D. La. Apr. 26, 2024); *United States v. Berríos-Aquino*, No.
22-CR-473, 2024 WL 1468488, at *4-7 (D.P.R. Apr. 4, 2024); *United States v.
Cousar*, No. 23-CR-10004, 2024 WL 1406898, at *11-13 (D. Kan. Apr. 2,
2024); *United States v. Jackson*, No. 4:23-CR-62, 2024 WL 1160304, at *11
(N.D. Miss. Mar. 18, 2024); *United States v. Wilson*, No. 4:24-CR-027, 2024
WL 1144251, at *2-3 (N.D. Tex. Mar. 15, 2024); *United States v. Hernandez*, 721
F. Supp. 3d 310, 314-17 (D. Del. 2024); *United States v. Hart*, No. 23-CR-293,
2024 WL 893335, at *3 (D. Minn. Mar. 1, 2024); *United States v. Bachmann*,
No. 8:23-CR-304, 2024 WL 730489, at *1-3 (M.D. Fla. Feb. 22, 2024); *United
States v. Fisher*, No. 1:23-CR-45, 2024 WL 589115, at *1-3 (W.D.N.C. Feb. 13,
2024); *United States v. Berger*, 715 F. Supp. 3d 676, 680-97 (E.D. Pa. 2024);
*United States v. Williams*, No. 21-CR-745, 2024 WL 308460, at *2 (N.D. Ill.
Jan. 26, 2024);*United States v. Kelley*, No. 23-CR-267, 2024 WL 264588, at *1
(D. Minn. Jan. 24, 2024); *United States v. Wilson*, No. 2:23-CR-20081, 2023 WL
8288989, at *5 (W.D. Tenn. Nov. 7, 2023); *United States v. Delafose*, No. 2:23-
CR-185, 2023 WL 7368239, at *1-2 (W.D. La. Nov. 7, 2023); *United States v.
Sturgeon*, No. 23-CR-6, 2023 WL 6961618, at *3 (E.D. Ky. Oct. 20, 2023);
*United States v. Smith*, No. 23-CR-28, 2023 WL 6880423, at *1-2 (E.D. Ky. Oct.
18, 2023); *United States v. Lane*, 689 F. Supp. 3d 232, 249-53 (E.D. Va. 2023);
*United States v. Kittson*, No. 3:21-CR-75, 2023 WL 5015812, at *2-3 (D. Or.
Aug. 7, 2023); *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710,
at *2-3 (N.D. Ill. July 26, 2023); *Cox v. United States*, No. 11-CR-22, 2023 WL
4203261, at *7-8 (D. Alaska June 27, 2023); *United States v. Dixon*, No. 22-CR-
140, 2023 WL 2664076, at *2-5 (N.D. Ill. Mar. 28, 2023); *United States v.
Simien*, 655 F. Supp. 3d 540, 552-53 (W.D. Tex. 2023).

## A.  Standard of review

This Court reviews de novo a constitutional challenge to a statute. *United States v. Cox*, 906 F.3d 1170, 1178-79 (10th Cir. 2018).

## B.  Statutory background

Subject to two narrow exceptions, § 922(o) makes it "unlawful for any person to transfer or possess a machinegun."  18 U.S.C. § 922(o)(1).  The first exception is for machineguns transferred or possessed by government entities. § 922(o)(2)(A).  The second is for machineguns that were lawfully possessed before the statute's effective date in 1986.  18 U.S.C. § 922(o)(2)(B).  Section 922(o)'s enactment as part of the Firearm Owners' Protection Act in 1986 thus "capped" civilian ownership "at pre[-]1986 levels."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023).

A "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(24) (incorporating definition from Title 26).  The term also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."  26 U.S.C. § 5845(b).

**C.** **The Second Amendment does not protect firearms that are not typically possessed by law-abiding citizens for lawful purposes.**

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment "protect[s] an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). The right, however "was never thought to sweep indiscriminately." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

When considering whether a firearm regulation is constitutional, the appropriate test is based on "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92. Instead, the modern law "must comport with the principles underlying the Second Amendment." *Id.* at 692.

The Supreme Court has recognized an "important limitation on the right to keep and carry arms"—"the sorts of weapons protected [a]re those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Put another way, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Courts cannot look at the Amendment's text in isolation but must instead consider the text "according to the understandings of those who ratified it," *Bruen*, 597 U.S. at 28. And, as *Heller* explained, the right to bear arms was not understood in 1791 as "a right to keep and carry any weapon whatsoever," *Heller*, 554 U.S. at 626, but only as a right to possess firearms "'in common use at the time,'" *id.* at 627.

*Heller* went on to hold that the textual "common use" limitation also "accords with the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. The Court explained that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627. Thus, whether as a matter of text, history, or both, firearms that are not "in common use" for "lawful purposes" are unprotected.

The Supreme Court first applied the "common use" limitation in *Miller*, which upheld convictions for possession of unregistered short-barreled shotguns in violation of the National Firearms Act. *Miller*, 307 U.S. at 179.

