No. 24-3141

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

TAMORI MORGAN,
Defendant–Appellee.

———————————

On Appeal from the United States District Court
for the District of Kansas, No. 6:23-CR-10047
(Hon. John W. Broomes)

———————————

**APPELLANT'S APPENDIX FOR THE UNITED STATES**

———————————

KATE E. BRUBACHER
United States Attorney

JAMES A. BROWN
Assistant United States Attorney
District of Kansas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## TABLE OF CONTENTS

| **Date** | **Document** | **Page** |
|---|---|---|
| Docket | ............................................................................................... | 1 |
| 4/18/23 | Indictment (Dkt. 1) ....................................................... | 7 |
| 11/27/23 | Motion to Dismiss Counts 1 and 2 on Second Amendment Grounds (Dkt. 26) ....................................................... | 11 |
| 12/12/23 | Government's Response to the Defendant's Motion to Dismiss Counts One and Two of the Indictment on Second Amendment Grounds (Dkt. 28) ....................................................... | 21 |
| 8/1/24 | Transcript of Proceedings (Dkt. 44) ........................................... | 32 |
| 8/1/24 | Government's Notice of Filing Exhibits (Dkt. 33)...................... | 58 |
| 8/26/24 | Memorandum and Order Nunc Pro Tunc (Dkt. 36)................... | 65 |
| 9/20/24 | Notice of Appeal (Dkt. 38) ......................................................... | 75 |

# 6:23cr10047, USA v. Morgan

US District Court Criminal Docket

United States District Court, Kansas

(Wichita)

**This case was retrieved on 12/04/2024**

## Header

---

**Date Filed:** 04/18/2023
**Other Docket:** None

**Class Code:** Closed
**Closed:** 08/21/2024

## Participants

---

### Defendant

---

**Name**
Tamori Morgan
Appeals court case number: 24-3141 10 CCA
*TERMINATED: 08/21/2024*

David J. Freund
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Office of Federal Public Defender - Wichita
850 Epic Center 301 North Main Street
Wichita, KS 67202
USA
david_freund@fd.org
316-269-6445Fax: 316-269-6175Designation: Public
Defender or Community Defender Appointment

### Charges

---

**Complaints:** none

**Pending:** none

**Terminated:** 18:922(o) Unlawful possession of a machine
gun; 18:2 Aiding and abetting (INDICTMENT 4/18/2023)(1-2)
**Offense Level (Terminated):** Felony

**Case Assigned To:** District Judge John W. Broomes

### Disposition

---

Dismissed

## U.S. Attorneys

---

Aaron L. Smith

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

Office of United States Attorney - Wichita

301 N. Main Street, Suite 1200

Wichita, KS 67202-4812

App. 1

6:23cr10047, USA v. Morgan

USA

aaron.smith3@usdoj.gov

316-269-6561Fax: 316-269-6484Designation: Retained

Bryan C. Clark

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

Office of United States Attorney - KCKS

500 State Avenue, Suite 360

Kansas City, KS 66101

USA

bryan.clark@usdoj.gov

913-551-6742Fax: 913-551-6541Designation: Retained

James A. Brown

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

Office of United States Attorney - Topeka

290 US Courthouse 444 SE Quincy

Topeka, KS 66683-3592

USA

james.brown2@usdoj.gov

785-295-2850Fax: 785-295-2853Designation: Retained

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 04/18/2023 | INDICTMENT as to Tamori Morgan (1) - counts 1-2. (mam) (Entered: 04/19/2023) | |
| | 05/16/2023 | ARREST of Tamori Morgan. (jk) (Entered: 05/17/2023) | |
| 2 | 05/17/2023 | ARREST WARRANT returned executed on 5/16/2023 as to Tamori Morgan. (jk) (Entered: 05/17/2023) | |
| | 05/17/2023 | ORDER as to Tamori Morgan - Pursuant to the Due Process Protections Act, the government is reminded of its obligations pursuant to Brady v. Maryland and its progeny to disclose material that is favorable to the defendant and material to defendants guilt or punishment. The failure to do so in a timely manner may include dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, or any other remedy that is just under the circumstances. Signed by Magistrate Judge Kenneth G. Gale on 5/17/23. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cc) (Entered: 05/17/2023) | |
| 3 | 05/17/2023 | ORAL MOTION for Temporary Detention as to Tamori Morgan. (ca) (Entered: 05/17/2023) | |
| 4 | 05/17/2023 | MINUTE ENTRY for proceedings held before Magistrate Judge Kenneth G. Gale: RULE 5/INITIAL APPEARANCE and ARRAIGNMENT as to Tamori Morgan (1) Count 1-2 held on 5/17/2023. Attorney AFPD, David Freund appointed for defendant. 3 Oral Motion for temporary detention is granted. Detention | |

6:23cr10047, USA v. Morgan

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Hearing set for 5/19/2023 at 01:30 PM in Wichita Courtroom 406 (KGG) before Magistrate Judge Kenneth G. Gale. Remanded to custody. (Tape #1:36 - 1:39) (ca) (Entered: 05/17/2023) | |
| 5 | 05/17/2023 | CJA 23 FINANCIAL AFFIDAVIT by Tamori Morgan. (ca) (Entered: 05/17/2023) | |
| 6 | 05/17/2023 | ORDER OF TEMPORARY DETENTION PENDING HEARING as to Tamori Morgan. Detention Hearing set for 5/19/2023 at 01:30 PM in Wichita Courtroom 406 (KGG) before Magistrate Judge Kenneth G. Gale. Signed by Magistrate Judge Kenneth G. Gale on 5/17/2023. (ca) (Entered: 05/17/2023) | |
| 7 | 05/18/2023 | PRETRIAL AND CRIMINAL CASE MANAGEMENT ORDER ENTERED as to Tamori Morgan. Status Conference set for 7/3/2023 at 09:00 AM in Wichita Room 232 before District Judge John W. Broomes. Jury Trial set for 7/17/2023 at 09:00 AM in Wichita Courtroom 238 (JWB) before District Judge John W. Broomes. Signed by District Judge John W. Broomes on 05/18/2023. (jmr) (Entered: 05/18/2023) | |
| 9 | 05/19/2023 | MINUTE ENTRY for PRETRIAL CONFERENCE proceedings held 5/19/2023 before Magistrate Judge Kenneth G. Gale as to Tamori Morgan. Defense asks for a continuance of the detention hearing, so granted. Detention Hearing set for 5/26/2023 at 01:30 PM in Wichita Courtroom 406 (KGG) before Magistrate Judge Kenneth G. Gale. Defendant remanded to custody. (Tape #2:02 - 2:04) (jal) (Entered: 05/22/2023) | |
| 8 | 05/22/2023 | NOTICE OF HEARING as to Defendant Tamori Morgan  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING At the request of Defense and with no objection from the Government, Detention Hearing RESET for 5/26/2023 at 01:30 PM in Wichita Courtroom 406 (KGG) before Magistrate Judge Kenneth G. Gale. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(cc) (Entered: 05/22/2023) | |
| 10 | 05/26/2023 | MINUTE ENTRY for proceedings held before Magistrate Judge Kenneth G. Gale: PRETRIAL CONFERENCE as to Tamori Morgan held on 5/26/2023. Detention hearing continued at the request of the defense. Detention Hearing set for 5/31/2023 at 01:30 PM in Wichita Courtroom 406 (KGG) before Magistrate Judge Kenneth G. Gale. Defendant remanded to custody. (1:38-1:39) (kas) (Entered: 05/26/2023) | |
| 11 | 05/31/2023 | ORAL MOTION for Detention by USA as to Tamori Morgan. (mam) (Entered: 05/31/2023) | |
| 12 | 05/31/2023 | MINUTE ENTRY for proceedings held before Magistrate Judge Kenneth G. Gale: PRETRIAL CONFERENCE as to Tamori Morgan held on 5/31/2023. The Government's oral motion for detention is withdrawn (Doc. 11). Release is ordered with a $5,000 unsecured bond. The defendant's next appearance is before Judge Broomes per the Scheduling Order. (Tape #2:00-2:04) (mam) (Entered: 05/31/2023) | |
| 13 | 05/31/2023 | ORDER SETTING CONDITIONS OF RELEASE as to Tamori Morgan (1) - $5,000 unsecured bond. Signed by Magistrate Judge Kenneth G. Gale on 5/31/2023. (mam) (Entered: 05/31/2023) | |
| 14 | 05/31/2023 | BOND POSTED as to Tamori Morgan. (mam) (Entered: 05/31/2023) | |
| 15 | 06/15/2023 | MOTION to Continue  Pretrial Motions Deadline, Status Conference, and Jury Trial by Tamori Morgan. (Freund, David) (Entered: 06/15/2023) | |
| 16 | 06/15/2023 | ORDER granting 15 Motion to Continue. Speedy Trial time excluded from 7/17/2023 until 8/21/2023 as to Tamori Morgan (1). Motions due by 7/17/2023. Status Conference set for 8/7/2023 at 09:00 AM in Wichita Room 232 before District Judge John W. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Broomes. Jury Trial set for 8/21/2023 at 09:00 AM in Wichita Courtroom 238 (JWB) before District Judge John W. Broomes. Signed by District Judge John W. Broomes on 6/15/2023. (sz) (Entered: 06/15/2023) | |
| 17 | 07/17/2023 | MOTION to Continue  Pretrial Motions Deadline, Status Conference, and Jury Trial by Tamori Morgan. (Freund, David) (Entered: 07/17/2023) | |
| 18 | 07/19/2023 | ORDER granting 17 Motion to Continue. Speedy Trial time excluded from 8/21/2023 until 9/25/2023 as to Tamori Morgan (1). Motions due by 8/16/2023. Status Conference set for 9/11/2023 at 09:00 AM in Wichita Room 232 before District Judge John W. Broomes. Jury Trial set for 9/25/2023 at 09:00 AM in Wichita Courtroom 238 (JWB) before District Judge John W. Broomes. Signed by District Judge John W. Broomes on 7/19/2023. (sz) (Entered: 07/19/2023) | |
| 19 | 08/16/2023 | MOTION to Continue  Pretrial Motions Deadline, Status Conference, and Jury Trial by Tamori Morgan. (Freund, David) (Entered: 08/16/2023) | |
| 20 | 08/17/2023 | ORDER granting 19 Motion to Continue. Time excluded from September 25, 2023 until November 13, 2023 as to Tamori Morgan. Motions due by 10/2/2023. Jury Trial set for 11/13/2023 at 09:00 AM in Wichita Courtroom 238 (JWB) before District Judge John W. Broomes. Status Conference set for 10/30/2023 at 09:00 AM in Wichita Room 232 before District Judge John W. Broomes. Signed by District Judge John W. Broomes on August 17, 2023. (mls) (Entered: 08/17/2023) | |
| 21 | 09/28/2023 | MOTION to Continue  Pretrial Motions Deadline, Status Conference, and Jury Trial by Tamori Morgan. (Freund, David) (Entered: 09/28/2023) | |
| 22 | 10/02/2023 | ORDER granting 21 Motion to Continue. Time excluded from November 13, 2023 until January 22, 2024 as to Tamori Morgan. Motions due by 10/30/2023. Jury Trial set for 1/22/2024 at 09:00 AM in Wichita Courtroom 238 (JWB) before District Judge John W. Broomes. Status Conference set for 1/8/2024 at 09:00 AM in Wichita Room 232 before District Judge John W. Broomes. Signed by District Judge John W. Broomes on October 2, 2023. (mls) (Entered: 10/02/2023) | |
| 23 | 10/27/2023 | MOTION to Continue  Pretrial Motions Deadline by Tamori Morgan. (Freund, David) (Entered: 10/27/2023) | |
| 24 | 10/30/2023 | ORDER granting 23 Motion to Continue Pretrial Motions Deadline as to Tamori Morgan (1). Motions due by 11/27/2023. Signed by District Judge John W. Broomes on 10/30/2023. (mam) (Entered: 10/30/2023) | |
| 25 | 11/27/2023 | MOTION to dismiss counts 1 and 2 on Commerce Clause Grounds  by Tamori Morgan. (Freund, David) (Entered: 11/27/2023) | |
| 26 | 11/27/2023 | MOTION to dismiss counts 1 and 2 on Second Amendment Grounds  by Tamori Morgan. (Freund, David) (Entered: 11/27/2023) | |
| 27 | 12/12/2023 | RESPONSE TO MOTION by USA as to Tamori Morgan re 25 MOTION to dismiss counts 1 and 2 on Commerce Clause Grounds   (Smith, Aaron) (Entered: 12/12/2023) | |
| 28 | 12/12/2023 | RESPONSE TO MOTION by USA as to Tamori Morgan re 26 MOTION to dismiss counts 1 and 2 on Second Amendment Grounds   (Smith, Aaron) (Entered: 12/12/2023) | |
| 29 | 12/26/2023 | REPLY TO RESPONSE TO MOTION by Tamori Morgan re 26 MOTION to dismiss counts 1 and 2 on Second Amendment Grounds   (Freund, David) (Entered: 12/26/2023) | |