*Miller* said it could not conclude that "the Second Amendment guarantees the right to keep and bear such an instrument [a short-barreled shotgun]," which was not "part of the ordinary military equipment." *Id.* at 178. Subsequently, *Heller* explained that *Miller*'s reference to "ordinary military equipment," "[r]ead in isolation," might be taken to mean that "only those weapons useful in warfare are protected." *Heller*, 554 U.S. at 624. But *Heller* rejected that "startling reading" of *Miller*, which "would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* Instead, *Heller* read *Miller* as holding that the Second Amendment protects the kinds of weapons used for militia service at the founding, that is, "arms 'in common use at the time' for lawful purposes like self-defense." *Id.* (quoting *Miller*, 307 U.S. at 179).

*Bruen* did not call into question *Miller* and *Heller*'s "common use" limitation. *Bruen* explained that *Heller* had "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Bruen*, 597 U.S. at 21. "For example," *Heller* had "found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"'" that the Second Amendment applies to weapons that are "in common use at the time." *Id.* (quoting *Heller*, 554 U.S. at 627). Later, *Bruen* again mentioned that, "[d]rawing from this historical tradition," *Heller*

had "explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). *Rahimi* too recognized that some jurisdictions at the founding "banned the carrying of 'dangerous and unusual weapons.'" *Rahimi*, 602 U.S. at 691. Accordingly, the Supreme Court has established that, consistent with the principles underlying the Second Amendment, the government may regulate firearms not typically possessed by law-abiding citizens for lawful purposes, such as dangerous and unusual weapons.

**D.    Machineguns are not in common use for lawful purposes.**

Machineguns are not protected by the Second Amendment because they are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, 627, but are instead "adapted for unlawful uses," *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116-17 (10th Cir. 2024).

Since *Heller*, multiple courts of appeals have upheld § 922(o) on the basis that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes." *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *see United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3rd Cir. 2016) (machineguns are "not in common use for lawful purposes"); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns

are dangerous and unusual and therefore not in common use."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (observing that "[a] machine gun is 'unusual'" and that "[o]utside of a few government-related uses, machine guns largely exist on the black market"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (challenge to § 922(o) was "foreclosed" by *Heller*'s statement that "'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (unpublished) (same).

The reasoning of those courts is supported by the relevant evidence. Machineguns are extraordinarily lethal. The Supreme Court has recognized "[t]he immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). As the Ninth Circuit has explained, "[a] modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. Thus, "[s]hort of bombs, missiles, and biochemical agents," that court could "conceive of few weapons that are more dangerous than machine guns." *Id.*

Moreover, machineguns are "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari); *see Polis*, 121 F.4th at 116-17 (observing that "the Second Amendment does not extend to weapons" that are "adapted

for unlawful uses"). As Congress has observed, machineguns are "used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954), and are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. Rep. No. 99-495, at 4 (1986).

The legislative landscape reflects this judgment and indicates that machineguns are not in common use for lawful purposes. Twelve states and the District of Columbia prohibit the possession of machineguns by private persons, regardless of whether they are properly registered under the National Firearms Act.[3] Another 25 states regulate or ban private machinegun possession while providing an exception or affirmative defense for machineguns possessed in compliance with federal law.[4] And two states,

---

[3] Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code Ann. tit. 11, § 1444(a)(5); D.C. Code Ann. § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Iowa Code §§ 724.1, 724.3; Mass. Gen. Laws ch. 140, § 131(o); Minn. Stat. § 609.67, subd. 2; N.J. Stat. Ann. § 2C:39-5(a); N.Y. Penal Law § 265.02(2); R.I. Gen. Laws § 11-47-8(a); Wis. Stat. § 941.26(1g)(a).

[4] Alaska Stat. § 11.61.200(a)(3), (c), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3), (F); Ark. Code Ann. §§ 5-73-204, 5-73-205; Conn. Gen. Stat. § 53-202(g), (h); Fla. Stat. § 790.221; Ga. Code Ann. §§ 16-11-122, 16-11-124; Ind. Code §§ 35-47-5-8, 35-47-5-10; Kan. Stat. Ann. § 21-6301(a)(5), (h); La. Stat. Ann. § 40:1752; Me. Stat. tit. 17-A, §§ 1051, 1052; Mich. Comp. Laws § 750.224(1), (3)(c); Mo. Rev. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350(1)(b); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11(K)(1),

without mentioning federal law, require registration of machineguns and make their public carry presumptively unlawful.[5] Thus, unlike with commonly owned firearms such as handguns, there is a nationwide legislative consensus of prohibiting or severely restricting the possession of machineguns.

Statistical evidence also shows that machineguns are not typically possessed by law-abiding citizens for lawful purposes. As of 2016, there were "175,977 pre-1986 civilian-owned machineguns in existence." *Hollis*, 827 F.3d at 449 (citing ATF statistics); *see* Record on Appeal at 167, *DeWilde v. Attorney General*, No. 23-8054 (10th Cir.) (2016 ATF letter). That is a tiny fraction of the 300 million to 500 million privately owned firearms in the United States.[6]

---

2923.17(A), (C)(5); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330; S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3), (d); Tex. Penal Code Ann. § 46.05(a)(1)(B); Wash. Rev. Code § 9.41.190(1), (4); W. Va. Code § 61-7-9.