6:23cr10047, USA v. Morgan

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 30 | 01/05/2024 | NOTICE OF CANCELLED HEARING: In light of the pending Motions to Dismiss, the Status Conference set January 8, 2024 and Jury Trial set January 22, 2024 as to Tamori Morgan are cancelled to be rescheduled at a later date. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 01/05/2024) | |
| 31 | 07/19/2024 | NOTICE OF HEARING as to Defendant Tamori Morgan.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) In Court Hearing set for 7/30/2024 at 11:00 AM in Wichita Courtroom 238 (JWB)before District Judge John W. Broomes. (jmr) (Entered: 07/19/2024) | |
| 32 | 07/26/2024 | NOTICE OF HEARING as to Defendant Tamori Morgan.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) In Court Hearing RESET for 8/1/2024 at 01:00 PM in Wichita Courtroom 238 (JWB)before District Judge John W. Broomes. (jmr) (Entered: 07/26/2024) | |
| 33 | 08/01/2024 | NOTICE of Filing of Exhibits  by USA as to Tamori Morgan (Attachments: # 1 Attachment A)(Smith, Aaron) (Entered: 08/01/2024) | |
| 34 | 08/01/2024 | MINUTE ENTRY for proceedings held before District Judge John W. Broomes: IN COURT HEARING as to Tamori Morgan held on 8/1/2024. WITNESS: TED PETERSON (Court Reporter Jana McKinney) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 08/01/2024) | |
| 35 | 08/21/2024 | (STRICKEN per 36 ) -- MEMORANDUM AND ORDER denying as moot 25 Motion to Dismiss Counts and granting 26 Motion to Dismiss Counts as to defendant Tamori Morgan (1). Signed by District Judge John W. Broomes on 8/21/24. (msb) Modified on 8/26/2024, nunc pro tunc filed at 36 ). (mam) (Entered: 08/21/2024) | |
| 36 | 08/26/2024 | MEMORANDUM AND ORDER NUNC PRO TUNC as to Tamori Morgan. The motion to dismiss on Second Amendment grounds (Doc. 26 ) is granted. The motion to dismiss on Commerce Clause grounds (Doc. 25 ) is denied as moot. Signed by District Judge John W. Broomes on 8/26/2024. (mam) (Entered: 08/26/2024) | |
| 37 | 09/20/2024 | ENTRY OF APPEARANCE on behalf of USA by Bryan C. Clark (Clark, Bryan) (Entered: 09/20/2024) | |
| 38 | 09/20/2024 | NOTICE OF APPEAL TO 10CCA as to defendant Tamori Morgan re 36 Memorandum Opinion, 35 Order on Motion to Dismiss Counts,, Order on Motion to Dismiss Indictment, (Clark, Bryan) (Entered: 09/20/2024) | |
| | 09/20/2024 | APPEAL FEE STATUS: Government appeal - Filing fee waived re: 38 Notice of Appeal - Final Judgment. (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (jal) (Entered: 09/20/2024) | |
| 39 | 09/20/2024 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA as to Tamori Morgan re 38 Notice of Appeal - Final Judgment. (Attachments: # 1 Preliminary Packet) (jal) (Entered: 09/20/2024) | |
| 40 | 09/20/2024 | APPEAL DOCKETED in 10CCA on 9/20/2024 and assigned Appeal No. 24-3141 re 38 Notice of Appeal - Final Judgment filed by USA as to Tamori Morgan. (jal) (Entered: 09/20/2024) | |
| 41 | 10/02/2024 | ORDER of 10CCA as to Tamori Morgan re 38 Notice of Appeal. The Federal Public Defender for the District of Kansas is appointed as counsel of record to represent the appellee Tamori Morgan. This appointment is effective nunc pro tunc to the date the notice of appeal was filed in this matter. (Appeal No. 24-3141) (kao) (Entered: 10/02/2024) | |

6:23cr10047, USA v. Morgan

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 42 | 10/02/2024 | ENTRY OF APPEARANCE on behalf of USA by James A. Brown AUSA (Brown, James) (Entered: 10/02/2024) | |
| 43 | 10/02/2024 | TRANSCRIPT ORDER FORM: Transcript Requested Hearing on 8-1-2024 re 38 Notice of Appeal - Final Judgment filed by USA (Brown, James) (Entered: 10/02/2024) | |
| 44 | 10/02/2024 | TRANSCRIPT of Motion Hearing held August 1, 2024 as to Tamori Morgan before Judge John W. Broomes, Court Reporter Jana McKinney, 316-315-4268, jana_mckinney@ksd.uscourts.gov. Transcript purchased by: Mr. James Brown. NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the court reporter or through PACER. Release of Transcript Restriction set for 12/31/2024. (jlm) (Entered: 10/02/2024) | |
| 45 | 10/03/2024 | LETTER TO 10CCA stating record is complete as to Tamori Morgan re 38 Notice of Appeal - Final Judgment. ( Appeal No. 24-3141) (sz) (Entered: 10/03/2024) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

**App. 6**

# UNITED STATES DISTRICT COURT
### District of Kansas
(Wichita Docket)

UNITED STATES OF AMERICA,

                Plaintiff,

      v.                            CASE NO. 6:23-cr-10047-JWB

TAMORI MORGAN,

                Defendant.

# INDICTMENT

**THE GRAND JURY CHARGES**:

## COUNT 1

### UNLAWFUL POSSESSION
### OF A MACHINEGUN
### (18 U.S.C. § 922(o))

On or about October 17, 2022, in the District of Kansas, the defendant,

**TAMORI MORGAN,**

the defendant herein, did knowingly and unlawfully possess a machinegun, that is

an Anderson Manufacturing, model AM-15 .300 caliber machinegun.

In violation of Title 18, United States Code, Section 922(o) and Title 18,

United States Code, Section 2.

**App. 7**

## COUNT 2

**UNLAWFUL POSSESSION
OF A MACHINEGUN
(18 U.S.C. § 922(o))**

On or about October 17, 2022, in the District of Kansas, the defendant,

**TAMORI MORGAN,**

the defendant herein, did knowingly and unlawfully possess a machinegun, that is a

machinegun conversion device, of an unknown manufacturer.

In violation of Title 18, United States Code, Section 922(o) and Title 18,

United States Code, Section 2.

## FORFEITURE NOTICE

1.      The allegations contained in Counts 1 - 2 of this Indictment are hereby

realleged and incorporated by reference for the purpose of alleging forfeiture.

2.      Upon conviction of one or more of the offenses set forth in Counts 1 - 2 of

this Indictment, the defendant, shall forfeit to the United States pursuant to Title 18,

United States Code, Section 924(d), and Title 28, United States Code, Section 2461(c),

any firearms or ammunition involved in the commission of the offenses, including, but

not limited to:

      A.      Anderson Manufacturing, model AM-15, .300 AAC Blackout
            caliber firearm, S/N 21401706;
      B.      Glock, model 33, .357 SIG caliber firearm, S/N BMXX745;
      C.      black conversion device, unknown manufacturer, no serial number;
      D.      ammunition.

**App. 8**

All pursuant to Title 18, United States Code, Section 924(d), and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

 April 18, 2023                                    s/Foreperson
DATE                                      FOREPERSON OF THE GRAND JURY

KATE E. BRUBACHER
UNITED STATES ATTORNEY

By: /s/ Aaron L. Smith
AARON L. SMITH
Assistant United States Attorney
District of Kansas
1200 Epic Center, 301 N. Main
Wichita, Kansas  67202
Ph: (316) 269-6481
Fax: (316) 269-6484
Email: aaron.smith3@usdoj.gov
Ks. S. Ct. No. 20447

IT IS REQUESTED THAT THE TRIAL BE HELD IN WICHITA, KANSAS

App. 9

<u>**PENALTIES**</u>

**Counts 1 - 2          18 U.S.C. § 922(o)**

- Punishable by a term of imprisonment of not more than ten (10) years.  18 U.S.C. § 924(a)(2).

- A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

4

**App. 10**

**In the United States District Court**
**for the District of Kansas**

---

**United States of America**,
        Plaintiff,

v.                                     Case No. 23-10047-01 JWB

**Tamori Morgan**,
        Defendant.

---

**Motion to Dismiss Counts 1 and 2**
**on Second Amendment Grounds**

---

Tamori Morgan moves this Court to dismiss Counts 1 and 2 of the Indictment, each alleging a violation of 18 U.S.C. § 922(o). Because the Second Amendment extends to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding, 18 U.S.C. § 922(o) offends the history and tradition of the Second Amendment of the United States Constitution by imposing a blanket prohibition on machineguns that is both facially unconstitutional and unconstitutional as applied to Mr. Morgan.