[5] Md. Code Ann., Criminal Law §§ 4-403, 4-404, 4-405; Va. Code Ann. §§ 18.2-290, 18.2-291, 18.2-295.

[6] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/ (estimate of 494 million); Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers, at 4 (June 2018), https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf (estimate of 393 million); John Berrigan, et al., *The Number and Type of Private Firearms in the United States*, Annals of the American Academy of Political and Social Science, Vol. 704, Issue 1, at 82 (Nov. 2022) (estimate of 326 million in 2019).

And it pales in comparison even to the number of firearms manufactured in and imported into the United States every year, which has exceeded 20 million in recent years.[7]  Moreover, those approximately 176,000 civilian-owned machineguns are not spread over 176,000 civilians, because many are amassed by collectors who own multiple machineguns.[8]  But even assuming (wrongly) that those machineguns were spread among 176,000 civilians, only one in 1,908 Americans—roughly 0.05% of the population—would legally own a machinegun,[9] compared to the roughly one in three Americans who owns a firearm.[10]

Given the fixed supply of pre-1986 machineguns, the cost of a privately registered machinegun is extremely high. "[T]oday, a transferable M16 costs

---

[7] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/.

[8] *See* Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of the 630,000 in the U.S.* (Dec. 21, 2018), https://www.boisestatepublicradio.org/news/2018-12-21/automatic-weapons-are-legal-but-it-takes-a-lot-to-get-one-of-the-630-000-in-the-u-s (interviewing a collector with more than 20 machineguns).

[9] *See* U.S. Census Bureau, Happy New Year 2024!, https://www.census.gov/library/stories/2023/12/happy-new-year-2024.html (estimating a population of 335,893,238).

[10] *See* Pew Research Center, Key facts about Americans and guns, https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/.

nearly $30,000 while 'entry-level' machine guns cost in the ballpark of $10,000." Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273, 285 (2022). The current wait time for such a transfer (accomplished using ATF Form 4) is 137 days for paper forms and 28 days for electronic forms. *Id.* at 289 & n.81; ATF, Current Processing Times, https://www.atf.gov/resource-center/current-processing-times (as of Dec. 1, 2024). The limited number of pre-1986 machineguns in civilian hands, their high cost, and the difficulty of acquiring them all indicate that they are not "in common use" or "typically possessed by law-abiding citizens." *Heller*, 554 U.S. at 624-25, 627.

Accordingly, the other circuits to consider the question have all agreed that machineguns not typically possessed by law-abiding citizens for lawful purposes and are instead "dangerous and unusual." *See Fincher*, 538 F.3d at 874; *Hollis*, 827 F.3d at 451; *One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d at 142-44; *Henry*, 688 F.3d at 640. Indeed, *Heller* itself observed that it would be "startling" to conclude that "restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624. This Court should follow *Heller* and other circuits in holding that machineguns are not "typically possessed by law-abiding citizens for lawful purposes," but are instead "dangerous and unusual." *Id.* at 625, 627 (quotation omitted).

22

**E. Section 922(o) is consistent with the historical principle that the government may ban dangerous and unusual weapons.**

Because it prohibits possession only of firearms that are not typically possessed by law-abiding citizens for lawful purposes, § 922(o) is "consistent with the principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. As *Heller* explained, the "common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing 12 historical sources). Thus, *Heller* has already authoritatively established this principle, *see Rahimi*, 602 U.S. at 692, and this Court need not sift through any additional historical sources to double-check the Supreme Court's work.[11]

In any event, an array of historical laws confirms the principle that *Heller* recognized. In England, the 1328 Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 41-45. This statute was understood to provide that "[t]he offence of riding or going armed,

---

[11] This is not to say that the historical evidence does not support other constitutional principles justifying firearm regulation. *See Rahimi*, 602 U.S. at 702 (declining, like prior cases, to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" (quoting *Bruen*, 597 U.S. at 31)). For present purposes, however, the principle that governments may ban firearms that are not in common use for lawful purposes is sufficient to dispose of this case.

with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."  4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787); *see Rahimi*, 602 U.S. at 697-98.  In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

The American colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'"  *Bruen*, 597 U.S. at 47; *see Heller*, 554 U.S. at 627. Early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[12] Colonial Massachusetts (1692) and New Hampshire (1701) codified this authority, providing that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed

---

[12] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

offensively . . . by night or by day, in fear or affray of their majesties' liege people."[13]  In the late-18th century, the Commonwealth of Virginia (1786) similarly provided that no person shall "ride armed by night nor by day, . . . in terror of the Country,"[14] and the Commonwealth of Massachusetts (1795) later again directed justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[15]  Confirming that these early laws targeted not just "terror" but also dangerousness, the province of East New Jersey (1686) prohibited the *concealed* carry of "unusual and unlawful weapons."[16]  Although these statutes contemplated that an affray required "something more" than merely carrying any firearm in public, *Bruen*, 597 U.S.