## I.  The government's allegations

In April 2023, a federal grand jury in Wichita returned a two-count indictment against Mr. Morgan. D.E.1 at 1. Counts 1 and 2 of the Indictment each allege a violation of 18 U.S.C. § 922(o). *Id*. Both Counts 1 and 2 state that Mr. Morgan "did knowingly and unlawfully possess a machine gun." *Id*. Specifically, in Count 1 the machine gun is described as an "Anderson Manufacturing model AM-15, .300 caliber machinegun." In Count 2, the machinegun is described as a "machinegun

1

**App. 11**

conversion device of an unknown manufacturer." *Id*. Neither Count 1 or 2 alleges that the firearm was possessed in or affecting commerce nor that they were transferred.

## II. This motion is proper under Federal Rule of Criminal Procedure 12

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) permits a defendant to move to dismiss an indictment for failure to state an offense. One basis for such a motion is that the charged statute is unconstitutional. *United States v. Herrera*, 51 F.4th 1226, 1284 (10th Cir. 2022). Challenges to the constitutionality of a statute generally come in two forms: facial challenges and as-applied challenges. *See id*. at 1282. But these constructs aren't "mutually exclusive." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 914 (10th Cir. 2016). A claim can be as-applied in the sense that it does not seek to strike the statute's application in all cases, but facial in the sense that it is not limited to the defendant's particular case. *Id*.

A defendant "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal citations omitted). A "facial challenge is…an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." On the other hand, "[a]n as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *Id*. Although distinct legal concepts that go to "the breadth of the remedy employed by the Court," "the distinction between facial and as-applied challenges is

2

**App. 12**

not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation," and therefore the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 139 S.Ct. 1112, 1127 (2019). *See also Gross v. United States*, 771 F.3d 10, 14-15 (D.C. Cir. 2014) ("[T]he substantive rule of law is the same for both challenges.").

### III.  The challenge presented

Mr. Morgan presents a challenge that "obviously has characteristics of both" as applied and facial challenges. *Supreme Court of New Mexico*, 839 F.3d at 907. Mr. Morgan challenges that to the extent § 922(o) bans the weapons alleged in Count 1, an Anderson Manufacturing model AM-15, .300 caliber machinegun, D.E. 1 at 1; and in Count 2, a machinegun conversion device, D.E. 1, at 2, it is unconstitutional. Our challenge is as applied in the sense that we're asking the Court to strike those provisions of the statute charged by the government in this case (and not any uncharged provisions). Here, the government does not allege a machinegun "transfer." *See* 18 U.S.C. § 922(o). So we "focus[] on only the constitutional validity of the subset of applications" charged by the government. *Supreme Court of New Mexico*, 839 F.3d at 915 (10th Cir. 2016).

The issue raised by Mr. Morgan is unimpaired by Tenth Circuit precedent. In *United States v. Haney*, 264 F.3d 1161, 1165 (10th Cir. 2001), the Tenth Circuit held

**App. 13**

that § 922(o) is facially constitutional. *Haney* "h[eld] that a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia." *Haney*, 264 F.3d. at 1165. That interpretation of the Second Amendment was overruled by *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Moreover, whatever the status of *Haney* in the Tenth Circuit, it does not preclude Mr. Morgan's as applied challenge.

## IV.   The Second Amendment

The Second Amended provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II. This amendment confers an individual right to keep and bear (or carry) arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008); *United States v. Cox*, 906 F.3d 1170, 1184 (10th Cir. 2018).

### A. *Bruen* and *Heller* establish the test for Second Amendment challenges

"*Heller*'s methodology centered on constitutional text and history." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128-29 (2022). In the years that followed *Heller*, most Courts of Appeals coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. The Tenth Circuit was one such Circuit. *United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

**App. 14**

But in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022), the Supreme Court declined to adopt means-end scrutiny. Instead, the Supreme Court announced a different "historical approach." *Id.* at 2129. Because the Court wholly rejected means-end scrutiny, it is unnecessary to retrace the history of the means-end approach. The Supreme Court has exhaustively set forth its disagreement and rejection of that two-step analysis. *Id.* at 2127 – 2129. Here, it is enough that the Supreme Court unequivocally announced, "despite the popularity of this two-step approach, it is one step too many." *Id.*

Instead, the Supreme Court set forth a different "historical approach." *Id.*

> That when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id* at 2126. The question here is thus whether stripping someone of their right to possess a machinegun without exception is consistent with the Nation's historical tradition of firearm regulation. If it is not, then § 922(o) is unconstitutional no matter the reasonableness of the policy it embodies. To answer that question,

**App. 15**

Courts within the Tenth Circuit[1] and beyond[2] have derived a new two-step analysis from the Supreme Court's discussion in *Bruen*. The first step is to determine whether the Second Amendment's plain text covers the conduct. If it does, in the second step, the government bears the burden to show the regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. 2111, 2135.

### B. The plain text of the Second Amendment covers the possession of a firearm

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2129–30. "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Thus, Mr. Morgan's alleged conduct, possessing a firearm, is presumptively protected by the Second Amendment. *See Bruen*, 142 S.Ct. 2111 at 2134 (holding that Second Amendment covers "carrying handguns publicly for self-defense").

The government may seek to curtail Mr. Morgan's presumptively constitutional conduct by relying on the characteristics of the firearm alleged, i.e., that is a particular subset of firearms – a machinegun – that should be treated differently. As a threshold matter, such an argument would be "bordering on the frivolous."

---

[1] *See e.g. United States v. Harrison*, Case No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023); *United States v. Lewis*, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Carrero*, Case No. 2 22-cr-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Gray*, No. 22-cr-00247-CNS, 2022 WL 16855696 (D. Colo. Nov. 10, 2022).

[2] *United States v. Daniels*, No. 22-60596, 2023 WL 5091317, at *3 (5th Cir. Aug. 9, 2023); *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *7 (9th Cir. Aug. 7, 2023).

**App. 16**

*Heller*, 554 U.S. at 582. The Second Amendment is not limited to "only those arms in existence in the 18th century," it extends "to all instruments that constitute bearable arms." *Id.*

That an "arm" "shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C. § 5845(b), does not mean that the "arm" is not, in fact, an "arm." A fully automatic handgun is obviously an "arm" that can be used in self-defense. *See Heller*, 554 U.S. at 581 (noting "all firearms constituted 'arms'" at the founding) (quotation omitted). Indeed, what better "arm" to use for self-defense? It would be a perverse reading of the Second Amendment's right to bear "arms" for self-defense to exclude from protection the "arms" that most effectively defend us from others.

This same reasoning applies to the "conversion device" alleged in Count 2. Under § 5845(b), a "machinegun" also means "any part designed and intended solely and exclusively … for use in converting a weapon into a machinegun." 18 U.S.C. § 5845(b). Yet, that device is used for self-defense. Thus, it should be considered an "arm" under the Second Amendment. *See*, *e.g.*, *Heller*, 554 U.S. at 581 (broadly defining an "arm" as "'any thing that a man … takes into his hands").

This Court may determine it is bound by Tenth Circuit precedent to deny this motion as to the conversion device alleged in Count 2 of the Indictment. See *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (firearm silencer is a firearm accessory and not a weapon in itself and thus not a bearable arm covered by the

**App. 17**

Second Amendment). If so, we present this issue nonetheless for preservation purposes, and in case this Court is inclined to weigh in on the issue in anticipation of further review.

### C. The government cannot meet its burden to show 18 U.S.C. § 922(o) is consistent with this Nation's historical tradition of firearm regulation

Mr. Morgan, and all of "the people," enjoy a presumptive right to possess firearms. To strip the people of that right via § 922(o), the government bears the burden to show the statute is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2135. The Supreme Court has made clear that the principle of party presentation applies at this step and that it is the government who must come forward with historical sources to meet this burden. *Bruen*, 142 S.Ct. at 2130, n.6 (reminding the "Court to decide a case based on the historical record compiled by the parties."). "Only by showing that the law does not tread on the historical scope of the right can the government 'justify its regulation.'" *Daniels*, 2023 WL 5091317, at *3 (citing *Bruen*, 142 S.Ct. at 2130.). This Court should "hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden." *Id*.

To whatever extent the government tries to meet its burden, we note, however, the history of barring possession of machineguns is limited and relatively recent. Congress first passed § 922(o) in 1968. *See* Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 et seq.). This was the first time in the Nation's history that Congress enacted such a ban. The government cannot rely on

**App. 18**

the passage of a mid-twentieth century statute to establish a long-standing historical tradition dating back to the enactment of the Second Amendment. *See Bruen*, 142 S.Ct. at 2137. Indeed, machineguns lawfully possessed before May 19, 1986, are specifically excluded from prohibition by § 922(o)(2)(B). With that said, we again note that it's the government's burden. To the extent the government attempts to meet that burden in this case with historical sources, we will reply accordingly.

### V. Conclusion

For the foregoing reasons, this Court should declare 18 U.S.C. § 922(o) unconstitutional (whether facially or as-applied) and dismiss Counts One and Two of the Indictment.

Respectfully submitted,

s/David J. Freund

DAVID J. FREUND
Sup. Ct. No. 17736
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: 316-269-6445
Fax:  316-269-6175
Email: david_freund@fd.org

**App. 19**

### **Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court on November 27, 2023, by using the CM/ECF system, which will send a notice of electronic filing to the following:

Aaron Smith
Assistant United States Attorney
Aaron.Smith3@usdoj.gov

s/David J. Freund
DAVID J. FREUND # 17736

**App. 20**

# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS
### (Wichita Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TAMORI MORGAN,

        Defendant.

CASE NO.: 23-10047-01-JWB

---

### GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT ON SECOND AMENDMENT GROUNDS
(Doc. 26)

---

APPEAR NOW the United States of America, by and through Aaron Smith, Assistant United States Attorney, and respectfully submit the following in response to the defendant's motion to dismiss Counts One and Two of the Indictment on Second Amendment grounds (Doc. 26).

**App. 21**

I.       THE DEFENDANT'S MOTION

The defendant moves this Court to dismiss both Counts of the Indictment (Doc. 1),
charging violations of 18 U.S.C. § 922(o)— possession of a machinegun.  (Doc. 26 at 1-
10.)[1]  The defendant maintains that Section 922(o) "offends the history and tradition of the
Second Amendment . . . by imposing a blanket prohibition on machineguns that is both
facially unconstitutional and unconstitutional as applied to [him]."  *Id.* at 1.