---

[13] *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904).

[14] Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[15] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

[16] An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

at 50, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *see id.* at 46-47.

Throughout the 1800s, states adopted restrictions on a wide variety of dangerous and unusual weapons. For example, many states banned the sale, carry, or concealed carry of dangerous knives such as Bowie knives, Arkansas toothpicks, dirks, and daggers.[17] Many states also banned the possession, sale, carry, or concealed carry of blunt weapons such as slung shots, brass knuckles, and billy clubs.[18] Consistent with a colonial New Jersey (1771) statute that

---

[17] *See, e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200; Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76; Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148-49; Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148; Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129; Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56-57; Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17; Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724; Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175; Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231; Act of May 24, 1879, § 1, 1879 Ill. Laws 114-15; Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48; Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92; Act of April 16, 1881, § 4, 1881 Ill. Laws 74; Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33; Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602; Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32; Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51.

[18] *See, e.g.*, Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404; Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26; Act of Aug. 6, 1868, No. 13, ch.

made it a crime to "set any loaded Gun . . . intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance,"[19] various states in the 19th and 20th centuries criminalized the setting of "trap guns."[20]

In the mid-1920s, light, portable machineguns such as the Thompson submachine and the Browning Automatic Rifle became publicly available in the United States and began to be used by gangsters and criminals. *See* Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 60-63 (2023). Between 1925 and 1934, at least half the states responded to this societal problem by enacting anti-

---

1637, ch. 7, § 11, 1868 Fla. Laws 95; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32.

[19] Act of December 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346.

[20] *See, e.g.*, Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137; Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35; Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51; Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136; Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75; Penal Code, § 7094, 1895 N.D. Rev. Codes 1259; Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450; Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973; Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61; Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339; Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180-81; Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870; Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42; Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78; Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671; *see* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442.

machinegun laws, including comprehensive bans.[21]  Congress, too, responded

to the "law violator" and "his most dangerous weapon," S. Rep. No. 73-1444,

at 1-2 (1934), by enacting the National Firearms Act 1934, which imposed a

$200 tax on machineguns and required that they be registered with the federal

government, *see* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842,

5845(a)-(b).  The $200 tax was prohibitively expensive to most Americans, as it

was "equivalent to nearly $4,500 today."  W. Kip Viscusi & Kyle J. Blasinsky,

*Leveraging Public Support for Gun Laws to Reduce Mass Shootings*, 2024 U. Ill. L.

Rev. 707, 755 (2024).  The taxing and registration system made it more

---

[21] *See* Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.

difficult for "the criminal class" to obtain the weapons and made it easier to "convict [criminals] when they have the weapons." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. at 6, 12, 22 (statement of Attorney General Homer Cummings).

In 1986, Congress adopted § 922(o) as part of the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (1986). That provision "effectively freezes the number of legal machine guns in private hands at its 1986 level," *United States v. Kenney*, 91 F.3d 884, 885 (7th Cir. 1996), by making it illegal for "any person to transfer or possess a machinegun" unless the transfer or possession is (a) under the authority of a government entity or (b) involves a "machinegun that was lawfully possessed" before 1986, 18 U.S.C. § 922(o)(2)(A), (B). The transfer of a pre-1986 machinegun continues to be subject to a $200 tax. 26 U.S.C. § 5811(a).

Section 922(o) is consistent with the principles underlying this longstanding tradition of firearm regulation. English and American jurisdictions restricted the carrying of dangerous and unusual weapons even before the founding era. *See Rahimi*, 602 U.S. at 691. States restricted a variety of such weapons throughout the 1800s, apparently without "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. And many states—followed quickly by the federal government—began regulating

29

machineguns within a few years of their entry into civilian use.  Section 922(o)

is therefore part of a tradition of weapons regulation that goes back to the

founding.  And this longstanding tradition shows that the government may ban

firearms not typically possessed by law-abiding citizens for lawful purposes,

such as dangerous and unusual weapons.  *See Rahimi*, 602 U.S. at 724

(Kavanaugh, J., concurring) ("Post-ratification interpretations and applications

by government actors—at least when reasonably consistent and

longstanding—can be probative of the meaning of vague constitutional text.").

Post-ratification history is particularly relevant given that machineguns

are largely a 20th-century innovation.  As *Bruen* recognized, "unprecedented

societal concerns or dramatic technological changes may require a more

nuanced approach" to the analogical inquiry.  *Bruen*, 597 U.S. at 27.  The

invention of machineguns—particularly lightweight and publicly available

machineguns—represented a dramatic technological advancement.  Guns in

the 18th century generally fired only one shot, often misfired, and took a long

time to load.  See Randolph Roth, *Why Guns Are and Are Not the Problem, in*

Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in*

*Contemporary Debates on the Second Amendment* 117 (2019).