II.      ARGUMENT

A. Legal Standard

The Second Amendment to the Constitution provides that "[a] well-regulated
Militia, being necessary to the security of a free State, the right of the people to keep and
bear Arms, shall not be infringed."  U.S. Const. amend. II.  However, "[l]ike most rights,
the right secured by the Second Amendment is not unlimited; it does not allow every person
"to keep and carry any weapons whatsoever in any manner whatsoever and for whatever
purpose."  *District of Columbia v. Heller,* 554 U.S. 570, 626 (2008).  In evaluating what
limitations Congress can impose on citizens' Second Amendment rights, the Supreme
Court has directed courts to ask two questions: (1) whether "the Second Amendment's
plain text covers an individual's conduct," *New York State Rifle & Pistol Ass'n v. Bruen,*

---

[1] The National Firearms Act of 1934 ("NFA") defines "machinegun" as "any weapon which shoots, is
designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual
reloading, by a single function of the trigger" as well as "the frame or receiver of any such weapon, any
part designed and intended solely and exclusively, or combination of parts designed and intended, for use
in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be
assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).  That
definition has been incorporated into Title 18 by reference. *See* 18 U.S.C. § 921(a)(24) ("The term
'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C.
5845(b)).").

**App. 22**

142 S. Ct. 2111, 2129–30 (2022), and (2) if not, whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

  B. Section 922(o)'s Prohibition on the Possession of Machineguns is Constitutional.

   1. Possession of Machineguns is Not Protected Under the Plain Text of the Second Amendment.

Section 922(o), which was enacted in 1986, bans the transfer or possession of a machinegun.  It carves out exceptions for (1) the transfer to, or possession by, a person acting under authority of the United States, or (2) any lawful transfer or possession of a machinegun that was lawfully possessed before the statute's enactment.

The defendant attempts to mount a facial and as applied challenge to this statute. (Doc. 26 at 3.)  A facial challenge is generally "the most difficult . . . to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and the defendant's facial challenge here is particularly meritless given the Supreme Court's clear pronouncement that the Second Amendment's plain text does not cover machineguns.  The defendant's as-applied challenge is similarly flawed as he is essentially making the same argument under both categories, namely, "whether stripping someone of their right to possess a machinegun without exception is consistent with the Nation's historical tradition of firearm regulation."  (Doc. 26 at 5.)

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld against a Second Amendment challenge to two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236.  Nearly 70 years later, in *Heller*, the Supreme Court affirmed

**App. 23**

*Miller*, explaining that *Miller's* "basis for saying that the Second Amendment did not apply was . . . that the *type of weapon at issue* was not eligible for Second Amendment protection." 554 U.S. at 622 (emphasis in original). *Heller* itself characterized as "startling" the notion that "the [NFA]'s restrictions on machineguns . . . might be unconstitutional." *Id*. at 624. *Heller* concluded: "We . . . read *Miller* to say only that the Second Amendment does not protect those weapons *not typically possessed by law-abiding citizens for lawful purposes*, such as short-barreled shotguns." *Id*. at 625 (emphasis added). It continued: "That accords with the historical understanding of the scope of the right." *Id*. *Heller* returned to *Miller* at its conclusion of the opinion. It wrote:

> *Miller* said, as we have explained, that the sorts of weapons protected were those "*in common use at the time*." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 627 (citing *Miller*, 307 U.S. at 179).

In other words, under *Heller*, the Second Amendment does not protect those weapons that were "not in common use at the time" of its passage and that were not "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625, 627. And the defendant falls remarkably short of demonstrating how the plain text of the Second Amendment covers his possession of a machinegun as a firearm "in common use at the time" by private citizens.

Without question, nothing in *Bruen* disturbed *Miller* or *Heller*. Instead, both concurrences in *Bruen* emphasized the narrow scope of its holding. Justice Alito, concurring, wrote that "our holding decides nothing about who may lawfully possess a

firearm.  Nor have we disturbed anything that we said in *Heller* or [*McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010)] about restrictions that may be imposed on the possession or carrying of guns."  142 S. Ct. at 2157.  Justice Kavanaugh, joined by Chief Justice Roberts in a separate concurring opinion, noted that as the Supreme Court had previously explained in *Heller* and *McDonald*, "the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check" and that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *Id.* at 2162 (cleaned up).

Courts have likewise relied on *Heller* to conclude that machineguns fall outside the Second Amendment's scope.  *See*, *e.g., United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3rd Cir. 2016) (finding "the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes.");  *Hollis v. Lynch*, 827 F.3d 436, 449-51 (5th Cir. 2016) (finding that machineguns do not receive Second Amendment protection because they are dangerous and unusual);  *Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009) (finding the right to keep and bear arms does not authorize an unlicensed individual to possess unregistered machine guns for personal use);  *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid.");  *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008) (finding machineguns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use);  *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012) (finding that short of bombs, missiles, and biochemical agents, few weapons

**App. 25**

are more dangerous than machineguns and thus the Second Amendment does not apply); *cf. United States v. Lucero*, 43 F. App'x 299, 301 (10th Cir. 2002) (Lucero, J. concurring) ("I am not persuaded that the semi-automatic rifle and fully automatic "machineguns" which defendant sold to federal agents, and which have been outlawed by federal legislation, are the type of arms subject to Second Amendment protection.").

The Fourth Circuit, sitting *en banc*, relied on similar reasoning to hold that semi-automatic assault rifles, like an AR-15 and large-capacity magazines, fell outside the Second Amendment.  *See Kolbe v. Hogan*, 849 F.3d 114, 135-37 (4th Cir. 2017).  The Fourth Circuit explained: "Are the banned assault weapons and large-capacity magazines "like" "M-16 rifles," i.e., "weapons that are most useful in military service," and thus outside the ambit of the Second Amendment? The answer to that dispositive and relatively easy inquiry is plainly in the affirmative."  *Kolbe*, 849 F.3d at 136 (citing *Heller*, 554 U.S. at 627).

In light of binding Supreme Court precedent holding that the Second Amendment protects only those weapons "in common use" by private citizens at the time of its enactment—and the persuasive authority afforded by numerous federal appeals courts extending that conclusion expressly to machineguns—this Court should deny defendant's motion to dismiss both counts of the Indictment because the plain text of the Second Amendment does not cover the possession of machineguns.

**App. 26**

   2.  <u>Prohibiting the Possession of Machineguns is Consistent with the Nation's Historical Tradition of Firearm Regulation</u>.

Even if this Court were to conclude that the Second Amendment's plain text protects the possession of machineguns, (it doesn't), Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2129–30.

To assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," *Bruen* contemplated two avenues of inquiry: (1) a "straightforward historical inquiry" to search for, most relevant here, historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy," for instances where there is no such straightforward correspondence between the challenged law and predecessors. *Id.* at 2131-34.

For purposes of defendant's challenge to Section 922(o), the "straightforward historical inquiry" that *Bruen* described suffices. *Heller* explained—and *Bruen* did not disturb—that this nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 637. For example, under English common law, "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769). In the United States, too, courts long ago acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381,

**App. 27**

383 (NC 1824).  For that reason, the Second Amendment encompasses only arms "of the kind in common use."  *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179).

Indeed, the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  *Heller*, 554 U.S. at 624.  *Heller* recognized that "[i]t may be objected that if weapons that are most useful in [modern] military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" that refers to militias.  *Id.* at 627-28.  But *Heller* explained that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right."  *Id.* at 628.  *Bruen* did not change this aspect of *Heller*.  Instead, *Bruen* reaffirmed *Heller's* finding that there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-149: *Miller*, 307 U.S. at 179).

Considering *Heller*'s conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms—a conclusion rooted in a variety of historical resources wholly unrefuted by defendant—this Court should reject defendant's constitutional challenge to Section 922(o) on historical grounds, assuming it does not already conclude that the plain text of the Second Amendment does not cover the possession of machineguns.

**App. 28**

Finally, whereas machineguns are universally regarded as dangerous and unusual weapons, it is unsurprising that federal courts have continued to reject Second Amendment challenges to Section 922(o) following *Bruen*. *See, e.g.*, *United States v. Sturgeon*, 2023 WL 6961618, at *3 (E.D. Kent. Oct. 20, 2023) (noting that "while no district court in the Sixth Circuit has had an opportunity to opine on the constitutionality of § 922(o), no other district courts have accepted a post-*Bruen* challenge to § 922(o)"); *United States v. Delafose*, 2023 WL 7368239, at *2 (W.D. La. Nov. 7, 2023) ("As with felon dispossession, the court can find nothing in *Bruen* that calls into question longstanding restrictions on ownership of particular types of dangerous weapons."); *United States v. Simien*, 655 F.Supp.3d 540 (W.D. Tex. Feb. 10, 2023) ("Based on this evidence, the Court finds machineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection and Simien's facial challenge to § 922(o), therefore, fails."); *United States v. Shelton*, 2023 WL 1812743, at *5 & n.2 (W.D. Pa. Feb. 8, 2023) (noting that Section 922(o) prohibits anyone, even law-abiding individuals, from possessing a machinegun); *United States v. Dixon*, 2023 WL 2664076, at *3 (N.D. Ill Mar. 28, 2023) ("Thus, *Miller*, *Heller*, and *Bruen* foreclose any challenge to the federal machinegun ban.  The Second Amendment simply does not extend to 'dangerous and unusual weapons.'"); *United States v. Kazmende*, 2023 WL 3872209, at *3 (N.D. Ga., May 17, 2023) (same); *DeWilde v. United States*, 2023 WL 4884582, at *6 (D. Wyo. July 17, 2023) (finding, after post-*Bruen* analysis, that "there is no Second Amendment right to possess a machinegun); *United States v. Lane*, 2023 WL 5663084, at *14 (E.D.V.A. Aug. 31, 2023) (holding that Section 922(o) withstands *Bruen* and that dangerous and unusual

**App. 29**

weapons like machineguns do not fit within the plain meaning that the Supreme Court has ascribed to "Arms" covered by the Second Amendment); *United States v. Kittson*, 2023 WL 5015812, at *1 (D. Ore. Aug. 7, 2023) (joining the several courts who have found, post-*Bruen*, that machineguns are not protected by the Second Amendment).