The 1920s, however, saw the introduction of firearms like the Browning

Automatic Rifle and Thompson submachine gun, which were lightweight,

maneuverable, and could fire automatically at rates exceeding 600 rounds per minute from magazines containing at least 20 (and up to 100) rounds.  Spitzer, *supra*, 51 Fordham Urb. L.J. at 61-63.  The availability of such machineguns in the civilian market brought with it new societal concerns, including the use of such weapons by gangsters and other criminals.  *Id.* at 62-63.  The fact that many states and the federal government quickly responded to these societal and technological developments with laws regulating machineguns—and the absence of "disputes regarding the lawfulness of such prohibitions," *Bruen*, 597 U.S. at 30—indicates that § 922(o) is consistent with the longstanding tradition of regulating dangerous and unusual weapons.  As Justice Kavanaugh explained in *Rahimi*, state and federal laws and practices "over time" have "often reflected and reinforced common understandings of the Constitution's authorizations and limitations."  *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

### F.     The district court's reasoning is flawed.

The district court committed several analytical errors in holding that § 922(o) is unconstitutional.  First, the district court improperly dismissed *Heller*'s statement that it would be "startling" to conclude that the National Firearms Act's restrictions on machineguns was unconstitutional.  App. 68; *see* App. 24.  Although that statement was "dicta" because "machineguns were

not at issue in *Heller*," App. 68, this Court considers itself "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *United States v. Simpkins*, 90 F.4th 1312, 1316 (10th Cir. 2024) (brackets and quotation omitted). As the government explained to the district court, App. 24-25, nothing in *Bruen* or *Rahimi* disturbed *Heller* or its understanding of *Miller*.

Second, the district court failed to take seriously *Heller*'s statements that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes" and that this "common use" limitation is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 625, 627. The district court treated dismissively the government's "suggest[ion]" that "the Second Amendment would allow weapons to be prohibited solely on the basis that they are 'dangerous and unusual' or 'highly unusual in society at large.'" App. 72 (quoting *Bruen*, 597 U.S. at 47). And the court instead assumed that the government must identify specific "historical analog[ue]s" to show that § 922(o) is "consistent with this nation's history of firearm regulation." App. 70.

The district court misunderstood the historical inquiry. As the Supreme Court recently clarified, the Second Amendment analysis does not require a

32

one-to-one comparison with historical laws, but instead focuses on broader "principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692. As Justice Barrett explained in concurrence, "[h]istorical regulations reveal a principle" that can then be applied to modern regulations. *Id.* at 740 (Barrett, J., concurring). Of course, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* But the "appropriate analysis" nevertheless "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (majority opinion).

Here, the Supreme Court has already authoritatively established a relevant principle: "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. *Heller* explained that this principle was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" citing eight historical treatises and four 19th-century court cases. *Id.* at 627.

Instead of simply applying this well-established principle and assessing whether machineguns are "in common use . . . for lawful purposes" or are instead "dangerous and unusual," the district court demanded more. It faulted the government for citing "only two potential historical analog[ue]s." App. 70.

The government's cited sources were simply two examples of the dozen sources that *Heller* cited to demonstrate a historical tradition of regulating "dangerous and unusual weapons." *Compare Heller*, 554 U.S. at 627, *with* App. 27-28 (citing Blackstone's *Commentaries* and *State v. Langford*, 3 Hawks 381 (N.C. 1824)). And the government thoroughly discussed *Heller*'s "conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms." App. 28. The government was not required to spell out all 12 historical sources cited by *Heller* or to cite additional historical support for a principle that the Supreme Court had already recognized was "fairly supported" by history. *Heller*, 554 U.S. at 627. Nor did the district court have authority to disagree with the Supreme Court's determination that the historical evidence supported this principle.

The district court wrongly suggested that the government had to point to historical laws prohibiting "the mere possession" of weapons like machineguns. App. 72. It pointed out that the government's cited laws involved carrying dangerous and unusual weapons "in a manner to terrorize the public." App. 71. But *Heller* relied on the historical tradition of "carrying" prohibitions to hold that weapons not in common use are not protected by the Second Amendment at all—meaning Congress may prohibit them. *See Heller*, 554 U.S. at 625 ("[T]he Second Amendment *does not protect* those weapons not

typically possessed by law-abiding citizens for lawful purposes . . . ." (emphasis added)); *id.* at 627 (indicating that the weapons "protected" by the Amendment are limited to those in common use).  And in *Rahimi*, the Supreme Court relied on historical laws regulating the public carry of firearms to uphold § 922(g)(8)'s application to a defendant's in-home firearm possession.  *Rahimi*, 602 U.S. at 697-98.  Accordingly, the government did more than enough to establish the relevant historical principle.  It did not need to point to historical laws burdening firearm possession in the exact same way as § 922(o).

Finally, the district court erroneously concluded that "machineguns are not unusual."  App. 73.  The court pointed out that "there are over 740,000 legally registered machineguns in the United States today."  App. 72 (brackets and quotation omitted); *see* Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021 at 16 (Exhibit 8), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.  This ignores the fact that most of those machineguns are registered to government entities.  As explained above (and in one of the cases the government cited below, *Hollis*, 827 F.3d at 449), fewer than 176,000 of those legally registered machineguns are in civilian hands.  That means less than one in 1,908 civilians owns a

machinegun.  As also explained, legally obtaining a machinegun is time-consuming and expensive, and many states strictly regulate machinegun possession.