### III.   <u>CONCLUSION</u>

The defendant's facial and as applied challenges to Section 922(o) fail because the Supreme Court has made clear that regulations of machineguns fall outside the Second Amendment; and even if this Court were to conclude that the Second Amendment's plain text protects the possession of machineguns, Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation."  Thus, for the foregoing reasons the defendant's motion must be overruled.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney

S/Aaron L. Smith
AARON L. SMITH, #20447
Assistant U.S. Attorney
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
Telephone: (316) 269-6481
Fax: (316) 269-6484
E-mail: aaron.smith3@usdoj.gov

**App. 30**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of December 2023, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

David J. Freund
Assistant Federal Public Defender
Counsel for Defendant Morgan
david_freund@fd.org

S/Aaron L. Smith
AARON L. SMITH
Assistant U.S. Attorney

**App. 31**

08/01/2024    USA v. MORGAN    23-10047    1

```
1              IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
2

3  THE UNITED STATES OF AMERICA,

4           Plaintiff,

5       vs.                        District Court
                                   Case Number
6  TAMORI MORGAN,                  23-10047-01

7           Defendant.

8

9              TRANSCRIPT OF PROCEEDINGS

10      On the 1st day of August, 2024 at 1:00 p.m. came
   on to be heard in the MOTION HEARING in the
11 above-entitled and numbered cause before the HONORABLE
   JOHN W. BROOMES, Judge of the United States District
12 Court for the District of Kansas, Sitting in Wichita.
           Proceedings recorded by mechanical stenography.
13         Transcript produced by computer.

14

15 APPEARANCES

16      The Plaintiff appeared by and through:
        Mr. Aaron Smith
17      United States Attorney's Office
        301 N. Main, Suite 1200
18      Wichita, Kansas 67202

19      The Defendant appeared in person, by and through:
        Ms. David Freund
20      Federal Public Defender's Office
        301 N. Main, Suite 850
21      Wichita, KS 67202

22

23

24

25
```

08/01/2024     USA v. MORGAN     23-10047     2

```
1          (The following proceedings commenced at 1:00 p.m.
2  and have been requested transcribed:)
3          THE COURT:  Please be seated.
4          This is Case Number 23-10047, United States versus
5  Tamori Morgan.
6          May I have appearances, please.
7          MR. SMITH:  Your Honor, the United States
8  appears by Assistant United States Attorney, Aaron Smith.
9          MR. FREUND:  Good morning, Your Honor.
10         Defendant appears in person, with counsel David
11 Freund, Assistant Federal Defender.
12         THE COURT:  Thank you.
13         Mr. Morgan, can you understand everything that is
14 being said in the courtroom today?
15         THE DEFENDANT:  Yes, sir.
16         THE COURT:  All right.  We're here on a motion
17 filed by the defendant seeking to dismiss Counts 1 and 2
18 of the indictment on Second Amendment grounds, and I
19 wanted to have a hearing just to hear some evidence to
20 establish the facts that describe the characteristics of
21 these firearms.  So that was it.
22         I couldn't glean from the briefing or the
23 indictment quite enough about the actual details of the
24 firearms to I think do my -- do what I needed to do to
25 analyze the application of the Second Amendment here, so
```

08/01/2024     USA v. MORGAN     23-10047     3

1  that's why we're here.

2       I don't really, as far as I know, need anything

3  beyond that that I can think of.  So, with that, I'll ask

4  the Government to put on whoever you have that can

5  provide that evidence for me.

6       MR. SMITH:  Thank you, Your Honor.

7       I will call a witness.

8       And my understanding is the Court's inquiry is

9  more in relation to Count 2?

10       THE COURT:  Mostly, but while we're here on the

11  Count 1, I can hear -- you might as well describe that,

12  too.

13       MR. SMITH:  Okay.

14       THE COURT:  I gather from the description of it

15  it's probably something -- sort of an AR-15 style of

16  firearm but --

17       MR. SMITH:  Okay.

18       THE COURT:  -- might as well hear the details on

19  it so I know what the facts are.

20       MR. SMITH:  Thank you, Your Honor.

21       The United States would call Special Agent Ted

22  Peterson of the ATF.

23       THE COURT:  Agent Peterson, please come up to

24  the witness stand and be sworn.

25       [Oath given.]

08/01/2024     USA v. MORGAN     23-10047     4

```
1                    THEODORE PETERSON,

2   called as a witness on behalf of the Plaintiff, having

3   been first duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5   MR. SMITH:

6   Q.     Agent, please tell us your name.

7   A.     Theodore Peterson.

8   Q.     What is it you do for a living?

9   A.     Special Agent with the Bureau of Alcohol, Tobacco,

10  Firearms, and Explosives, more commonly known as the ATF.

11  Q.     And is your duty station here in Wichita, Kansas?

12  A.     It is.

13  Q.     Are you familiar with the investigation involving

14  an individual identified as Tamori Morgan?

15  A.     I am.

16  Q.     And I won't identify him for the record for the

17  purposes of this hearing but does that involve an

18  indictment which stands for activities occurring on or

19  about October 17th, 2022?

20  A.     It does.

21  Q.     Generally, that investigation involved -- or did

22  it involve trying to identify persons who were in

23  possession of fully automatic firearms?

24  A.     It did, yes.

25  Q.     Without kind of delving too far into the details,
```

08/01/2024      USA v. MORGAN      23-10047      5

1  what was the location, what draw -- drew law enforcement

2  attention to Tamori Morgan, and what made you suspect

3  that automatic firearms were involved?

4  **A.      An officer with the Wichita Police Department had**

5  **been monitoring the Snapchat account of Mr. Morgan's, was**

6  **monitoring that day and saw a post on Mr. -- what**

7  **appeared to be Mr. Morgan's account, of them firing what**

8  **looked to be a machine gun into an area that we**

9  **previously established as being in the Arkansas River and**

10 **near the area of 54th and West Street in north Sedgwick**

11 **County.**

12 Q.      Okay.  You already said Sedgwick County?

13 **A.      Yes.**

14 Q.      And it's the Arkansas River here.

15 **A.      Excuse me.**

16 Q.      Okay.  So was Tamori Morgan then contacted in

17 relation to seeing those postings?

18 **A.      He was.**

19 Q.      Was a search conducted?

20 **A.      There was, yes.**

21 Q.      During the search were firearms or parts of

22 firearms discovered?

23 **A.      There were.**

24 Q.      And I'm going to approach.

25       MR. SMITH:  And if I may approach the bench?

```
            08/01/2024      USA v. MORGAN      23-10047      6
 1              THE COURT:  Please.
 2  MR. SMITH:
 3  Q.     I gave you two number ones?
 4  A.     You did.
 5  Q.     Okay.
 6              THE COURT:  Thank you.
 7  MR. SMITH:
 8  Q.     I guess I am going to go out of order.
 9         So during the search, were objects identified
10  related to what is represented as Count 2 in the
11  indictment, which is possession of a machine gun
12  conversion device?
13  A.     Yes.
14  Q.     And that's a machine gun diversion device of
15  unknown manufacture, is that right?
16  A.     That's correct.
17  Q.     Is a machine gun conversion device commonly known
18  by another name?
19  A.     It is.
20  Q.     What is that?
21  A.     A Glock switch.
22  Q.     So during the course of this search, did the
23  search reveal a actual Glock handgun?
24  A.     It did, yes.
25  Q.     Was that a .357 caliber?
```

08/01/2024     USA v. MORGAN     23-10047       7

1   A.     It was, yes.

2   Q.     And is that handgun represented in one of the

3   exhibits I placed in front of you marked as Exhibit

4   Number 2?

5   A.     It is.

6   Q.     Does that picture appear to be a true and accurate

7   representation of what was found that day?

8   A.     It does.

9   Q.     And that's the Glock .357 caliber handgun that

10  I've just referred to, is that correct?

11  A.     Yes, it is.

12  Q.     Now, when the Glock was found on that day, did it

13  have the Glock switch or machine gun conversion device

14  attached?

15  A.     It did not.

16  Q.     Was a machine gun conversion device discovered?

17  A.     There was.

18  Q.     Where was that?

19  A.     It was located in the glove box in the vehicle,

20  inside of an eyeglass case.

21  Q.     Okay.  And is that represented in Government's

22  Exhibit Number 1?

23  A.     It is.

24  Q.     And are those pieces inside of that eyeglass case

25  true and accurate representation of the conversion device

08/01/2024      USA v. MORGAN      23-10047      8

1  that was found?

2  **A.      That's correct.**

3  Q.     And it is currently, or at least in that picture,

4  in pieces, is that correct?

5  **A.      That is correct.**

6  Q.     So, in your training and experience -- and I'm not

7  asking you for a scientific opinion today, but that

8  machine gun conversion device, is it designed to be

9  installed in the Glock that is represented in Exhibit

10 Number 2?

11 **A.      It is, yes.**

12 Q.     And in your training and experience, not asking

13 for a scientific opinion, do you see markings on

14 Government's Exhibit Number 2 indicating that

15 Government's Exhibit 2 has been modified so the

16 conversion device would function?

17 **A.      Yes, it has.**

18 Q.     In addition to the photographs and the search,

19 during the course of your investigation did you observe

20 Mr. Morgan in possession of a Glock handgun with the

21 conversion device installed?

22 **A.      I did, yes.**

23 Q.     And what did you observe?

24 **A.      I observed him in a video posted to Snapchat**

25 **firing a Glock pistol in similar configuration as Exhibit**

08/01/2024      USA v. MORGAN      23-10047      9

1  Number 2, and appeared to function fully automatically by

2  one pull of the trigger, firing more than one shot.

3  Q.    And that was just your observation, that wasn't

4  based upon scientific testing by yourself, is that

5  correct?

6  A.    That's correct.

7  Q.    So moving briefly then to the allegations

8  contained in Count Number 1, Count Number 1 is in

9  relation to the possession of a machine gun identified as

10 an Anderson Manufacturing machine gun, is that correct?

11 A.    That's correct.

12 Q.    Have you had an opportunity in this investigation

13 to observe that machine gun?

14 A.    I have, yes.

15 Q.    And I guess describe for the Court briefly what

16 that -- what that firearm is, how it presents, general

17 description.

18 A.    It's a multi-caliber AR pistol by most people's

19 definitions.

20       It's a receiver that is designed to accept

21 multiple different calibers of ammunition in the way it

22 was configured.  It was configured with a 300 Blackout

23 upper and so it could fire 300 Blackout, and it was in a

24 pistol re -- without a rear extended stock, or an

25 extended stock.

**App. 40**

08/01/2024      USA v. MORGAN      23-10047      10

 1          THE COURT:  Say that again.

 2          THE WITNESS:  It was configured in such a way

 3  that we consider it to be a pistol because it doesn't

 4  have a rear stock on it, there is a buffer tube to allow

 5  for the buffer and the buffer spring to expand to allow

 6  the weapon to fire but there's no --

 7          THE COURT:  There is no arm brace or anything,

 8  it's just that kind of black tube that sticks out the

 9  back?

10          THE WITNESS:  Yes, Your Honor, that's correct.

11          MR. SMITH:  And, Your Honor, I have a photograph

12  of that firearm but I didn't prepare multiple photographs

13  of that.  I didn't anticipate focussing on Count 1 but if

14  I could show it?

15          THE COURT:  I would like to see it.

16          But before we switch, while we're talking about

17  the Glock pistol, so I see three pieces in the photograph

18  in Exhibit 1.  How does that work?

19          I see one of them looks like it has the same shape

20  as this piece on the back of the firearm in

21  exhibit -- photo in Exhibit 2 that has Bible verse on it,

22  so I gather that that -- that the piece from Exhibit 1

23  probably goes in place of the one in Exhibit 2 that has

24  the verse inscribed on it.