The district court also placed too much weight on the fact that it is "perfectly legal" for a law-abiding citizen to "acquire and possess a machinegun" so long as he complies with the National Firearms Act.  App. 72-73.  As explained above, the Act's $200 tax was prohibitively expensive for most citizens in 1934, and the limited supply of legal machineguns today continues to make them quite expensive and difficult to acquire.  The fact that it is technically possible to obtain a machinegun—for upwards of $10,000 and subject to a lengthy approval process—does not mean that such weapons are in common use.  And even if *legally registered* machineguns were in common use for lawful purposes, that would not establish that *unregistered* machineguns were in common use for such purposes.  The district court accordingly erred in concluding that the weapons Morgan possessed were protected by the Second Amendment.

## CONCLUSION

This Court should reverse the judgment of the district court.

## STATEMENT REGARDING ORAL ARGUMENT

Because the district court found a federal statute unconstitutional and because there is no binding circuit precedent on this issue, the government believes oral argument will be helpful to the Court.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney

JAMES A. BROWN
Assistant United States Attorney
District of Kansas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because this brief contains 8,965 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER

**ADDENDUM**

Memorandum and Order Granting Motion to Dismiss

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                             Case No. 23-10047-JWB

TAMORI MORGAN,

     Defendant.

## MEMORANDUM AND ORDER NUNC PRO TUNC

Section II of the original memorandum and order (Doc. 35) erroneously referred to Defendant as Plaintiff in a few places. This memorandum and order is issued nunc pro tunc to correct that error. In all other material respects, the original memorandum and order remains unchanged. Document 35 is hereby stricken from the record.

**** 

This matter is before the court on Defendant's motion to dismiss based on Second Amendment grounds. (Doc. 26.) A response and a reply have been filed (Docs. 28, 29), and the court held a hearing to establish additional facts about the weapons charged. The motion is thus ripe for review. The court finds that the Second Amendment applies to the weapons charged because they are "bearable arms" within the original meaning of the amendment. The court further finds that the government has failed to establish that this nation's history of gun regulation justifies the application of 18 U.S.C. § 922(o) to Defendant. The court therefore grants the motion to dismiss.

## I.      Background

Defendant Tamori Morgan is charged with two counts of possessing a machinegun in violation of 18 U.S.C. § 922(o). (Doc. 1.) Specifically, Defendant is charged with possessing an

Anderson Manufacturing, model AM-15 .300 caliber machinegun and a machinegun conversion device. It was established at the hearing that the conversion device is a so-called "Glock switch" which allows a Glock, model 33, .357 SIG caliber firearm to fire as an automatic weapon.

## II.     Standard

Under the Second Amendment, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *D.C. v. Heller*, 554 U.S. 570, 582 (2008). To keep arms means, simply, to possess arms. *Id.* at 583. If the plain text of the Second Amendment applies to a defendant's conduct, the government has the burden to show that the regulation is consistent with this nation's historical firearm regulation tradition. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). This standard requires a "historical analogue" between the modern regulation and historical regulations, not a "historical twin." *United States v. Rahimi*, 144 S. Ct. 1889, 1902–03 (2024).

## III.    Analysis

Defendant argues that 18 U.S.C. § 922(o) is unconstitutional facially and as applied to him. (Doc. 26 at 1.) Defendant first argues that, under the first step of *Bruen*, the plain text of the Second Amendment applies to his conduct of possessing machineguns. (Doc. 26 at 6.) The government argues to the contrary, pointing to language in *Heller* that suggests the unconstitutionality of machinegun regulation would be "startling," and that the Second Amendment only applies to weapons that were commonly used by law-abiding citizens at the time of the Second Amendment's enactment. (Doc. 28 at 4 (citing *Heller*, 554 U.S. at 624–25).)

The Tenth Circuit has yet to apply *Bruen* to § 922(o).  Therefore the court starts its analysis at the beginning: the statutory text.  Section 922(o) generally makes it unlawful to "possess a machinegun."  *Id.*  Section 922 incorporates the definition of machinegun from 26 U.S.C. § 5845, which defines that term as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

§ 5845(b).  The court notes that this definition is extremely broad.  It does not, for instance, include a projectile in the definition like the definitions for a "rifle" or "shotgun" do under 18 U.S.C. § 921 or § 5845.  Nor does it require that a projectile or "shot" be expelled through the energy of an explosive or other propellant, as contemplated under the definitions of "rifle," "shotgun," "any other weapon" and "destructive" device" in § 5854(c) through (f), or the definitions of a "firearm," "shotgun," or "rifle" in § 921(a).  Thus, this definition seems to encompass everything from an aircraft-mounted automatic cannon to a small hand-held taser or stun gun that can easily be placed inside a handbag and which shoots multi-shot bursts of electrical particles with a single pull of the trigger, or a fully automatic BB gun that shoots multiple rounds of metal projectiles using compressed air.  The court is not, of course, faced with a situation where the government has charged someone under § 922(o) with illegal possession of a taser or a BB gun.  But the example of the aircraft-mounted gun seems fatal to Defendant's facial challenge.  Defendant fails to show how an example like that would constitute a "bearable arm" within the Second Amendment's protection.  And to succeed on a facial challenge, Defendant must show that § 922(o) is

unconstitutional in all its applications. *Rahimi*, 144 S. Ct. at 1888. The court thus proceeds to analyze Defendant's as-applied challenge.