25          What about the other pieces and how does that all

08/01/2024     USA v. MORGAN     23-10047     11

1  work to make this thing fully automatic?

2          MR. SMITH:  Your Honor, I have a photograph of

3  the assembled device and have a photograph of it attached

4  to the firearm.

5          THE COURT:  Okay.

6          MR. SMITH:  If you would give me a moment and

7  then maybe I can address that that way.

8          THE COURT:  Thank you.

9  MR. SMITH:

10  Q.    So, Agent, I am going to go back then to the Glock

11  and Glock switch.

12        I am handing you what's been identified as

13  Government's Exhibit Number 3, is that correct?

14  **A.     That is correct.**

15  Q.    Does Government's Exhibit 3 exhibit the assembled

16  Glock switch as it is attached to the Glock firearm in

17  question?

18  **A.     It does, yes.**

19  Q.    And I'll move to Government's Exhibit 4.

20        Is Government's Exhibit 4 a photograph of the

21  Anderson Manufacturing 300 Blackout pistol, or possibly

22  could have been configured in a rifle configuration that

23  you testified to before?

24  **A.     That's correct, yes.**

25  Q.    Thank you.

08/01/2024      USA v. MORGAN      23-10047      12

1                 MR. SMITH:  May I approach, Your Honor?

2                 THE COURT:  Yes.  Thank you.

3    MR. SMITH:

4    Q.     Now I think the Court's inquiry was a little bit

5    about the functionality, observing the three individual

6    parts of that Glock switch.

7           Again, I'm not asking for your scientific opinion

8    but based on -- actually, I have one more picture that

9    may be instructive.

10          Based on your understanding of the functionality

11   of the parts of the Glock switch, how do those parts

12   essentially interact with the normal function of the gun

13   to cause it to fire automatically?

14   **A.     The parts replace the rear backplate on the slide**

15   **assembly of the pistol.  When they're in place, the leg,**

16   **which is the slender portion that goes further -- goes**

17   **further forward, acts to depress the trigger part which**

18   **prevents the firearm from having its firing pin reset.**

19          **Instead of it resetting and cocking again, the**

20   **firing pin moves forward and strikes the second cartridge**

21   **as it is rechambered, thus, firing more than one shot**

22   **with a single function of a trigger.**

23   Q.     And, Agent, I placed in front of you what has been

24   marked as Government Exhibit 5, is that correct?

25   **A.     That's correct.**

08/01/2024     USA v. MORGAN     23-10047     13

1  Q.     It shows the larger, um, square-ish machine metal

2  back, is that correct?

3  **A.     That's correct.**

4  Q.     The round portion is the pin that holds what you

5  described as the leg, or the slender metal portion into

6  place on the back, is that correct?

7  **A.     That's correct.**

8  Q.     And you described that slender metal piece, which

9  is actually a sharpened piece, as the device that goes

10 into the slide causing the automatic discharge of the

11 rounds, is that correct?

12 **A.     That's correct.**

13       MR. SMITH:  May I approach, Your Honor?

14       THE COURT:  Yes.  Thank you.

15       Okay.  How hard is it to swap these pieces out?

16       How long does it take?

17       THE WITNESS:  Less than a minute.

18       THE COURT:  Okay.  All right.  Go ahead.

19       Okay.

20 MR. SMITH:

21 Q.     And so, Agent, then, directing you back to the

22 proposed indictment, in Count 1, it's a representation

23 that the defendant, Mr. Morgan, was in possession of that

24 Anderson Manufacturing machine gun, the one without the

25 stock, with just the tube on the back, is that correct?

08/01/2024     USA v. MORGAN     23-10047     14

1   **A.      That's correct.**

2   Q.      And in relation to Count 2, and we're talking

3   about specifically to October 17th, 2022, Count 2 is in

4   relation to possessing the machine gun conversion device

5   itself, is that correct?

6   **A.      That's correct.**

7   Q.      And that, again, is the item commonly known as a

8   Glock switch, is that right?

9   **A.      That is correct.**

10          MR. SMITH:  I don't have any further questions,

11  Your Honor.

12          THE COURT:  On this Anderson rifle or pistol,

13  was it manufactured as a fully automatic weapon or has it

14  been modified?

15          MR. SMITH:  Think we're going have to get in

16  to -- can I speak to counsel for a second about that

17  because --

18          THE COURT:  Okay.

19          MR. SMITH:  -- I think that might get into a

20  couple of specific factual questions.

21      [Sotto voce discussion had between counsel.]

22          MR. SMITH:  Okay.  I am going -- I'll ask some

23  follow-up questions again but Agent Peterson wasn't the

24  examining scientist in this case so I'll ask questions

25  and see if he has the answer.

08/01/2024     USA v. MORGAN     23-10047     15

1            THE COURT:  Okay.

2   MR. SMITH:

3   Q.    Agent, in your investigation, and based on the

4   investigation of ATF and the examination specifically of

5   this Anderson rifle, was it determined if the trigger

6   mechanism or fire group or any parts within the Anderson

7   rifle were original to the rifle, or were they

8   modifications to the Anderson rifle?

9            If you know the answer.

10  **A.    I'm not actually sure.  We -- it was discovered as**

11  **it was configured.  It could have been assembled by**

12  **anyone.  It was purchased as a stripped lower receiver**

13  **and someone then outfitted it as it was found.**

14  Q.    Okay.  So it was purchased as parts and then the

15  firing mechanisms itself had to be placed into the rifle

16  for it to have been found as it was found on October

17  17th, 2022?

18  **A.    That's correct.**

19            THE COURT:  Okay.  That's fine.

20            You done with him?

21            MR. SMITH:  I have nothing further, Your Honor.

22            THE COURT:  Mr. Freund, do you want to ask

23  anything?

24            MR. FREUND:  Yes, Your Honor.

25            THE COURT:  Go ahead.

```
              08/01/2024     USA v. MORGAN     23-10047     16
 1                        CROSS-EXAMINATION

 2   MR. FREUND:

 3   Q.     In an AR platform firearm there are two parts to

 4   the receiver?

 5   A.     That's correct.

 6   Q.     It's the lower receiver that must be marked with a

 7   serial number by the manufacturer?

 8   A.     That is correct.

 9   Q.     And that's the part generally that the statute

10   identifies as a firearm?

11   A.     That's correct.

12   Q.     The upper receiver is not the firearm?

13   A.     It is not considered a firearm, no.

14   Q.     You could order one of those through the mail and

15   it's perfectly legal?

16   A.     You can, yes.

17   Q.     The lower receiver here, you said it was sold by

18   itself?

19   A.     That's how it last went through a federal firearms

20   licensee, yes.

21   Q.     And so we don't know the chain of possession after

22   the FFL sold it to someone?

23   A.     Correct.

24   Q.     We know the FFL sold it to an individual, and we

25   know it was later recovered in the vehicle?
```

08/01/2024     USA v. MORGAN     23-10047     17

1   A.      Correct.

2   Q.      The AR platform is modular?

3   A.      **That would be one way to describe it, yes.**

4   Q.      You can put various uppers on it?

5   A.      Correct.

6   Q.      But regardless of how you assemble an AR, it must

7   have the buffer tube to function?

8   A.      **By most people's standards, yes.  There is a**

9   **couple -- there is a couple exceptions but, generally,**

10  **yes.**

11  Q.      So when the AR fires and it begins to recoil from

12  the gas being poured in from the gas block to -- the gas

13  is ported, whether it's piston or gas impingement, and

14  that makes then the bolt move back?

15  A.      **That's correct.**

16  Q.      And it moves back along a channel and then it hits

17  a piece called a buffer?

18  A.      Correct.

19  Q.      And then the buffer itself has a spring behind it

20  that lessens the blow and then makes the hammer -- or,

21  pardon me, the bolt reengage with the barrel extension

22  block again in semiautomatic fire?

23  A.      **That's correct.**

24  Q.      And the buffer tube is what holds the spring and

25  the buffer itself?

08/01/2024      USA v. MORGAN      23-10047      18

1  **A.      That's correct.**

2  Q.     So if you had an AR lower, and there was no buffer

3  tube, no buffer and no spring, it generally would not

4  operate.  It wouldn't cycle after one?  I mean, a bolt

5  could fly out the back, right?

6  **A.      It would depend and I would have to have shot it.**

7  **       The way that I tested it was by doing a machine**

8  **gun function check and for that it's the safest method to**

9  **check for.  You don't have to actually function with an**

10 **explosion of a round, it's done basically by a dry fire**

11 **to see if there is an actual trigger reset, and that is**

12 **the way that I was originally alerted to it potentially**

13 **being a machine gun as later determined by a firearms**

14 **examiner.**

15 Q.     I appreciate that.  But my question was, if you

16 took the buffer tube and the buffer and the spring off

17 your normal AR, it would not function as designed?

18 **A.      It would not, no.**

19 Q.     Okay.  And this is an AR pistol because it has the

20 buffer tube but it does not itself have a stock?

21 **A.      That's correct.**

22 Q.     Okay.  And an AR can be fully automatic, either

23 because it was manufactured that way, or because of

24 either swapping out or adding parts to the fire control

25 group?

08/01/2024     USA v. MORGAN     23-10047     19

1   A.      That's correct.

2   Q.      When an AR is manufactured where it can fire full

3   auto, there is usually a selector switch?

4   A.      There are in certain scenarios, yes.

5   Q.      So we are talking about an AR that would be

6   manufactured and, obviously, after the Firearm's Owner

7   Protection Act of 1986, the public can't lawfully possess

8   a machine gun that was registered after -- I think it was

9   May 19th, 1986?

10  A.      That's correct.

11  Q.      So assuming a manufacturer made a fully automatic

12  AR, it would have to be for military or law enforcement

13  to be legal?

14  A.      That's correct, or in the hands of an FFL that is

15  licensed to have those.

16  Q.      Right.  And then they would need a sample letter

17  stating that they needed it to show because somebody was

18  interested in buying -- somebody who could lawfully

19  purchase full automatic weapons was potentially

20  interested in buying one?

21  A.      That's correct.

22  Q.      And those ARs generally have a fire control switch

23  on the side?

24  A.      In my experience generally, yes, they do.

25  Q.      So the standard AR will have a fire control switch

08/01/2024      USA v. MORGAN      23-10047      20

1  that will either be fired, or safe?

2  **A.      Correct.**

3  Q.      A full auto AR, depending on the configuration,

4  will have fire, safe, and full auto?

5  **A.      Most of them, yes, sir.**

6  Q.      Although some can be manufactured to fire a

7  three-shot group with one pull of the trigger versus

8  fully automatic?

9  **A.      Yes, sir.**

10  Q.      But that would be reflected in the fire control

11  switch itself?