Here, Defendant is charged with two counts of machinegun possession, and both counts apply to arms that can be carried in the hand. Thus, by definition, the machinegun and Glock switch are bearable arms within the plain text of the Second Amendment.[1] The government relies on *Heller* to argue that machineguns are not covered by the plain text of that amendment. The *Heller* language cited by the government is unavailing. First, the government's interpretation of *Heller* relies exclusively on dicta (and circuit authority that predates the historical analysis mandated in *Bruen*)—machineguns were not at issue in *Heller*. Second, the government's interpretation would run directly counter to the essential analysis in *Heller*: just as the Fourth Amendment applies to modern "searches," the Second Amendment applies to arms that did not exist at the country's founding. *Heller*, 554 U.S. at 582.

Third, the government relies on comments in *Heller* regarding *United States v. Miller*, 307 U.S. 174 (1939), for the proposition that machineguns are not covered by the Second Amendment. In *Miller*, the Supreme Court rejected a challenge to the National Firearms Act's prohibition against carrying an unregistered sawed-off shotgun across state lines. *See id.* at 175–77, 183. Interestingly, over half of the opinion in *Miller* was devoted to explaining how, in the years preceding and immediately following the enactment of the Second Amendment, one of the lawful purposes for which law-abiding citizens possessed modern (for that era) firearms was for service in the militia. *Id.* at 178–82. The Court surveyed several laws from that era that not only permitted, but essentially required, law-abiding citizens to provide for their own use modern military-style

---

[1] The government does not argue, nor does the court find, that the Glock switch is a mere accessory unprotected by the Second Amendment. *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (suppressor is an accessory unprotected by Second Amendment). The switch is, rather, an integral component of what makes the Glock to which it is attached a machinegun.

small arms.  *See id.* at 180–82.  Against that backdrop, the Court concluded that a sawed-off shotgun was not the type of weapon that would be useful for military service.  *See id.* at 178, 182–83.  In *Heller*, the Supreme Court simply observed that *Miller* fit within the tradition of regulating "dangerous and unusual weapons."  *Heller*, 554 U.S. at 627.  Moreover, it bears noting that, unlike § 922(o), the National Firearms Act does not categorically prohibit the possession of the sawed-off shotgun at issue in *Miller* or the firearms at issue in this case; rather, that act regulates possession of such weapons by restricting possession to those who comply with the registration and taxation requirements imposed under the act.  *See Miller*, 307 U.S. at 175; 26 U.S.C. § 5861. *Heller*, because it predates *Bruen*, however, certainly does not say that the Second Amendment does not apply to bearable machineguns.  It merely implies that restrictions on "dangerous and unusual weapons" can be consistent with this nation's history and tradition of firearm regulation. This touches on what is now the second step of *Bruen*, rather than the first step.  Suffice it to say that the weapons at issue in this case are bearable arms that, under *Bruen*'s first step, are covered by the plain text of the Second Amendment.  The court thus proceeds to the second step in the analysis.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."  *Bruen*, 597 U.S. at 24 (quotation omitted).  In *Heller*, the Supreme Court concluded that the Second Amendment "'guarantee[s] the individual right to *possess* and *carry* weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (emphasis added) (quoting *Heller*, 554 U.S. at 592).  It is worth noting at

the outset that the Court's language distinguishes between possessing and carrying weapons, and that § 922(o) prohibits the mere act of possessing a machinegun, without regard to whether the weapon is carried or otherwise employed.

Defendant argues that the government cannot meet its burden to show that § 922(o) is consistent with this nation's history of firearm regulation. (Doc. 26 at 8–9.) To meet its burden, the government advances only two potential historical analogs. First, the government points to English common law, which it asserts prohibited riding or going armed with dangerous or usual weapons. (Doc. 28 at 7 (citing 4 William Blackstone, Commentaries on the Laws of England 148–49 (1769).) Second, the government cites one case from the North Carolina Supreme Court in 1824 that recognized an offense to arm oneself "with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." (*Id.* at 7–8 (citing *State v. Langford*, 10 N.C. (3 Hawks) 381, 383 (NC 1824).) But both examples are disanalogous to what Defendant is charged with here—simple possession of a machinegun.

As to the government's first example, the Supreme Court addressed this history in *Bruen*. There, the Supreme Court observed that Blackstone's reference to English laws concerning going armed with dangerous and unusual weapons derived from the Statute of Northampton, an English statute from 1328 which generally provided that

> Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure."