12  **A.      Generally speaking, yes.**

13  Q.      So when you have an AR that was manufactured to be

14  fully automatic, that might be something you could glean

15  from looking at the fire control, the safety lever on the

16  firearm itself?

17  **A.      Potentially, yes.**

18  Q.      Okay.  But, otherwise, if you just have a table

19  full of ARs that appear all the same, it would be

20  difficult to impossible to determine whether any of them

21  fired fully automatically unless you function tested it?

22  **A.      Generally, yes.**

23  Q.      That's because it's the fire control group and its

24  configuration that determines whether or not the sear

25  catches and retains the firing pin when you release the

08/01/2024     USA v. MORGAN     23-10047     21

1  trigger, versus continuing to follow the bolt forward?

2  **A.     Generally correct, yes.**

3  Q.     And in this particular AR, it's my understanding

4  that it had a legal fire control group generally, but as

5  installed here, the way the pieces fit together it

6  allowed a condition called hammer follow, so it didn't

7  correctly catch after you pulled the trigger, and it

8  fired and recoiled, which allowed the hammer to continue

9  to follow through in full automatic fire?

10 **A.     That is how it was described by our firearms**

11 **examiner, yes.**

12 Q.     And that's different from installation, for

13 instance, of a lightening link, which is a piece that

14 specifically converts semiautomatic to full automatic?

15 **A.     That's correct.**

16 Q.     Okay.  The Glock switch recovered here didn't have

17 any markings on it itself?

18 **A.     No, sir.**

19 Q.     No manufacturer, no place of manufacture?

20 **A.     No, sir.**

21 Q.     What -- I think would you agree that one of the

22 difficulties for the Bureau of Alcohol Tobacco and

23 Firearms in regulating Glock switches is somebody could

24 make one themselves?

25 **A.     That would be one of many issues, yes.**

08/01/2024     USA v. MORGAN     23-10047     22

1  Q.    You could potentially 3D print one if you had the

2  printer, the correct medium to print, and the CAD design

3  to do it?

4  **A.    That's correct.**

5  Q.    So a Glock switch could be produced in the state

6  where it was found?

7  **A.    It could.**

8  Q.    And here we simply have no way of knowing where

9  this particular switch was manufactured?

10 **A.    That's correct.**

11       MR. FREUND:  I have no other questions at this

12 time, Your Honor.

13       Thank you.

14       THE COURT:  Thank you.

15       Mr. Smith, anything else?

16       MR. SMITH:  No, Your Honor.  Thank you.

17       THE COURT:  All right.  Appreciate your help on

18 this.

19       I'll take these motions under advisement and get

20 you a written ruling promptly as possible.

21       Is there anything else you want to cover, Mr.

22 Freund?  You look like you were going to say something.

23       MR. FREUND:  Your Honor, I can hear the voice of

24 our appellate attorneys in the back of my head telling me

25 that these exhibits need to be filed on the record

08/01/2024      USA v. MORGAN      23-10047      23

```
 1  because it's easier to do that now than try and recreate

 2  them later.

 3          THE COURT:  Yes.

 4          MR. FREUND:  So could we please have the

 5  exhibits filed?

 6          THE COURT:  Sure.  You want me to have my folks

 7  do it or are you asking to be permitted do something on

 8  your end?

 9          MR. FREUND:  I would be fine if the Government

10  filed them, Your Honor, as long as they're in the record.

11          MR. SMITH:  I'll just file a notice of the

12  exhibits and attach the exhibits.

13          THE COURT:  Okay.  So do you want these back

14  from me or do you have separate ones that you can put in

15  there?

16          MR. SMITH:  I'll just -- how about I take them

17  back and then I'll file the notice with those attached,

18  if that's okay with Mr. Freund.

19          MR. FREUND:  It is, Your Honor, thank you.

20          THE COURT:  Sounds good.

21          I'll return these to the Government for filing.

22          Thank you.

23          MR. SMITH:  Thank you.

24          THE COURT:  Is it Peterson?

25          THE WITNESS:  Yes, sir.
```

08/01/2024     USA v. MORGAN     23-10047     24

1        THE COURT:  Thank you, Agent Peterson, for your

2   testimony.  Appreciate that.

3        THE WITNESS:  You're welcome, sir.

4        THE COURT:  All right.  We're done on this one

5   and I think it's time for me to move in to my next matter

6   here.

7        So thanks for your time, everyone.

8        (Proceedings conclude at 1:30 p.m.)

9        ********************************************

10                C E R T I F I C A T E

11        I, Jana L. McKinney, United States Court

12   Reporter in and for the District of Kansas, do hereby

13   certify:

14        That the above and foregoing proceedings were

15   taken by me at said time and place in stenotype;

16        That thereafter said proceedings were

17   transcribed under my discretion and supervision by means

18   of transcription, and that the above and foregoing

19   constitutes a full, true and correct transcript of

20   requested proceedings;

21        That I am a disinterested person to the said

22   action.

23        IN WITNESS WHEREOF, I hereto set my hand on

24   this, the 2nd day of October, 2024.

25

08/01/2024     USA v. MORGAN     23-10047     25

1                    s/ Jana L. McKinney
                Jana L. McKinney, RPR, CRR, CRC, RMR
2               United States Court Reporter