*Bruen*, 597 U.S. at 40 (citation omitted). According to the Court, "[n]otwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Id.* at 41. It

was focused, for the most part, on conduct that evinced an intent to breach the peace, *id.*, and, in any event, was predicated on the manner in which arms were carried or displayed. *Bruen* considered an example of the application of the Statute of Northamptom to the conduct of Sir John Knight, who was charged with violating the statute based on allegations that he "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Id.* at 43 (citation omitted). The Court further observed that "one's conduct 'will come within the [Statute of Northampton],'—i.e., would terrify the King's subjects—only 'where the crime shall appear to be malo animo,' with evil intent or malice." *Bruen*, 597 U.S. at 44 (internal citation omitted). And by 1716 it was observed by another learned treatise that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." *Id.* at 45 (alteration in original) (citation omitted).

Turning to the government's second example, it asserts merely that "[i]n the United States, too, courts long ago acknowledged that a man commits 'an offence at common law' when he 'arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.'" (Doc. 28 at 7 (quoting *Langford*, 10 N.C. at 383).) The Supreme Court addressed this category of laws at some length in both *Bruen* and *Rahimi*, describing them as prohibitions against "going armed" or "affray," the latter word being a term derived from a French word meaning "to terrify." *See Rahimi*, 144 S. Ct. at 1900–01; *Bruen*, 597 U.S. at 46. Without belaboring the point, the Court observed that these laws combined the elements of going about in a manner to terrorize the public with dangerous and unusual weapons. *See generally Rahimi*, 144 S. Ct. 1900–01; *Bruen*, 597 U.S. at 46–50.

In contrast with the aforementioned historical examples, § 922(o) says nothing about the manner in which machineguns are carried or displayed.  Instead, § 922(o) criminalizes the mere possession of such weapons without regard to how the possessor uses them.  If an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner.  The statute requires no more than possession, and, more importantly in an as-applied challenge, the indictment in this case alleges nothing more.

Moreover, to the extent that the Second Amendment would allow weapons to be prohibited solely on the basis that they are "dangerous and unusual" or "highly unusual in society at large", *Bruen*, 597 U.S. at 47, as the government suggests, the government has not made that showing here.  As Defendant points out, "[t]here are over 740,000 legally registered machineguns in the United States today."  (Doc. 29 at 4 (citing Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States – Annual Statistical Update 2021.* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download).) Machineguns have been in existence for well over a century.  While the federal government has regulated transfer and possession of such weapons since passage of the National Firearms Act in 1934, it did not outright prohibit possession of machineguns until passage of the Firearms Owners Protection Act in 1986.  Even then, the law did not prohibit the possession of all machineguns; rather, § 922(o) merely prohibits possession of machineguns that were not lawfully possessed as of the date that prohibition went into effect in 1986.  § 922(o)(2)(B).  Thus, even today, it is perfectly legal for a person who has not been divested of his firearm rights under some other provision of law to acquire and possess a machinegun, so long as it was lawfully possessed by

someone before the relevant date in 1986, and so long as he complies with the National Firearms

Act's requirements to obtain and possess the weapon.  In that sense, machineguns are not unusual.

The government fails to address these facts, and thus fails to meet its burden to demonstrate that

possession of the types of weapons at issue in this case are lawfully prohibited under the Second

Amendment.

To summarize, in this case, the government has not met its burden under *Bruen* and *Rahimi*

to demonstrate through historical analogs that regulation of the weapons at issue in this case are

consistent with the nation's history of firearms regulation.  Indeed, the government has barely tried

to meet that burden.  And the Supreme Court has indicated that the *Bruen* analysis is not merely a

suggestion.  In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Tenth Circuit side-stepped

the *Bruen* analysis in a challenge to the prohibition against felons possessing firearms under 18

U.S.C. § 922(g)(1), concluding that *Bruen* did not abrogate the Tenth Circuit's prior decision,

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), which upheld the constitutionality of

§ 922(g)(1) in the face of a Second Amendment challenge..  *Vincent*, 80 F.4th at 1202.

Nevertheless, just last month the Supreme Court vacated *Vincent* and remanded for further

consideration in light of *Rahimi*.  *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (U.S. July

2, 2024).  The court interprets that as indicating that the Supreme Court means what it says: the

constitutionality of laws regulating the possession of firearms under the Second Amendment must

be evaluated under the *Bruen* framework.

Importantly, this decision says little about what the government might prove in some future

case.  Rather, under *Bruen*'s framework for evaluating Second Amendment challenges, it is the

government's burden to identify a historical analog to the restrictions challenged in this case.  This

the government has failed to do.  The court expresses no opinion as to whether the government

could, in some other case, meet its burden to show a historically analogous restriction that would justify § 922(o).

## IV.    Conclusion

The motion to dismiss on Second Amendment grounds (Doc. 26) is GRANTED.   The motion to dismiss on Commerce Clause grounds (Doc. 25) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: August 26, 2024                     /s/ John Broomes
                                           JOHN W. BROOMES
                                           UNITED STATES DISTRICT JUDGE