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**App. 56**

```
 1                           I N D E X
                                                        PAGE
 2

 3
    WITNESSES
 4       FOR THE PLAINTIFF
         THEODORE PETERSON
 5          Direct Examination by Mr. Smith              4
            Cross-Examination by Mr. Freund             16
 6

 7  REPORTER'S CERTIFICATE                              25

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT

## District of Kansas

(Wichita Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                     Case No. 23-cr-10047-JWB

TAMORI MORGAN,

        Defendant.

## GOVERNMENT'S NOTICE OF FILING EXHIBITS

Comes now the United States, by and through the United States Attorney for the District of Kansas and Assistant U.S. Attorney Aaron L. Smith, and  submits the following exhibits that were presented at a Motion hearing held on August 1, 2024.    They are attached hereto as Attachment A, but they were marked and presented as Exhibits 1 through 5 at the hearing.

                         KATE E. BRUBACHER
                         UNITED STATES ATTORNEY

                         By: /s/ *Aaron L. Smith*
                         AARON L. SMITH
                         Assistant United States Attorney
                         District of Kansas
                         301 N. Main, Suite 1200
                         Wichita, Kansas  67202
                         Ph: (316) 269-6481
                         Fax: (316) 269-6484
                         Email: aaron.smith3@usdoj.gov
                         Ks. S. Ct. No. 20447

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2024 I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to Richard C. Paugh, Attorney for Defendant Lopez.


By: /s/ *Aaron L. Smith*
AARON L. SMITH
Assistant United States Attorney

**App. 59**





Exhibit **3** Installed on Exhibit **2** Slide









GOVERNMENT
EXHIBIT
3

**App. 62**

Appellate Case: 24-3141     Document: 18     Date Filed: 12/12/2024     Page: 65

779060-22-0186 Exhibit 1





App. 63

779060-22-1086
2023-201-ALC
Page 15

Appellate Case: 24-3141     Document: 18     Date Filed: 12/12/2024     Page: 66



Exhibit 3 Profile Views



FIG. 3a

**App. 64**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 23-10047-JWB |
| TAMORI MORGAN, | |
| Defendant. | |

**MEMORANDUM AND ORDER NUNC PRO TUNC**

Section II of the original memorandum and order (Doc. 35) erroneously referred to Defendant as Plaintiff in a few places.  This memorandum and order is issued nunc pro tunc to correct that error.  In all other material respects, the original memorandum and order remains unchanged.  Document 35 is hereby stricken from the record.

\*\*\*\*

This matter is before the court on Defendant's motion to dismiss based on Second Amendment grounds.  (Doc. 26.)  A response and a reply have been filed (Docs. 28, 29), and the court held a hearing to establish additional facts about the weapons charged.  The motion is thus ripe for review.  The court finds that the Second Amendment applies to the weapons charged because they are "bearable arms" within the original meaning of the amendment.  The court further finds that the government has failed to establish that this nation's history of gun regulation justifies the application of 18 U.S.C. § 922(o) to Defendant.  The court therefore grants the motion to dismiss.

I.     **Background**

Defendant Tamori Morgan is charged with two counts of possessing a machinegun in violation of 18 U.S.C. § 922(o).  (Doc. 1.)  Specifically, Defendant is charged with possessing an

**App. 65**

Anderson Manufacturing, model AM-15 .300 caliber machinegun and a machinegun conversion device.  It was established at the hearing that the conversion device is a so-called "Glock switch" which allows a Glock, model 33, .357 SIG caliber firearm to fire as an automatic weapon.

## II.    Standard

Under the Second Amendment, "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *D.C. v. Heller*, 554 U.S. 570, 582 (2008).  To keep arms means, simply, to possess arms.  *Id.* at 583.  If the plain text of the Second Amendment applies to a defendant's conduct, the government has the burden to show that the regulation is consistent with this nation's historical firearm regulation tradition.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  This standard requires a "historical analogue" between the modern regulation and historical regulations, not a "historical twin."  *United States v. Rahimi*, 144 S. Ct. 1889, 1902–03 (2024).

## III.    Analysis

Defendant argues that 18 U.S.C. § 922(o) is unconstitutional facially and as applied to him. (Doc. 26 at 1.)  Defendant first argues that, under the first step of *Bruen*, the plain text of the Second Amendment applies to his conduct of possessing machineguns.  (Doc. 26 at 6.)  The government argues to the contrary, pointing to language in *Heller* that suggests the unconstitutionality of machinegun regulation would be "startling," and that the Second Amendment only applies to weapons that were commonly used by law-abiding citizens at the time of the Second Amendment's enactment.  (Doc. 28 at 4 (citing *Heller*, 554 U.S. at 624–25).)

**App. 66**

The Tenth Circuit has yet to apply *Bruen* to § 922(o). Therefore the court starts its analysis at the beginning: the statutory text. Section 922(o) generally makes it unlawful to "possess a machinegun." *Id.* Section 922 incorporates the definition of machinegun from 26 U.S.C. § 5845, which defines that term as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

§ 5845(b). The court notes that this definition is extremely broad. It does not, for instance, include a projectile in the definition like the definitions for a "rifle" or "shotgun" do under 18 U.S.C. § 921 or § 5845. Nor does it require that a projectile or "shot" be expelled through the energy of an explosive or other propellant, as contemplated under the definitions of "rifle," "shotgun," "any other weapon" and "destructive" device" in § 5854(c) through (f), or the definitions of a "firearm," "shotgun," or "rifle" in § 921(a). Thus, this definition seems to encompass everything from an aircraft-mounted automatic cannon to a small hand-held taser or stun gun that can easily be placed inside a handbag and which shoots multi-shot bursts of electrical particles with a single pull of the trigger, or a fully automatic BB gun that shoots multiple rounds of metal projectiles using compressed air. The court is not, of course, faced with a situation where the government has charged someone under § 922(o) with illegal possession of a taser or a BB gun. But the example of the aircraft-mounted gun seems fatal to Defendant's facial challenge. Defendant fails to show how an example like that would constitute a "bearable arm" within the Second Amendment's protection. And to succeed on a facial challenge, Defendant must show that § 922(o) is

unconstitutional in all its applications.  *Rahimi*, 144 S. Ct. at 1888.  The court thus proceeds to analyze Defendant's as-applied challenge.

Here, Defendant is charged with two counts of machinegun possession, and both counts apply to arms that can be carried in the hand.  Thus, by definition, the machinegun and Glock switch are bearable arms within the plain text of the Second Amendment.[1]  The government relies on *Heller* to argue that machineguns are not covered by the plain text of that amendment.  The *Heller* language cited by the government is unavailing.  First, the government's interpretation of *Heller* relies exclusively on dicta (and circuit authority that predates the historical analysis mandated in *Bruen*)—machineguns were not at issue in *Heller*.  Second, the government's interpretation would run directly counter to the essential analysis in *Heller*: just as the Fourth Amendment applies to modern "searches," the Second Amendment applies to arms that did not exist at the country's founding.  *Heller*, 554 U.S. at 582.

Third, the government relies on comments in *Heller* regarding *United States v. Miller*, 307 U.S. 174 (1939), for the proposition that machineguns are not covered by the Second Amendment. In *Miller*, the Supreme Court rejected a challenge to the National Firearms Act's prohibition against carrying an unregistered sawed-off shotgun across state lines.  *See id.* at 175–77, 183. Interestingly, over half of the opinion in *Miller* was devoted to explaining how, in the years preceding and immediately following the enactment of the Second Amendment, one of the lawful purposes for which law-abiding citizens possessed modern (for that era) firearms was for service in the militia.  *Id.* at 178–82.  The Court surveyed several laws from that era that not only permitted, but essentially required, law-abiding citizens to provide for their own use modern military-style

---

[1]  The government does not argue, nor does the court find, that the Glock switch is a mere accessory unprotected by the Second Amendment.  *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (suppressor is an accessory unprotected by Second Amendment).  The switch is, rather, an integral component of what makes the Glock to which it is attached a machinegun.

small arms. *See id.* at 180–82. Against that backdrop, the Court concluded that a sawed-off shotgun was not the type of weapon that would be useful for military service. *See id.* at 178, 182–83. In *Heller*, the Supreme Court simply observed that *Miller* fit within the tradition of regulating "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. Moreover, it bears noting that, unlike § 922(o), the National Firearms Act does not categorically prohibit the possession of the sawed-off shotgun at issue in *Miller* or the firearms at issue in this case; rather, that act regulates possession of such weapons by restricting possession to those who comply with the registration and taxation requirements imposed under the act. *See Miller*, 307 U.S. at 175; 26 U.S.C. § 5861. *Heller*, because it predates *Bruen*, however, certainly does not say that the Second Amendment does not apply to bearable machineguns. It merely implies that restrictions on "dangerous and unusual weapons" can be consistent with this nation's history and tradition of firearm regulation. This touches on what is now the second step of *Bruen*, rather than the first step. Suffice it to say that the weapons at issue in this case are bearable arms that, under *Bruen*'s first step, are covered by the plain text of the Second Amendment. The court thus proceeds to the second step in the analysis.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 597 U.S. at 24 (quotation omitted). In *Heller*, the Supreme Court concluded that the Second Amendment "'guarantee[s] the individual right to *possess* and *carry* weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (emphasis added) (quoting *Heller*, 554 U.S. at 592). It is worth noting at

**App. 69**

the outset that the Court's language distinguishes between possessing and carrying weapons, and that § 922(o) prohibits the mere act of possessing a machinegun, without regard to whether the weapon is carried or otherwise employed.

Defendant argues that the government cannot meet its burden to show that § 922(o) is consistent with this nation's history of firearm regulation. (Doc. 26 at 8–9.) To meet its burden, the government advances only two potential historical analogs. First, the government points to English common law, which it asserts prohibited riding or going armed with dangerous or usual weapons. (Doc. 28 at 7 (citing 4 William Blackstone, Commentaries on the Laws of England 148–49 (1769).) Second, the government cites one case from the North Carolina Supreme Court in 1824 that recognized an offense to arm oneself "with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." (*Id.* at 7–8 (citing *State v. Langford*, 10 N.C. (3 Hawks) 381, 383 (NC 1824).) But both examples are disanalogous to what Defendant is charged with here—simple possession of a machinegun.

As to the government's first example, the Supreme Court addressed this history in *Bruen*. There, the Supreme Court observed that Blackstone's reference to English laws concerning going armed with dangerous and unusual weapons derived from the Statute of Northampton, an English statute from 1328 which generally provided that

> Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure."

*Bruen*, 597 U.S. at 40 (citation omitted). According to the Court, "[n]otwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Id.* at 41. It

**App. 70**

was focused, for the most part, on conduct that evinced an intent to breach the peace, *id.*, and, in any event, was predicated on the manner in which arms were carried or displayed. *Bruen* considered an example of the application of the Statute of Northamptom to the conduct of Sir John Knight, who was charged with violating the statute based on allegations that he "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Id.* at 43 (citation omitted). The Court further observed that "one's conduct 'will come within the [Statute of Northampton],'—i.e., would terrify the King's subjects—only 'where the crime shall appear to be malo animo,' with evil intent or malice." *Bruen*, 597 U.S. at 44 (internal citation omitted). And by 1716 it was observed by another learned treatise that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." *Id.* at 45 (alteration in original) (citation omitted).

Turning to the government's second example, it asserts merely that "[i]n the United States, too, courts long ago acknowledged that a man commits 'an offence at common law' when he 'arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.'" (Doc. 28 at 7 (quoting *Langford*, 10 N.C. at 383).) The Supreme Court addressed this category of laws at some length in both *Bruen* and *Rahimi*, describing them as prohibitions against "going armed" or "affray," the latter word being a term derived from a French word meaning "to terrify." *See Rahimi*, 144 S. Ct. at 1900–01; *Bruen*, 597 U.S. at 46. Without belaboring the point, the Court observed that these laws combined the elements of going about in a manner to terrorize the public with dangerous and unusual weapons. *See generally Rahimi*, 144 S. Ct. 1900–01; *Bruen*, 597 U.S. at 46–50.

In contrast with the aforementioned historical examples, § 922(o) says nothing about the manner in which machineguns are carried or displayed. Instead, § 922(o) criminalizes the mere possession of such weapons without regard to how the possessor uses them. If an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner. The statute requires no more than possession, and, more importantly in an as-applied challenge, the indictment in this case alleges nothing more.

Moreover, to the extent that the Second Amendment would allow weapons to be prohibited solely on the basis that they are "dangerous and unusual" or "highly unusual in society at large", *Bruen*, 597 U.S. at 47, as the government suggests, the government has not made that showing here. As Defendant points out, "[t]here are over 740,000 legally registered machineguns in the United States today." (Doc. 29 at 4 (citing Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States – Annual Statistical Update 2021*. https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download).) Machineguns have been in existence for well over a century. While the federal government has regulated transfer and possession of such weapons since passage of the National Firearms Act in 1934, it did not outright prohibit possession of machineguns until passage of the Firearms Owners Protection Act in 1986. Even then, the law did not prohibit the possession of all machineguns; rather, § 922(o) merely prohibits possession of machineguns that were not lawfully possessed as of the date that prohibition went into effect in 1986. § 922(o)(2)(B). Thus, even today, it is perfectly legal for a person who has not been divested of his firearm rights under some other provision of law to acquire and possess a machinegun, so long as it was lawfully possessed by

someone before the relevant date in 1986, and so long as he complies with the National Firearms

Act's requirements to obtain and possess the weapon.  In that sense, machineguns are not unusual.

The government fails to address these facts, and thus fails to meet its burden to demonstrate that

possession of the types of weapons at issue in this case are lawfully prohibited under the Second

Amendment.

To summarize, in this case, the government has not met its burden under *Bruen* and *Rahimi*

to demonstrate through historical analogs that regulation of the weapons at issue in this case are

consistent with the nation's history of firearms regulation.  Indeed, the government has barely tried

to meet that burden.  And the Supreme Court has indicated that the *Bruen* analysis is not merely a

suggestion.  In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Tenth Circuit side-stepped

the *Bruen* analysis in a challenge to the prohibition against felons possessing firearms under 18

U.S.C. § 922(g)(1), concluding that *Bruen* did not abrogate the Tenth Circuit's prior decision,

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), which upheld the constitutionality of

§ 922(g)(1) in the face of a Second Amendment challenge..   *Vincent*, 80 F.4th at 1202.

Nevertheless, just last month the Supreme Court vacated *Vincent* and remanded for further

consideration in light of *Rahimi*.  *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (U.S. July

2, 2024).  The court interprets that as indicating that the Supreme Court means what it says: the

constitutionality of laws regulating the possession of firearms under the Second Amendment must

be evaluated under the *Bruen* framework.

Importantly, this decision says little about what the government might prove in some future

case.  Rather, under *Bruen*'s framework for evaluating Second Amendment challenges, it is the

government's burden to identify a historical analog to the restrictions challenged in this case.  This

the government has failed to do.  The court expresses no opinion as to whether the government

could, in some other case, meet its burden to show a historically analogous restriction that would

justify § 922(o).

**IV.     Conclusion**

The motion to dismiss on Second Amendment grounds (Doc. 26) is GRANTED.   The

motion to dismiss on Commerce Clause grounds (Doc. 25) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: August 26, 2024                    /s/ John Broomes
                                          JOHN W. BROOMES
                                          UNITED STATES DISTRICT JUDGE

**App. 74**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-cr-10047-JWB-1 |
| | ) | |
| TAMORI MORGAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**NOTICE OF APPEAL**

Plaintiff, the United States of America, pursuant to 18 U.S.C. § 3731, appeals to the

United States Court of Appeals for the Tenth Circuit from this Court's orders dismissing the

charges in the indictment, Memorandum and Order (Doc. 35), entered on August 21, 2024, and

Memorandum and Order Nunc Pro Tunc (Doc. 36), entered on August 26, 2024.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney
District of Kansas

s/ Bryan C. Clark
Bryan C. Clark, #24717
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Tel.: (913) 551-6730
Fax: (913) 551-6541
bryan.clark@usdoj.gov

**App. 75**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 20, 2024, this document was electronically filed with the

Clerk of the U.S. District Court for the District of Kansas using the Court's CM/ECF system,

which will send a notice of electronic filing to all ECF system participants as of the time of this

filing, including to Defendant's counsel of record.

<u>s/ Bryan C. Clark</u>

**App. 76**