No. 24-3141

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

TAMORI MORGAN,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Kansas
No. 6:23-cr-10047-JWB, The Honorable John W. Broomes

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Michael Kim Krouse
Paul J. Fishman
ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
michael.krouse@arnoldporter.com
paul.fishman@arnoldporter.com

Joanna McDonough
ARNOLD & PORTER
    KAYE SCHOLER LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
(617) 351-8050
joanna.mcdonough@arnoldporter.com

# 26.1 DISCLOSURE STATEMENT

Counsel for *amici curiae* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence respectfully submit this disclosure statement:

Giffords Law Center to Prevent Gun Violence does not have a parent corporation, nor does it have any stock (meaning that no corporation owns 10% or more of its stock).

Brady Center to Prevent Gun Violence does not have a parent corporation, nor does it have any stock (meaning that no corporation owns 10% or more of its stock).

Arnold & Porter Kaye Scholer LLP is the only law firm that has appeared, or is expected to appear, in this case for Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence.

/s/ *Michael Kim Krouse*
Michael Kim Krouse

*Counsel of Record for Amici Curiae
Giffords Law Center to Prevent Gun
Violence and Brady Center to Prevent Gun
Violence*

# TABLE OF CONTENTS

26.1 DISCLOSURE STATEMENT .......................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* .........................................................1

ARGUMENT .......................................................................................5

I.  Machineguns Are Dangerous And Unusual Weapons That Pose A Profound Threat To Public Safety. ..........................................5

    A.  The National Firearms Act was Passed to Address High-Profile Gang Violence .............................................................5

    B.  Congress Has Continued to Pass Laws to Address the Danger of Machineguns and to Respond to Technological Advances .............7

    C.  In Recent Years, There Has Been A Drastic Increase In Use of Machinegun Conversion Devices, Such As "Glock Switches," To Perpetrate Crimes .........................................9

II.  Prosecutors Rely On § 922(o) To Prosecute Violent Criminals And To Protect Public Safety. ...............................................10

    A.  Crimes Involving Machineguns Lead to Longer Sentences ...............10

    B.  Prosecutions Under Section 922(o) Have Increased Significantly ...................................................................12

CONCLUSION ................................................................................15

CERTIFICATE OF COMPLIANCE ....................................................17

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS ................................................................................18

CERTIFICATE OF SERVICE ............................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B & L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ...................................................................4

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ..................................................................3

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................................3, 4

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)......................................................................................4

*Rocky Mt. Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) ..................................................................4

*United States v. Miller*,
307 U.S. 174 (1939)..................................................................................6

**Statutes**

18 U.S.C. § 922(o) ........................................................................2, 4, 8, 12

18 U.S.C. § 924(c) ....................................................................................11

18 U.S.C. § 924(c)(1)(B)(ii) ....................................................................11

18 U.S.C. § 924(c)(1)(C) ..........................................................................12

26 U.S.C. § 5845(b) ................................................................................2, 7

National Firearms Act of 1934, Pub. L. No. 73–474, § 2(a), 48 Stat.
1236, 1237 (1934)....................................................................................6

Pub. L. No. 99-308, § 109(a), 100 Stat. 449 (1986) ................................8

USSG § 2K2.1(a)(1) (U.S. Sentencing Comm'n 2024)...........................11

## Legislative Materials

Armor Piercing Ammunition and the Criminal Misuse and
Availability of Machineguns and Silencers: Hearings on H.R. 641
& Related Bills Before the Subcomm. on Crime of the H. Comm.
on the Judiciary, 98th Cong. 107 (1984) ............................................................8

H.R. Rep. No. 1780....................................................................................................6

National Firearms Act: Hearings on H.R. 9066 Before the H. Comm.
on Ways & Means, 73d Cong. 5 (1934) ............................................................6

## Other Authorities

Carol Skalnik Leff & Mark H. Leff, *The Politics of Ineffectiveness:
Federal Firearms Legislation, 1919-38*, 455 Annals Am. Acad.
Pol. & Soc. Sci. 48, 54 (1981) ............................................................5

Cong. Rsch. Serv., Federal Regulation of Firearms: A Report
Prepared for the Use of the Senate Committee on the Judiciary 26
(May 1982)......................................................................................8

David T. Hardy, *The Firearms Owners' Protection Act: A Historical
and Legal Perspective*, 17 Cumb. L. Rev. 585 (1987) .....................................7, 8

Deputy Attorney General Lisa Monaco, *Remarks on Combating the
Production of Unlawful Machinegun Conversion Devices* (Sept. 6,
2024) ........................................................................................9, 13, 14

Ernesto Londoño & Glenn Thrush, *Inexpensive Add-on Spawns a New
Era of Machine Guns*, N.Y. Times (Aug. 12, 2023) ...........................................9

Franklin E. Zimring, *Firearms and Federal Law: The Gun Control
Act of 1968*, 4 J. Legal Stud. 133 (1975) ............................................5

Leigha Simonton, et al., *We're U.S. Attorneys for Texas. We Need
Your Help Fighting This Rising Gun Violence Threat*, Austin
American-Statesman, June 10, 2024, https://tinyurl.com/4y5xnw8r .................13

Perry Stein, *Taking Aim at Devices that Change Legal Weapons to
Illegal Machine Guns*, Washington Post (Sept. 6, 2024) .....................................9

Press Release, U.S. Attorney's Office for the Eastern District of Texas, *Harrison County Man Charged With Federal Firearms Violations*https://www.justice.gov/usao-edtx/pr/harrison-county-man-charged-federal-firearms-violations (Aug. 5, 2024)...................................13

Press Release, U.S. Attorney's Office for the Northern District of Alabama, *Five Individuals Sentenced for Possession of Glock Switches and Other Gun Crimes* (Aug. 20, 2024)...............................14

Press Release, U.S. Attorney's Office for the Northern District of Alabama, *U.S. Attorney's Office Announces "Operation Flip the Switch" Aimed at Machinegun Conversion Devices* (July 18, 2024) ...............14

Press Release, U.S. Attorney's Office for the Northern District of Texas, *Dallas Gang Member Charged With Possessing Glock Switches* (June 27, 2024) ...................................................13

Press Release, U.S. Attorney's Office for the Northern District of Texas, *Switch Dealer Pleads Guilty to Possessing Machinegun* (Oct. 25, 2024) ...........................................................13

Press Release, U.S. Attorney's Office for the Northern District of Texas, *Violent Felon Armed With Switch Charged With Firearm Crime* (Aug. 12, 2024)...........................................................13

Press Release, U.S. Attorney's Office for the Southern District of Texas, *Houston "Problem Gang" Member Heads to Prison for Possessing Machine Gun* (Sept. 27, 2024)...........................................13

Press Release, U.S. Attorney's Office for the Western District of Oklahoma, *United States Attorney and ATF Discuss Emerging Threat of Machinegun Conversion Devices* (Nov. 29, 2023).............................12

Press Release, U.S. Attorney's Office for the Western District of Texas, *Three Arrested, Facing Up To 10 years in Federal Prison for Possession of Machinegun Conversion Devices* (Oct. 9, 2024) ...................13

Press Release, U.S. Department of Justice Office of Justice Programs, *Justice Department Releases New Training to Focus on Detecting Machine Gun Conversion Devices* (Sept. 6, 2024) ...............................................9

v

Robert J. Spitzer, *Understanding Gun Law History after* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) ........................................................................................................5

Scott Glover & Curt Devine, *A Device That Can Turn A Semi-Automatic Weapon Into A Machine Gun In Moments Is Wreaking Havoc On American Streets*, CNN, Aug. 30, 2022, https://tinyurl.com/2p8mrmnc ...........................................................10

United States Code Statistics, Bureau of Justice Statistics Federal Criminal Case Processing Statistics Tool, https://tinyurl.com/yydxnjfs ................................................................12

Victor Hagan, *Birmingham Mass Shooting: Alabama Officials Call for Glock Switch Ban*, Montgomery Advertiser, Sept. 22, 2024, https://www.montgomeryadvertiser.com/story/news/crime/2024/09/22/leaders-call-for-glock-switch-ban-after-birmingham-mass-shooting/75339673007/ ....................................................................10

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.  Giffords Law Center researches, drafts, and defends laws, policies, and programs proven to effectively reduce gun violence.  Its attorneys track and analyze firearm legislation, evaluate policy proposals regarding gun violence prevention, and participate in litigation nationwide.  The organization has provided courts with amicus assistance in many important cases affecting gun violence and the safety of our communities.

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's longest-standing nonpartisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership.  Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live.  Brady has filed numerous

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to fund the preparation or submission of this brief.  No one other than the *amici curiae* made any monetary contribution to its preparation and submission.  All parties have consented to the filing of this brief.

briefs as amicus curiae in cases that implicate gun violence prevention.

## INTRODUCTION

Machineguns are extremely dangerous, fully-automatic weapons that can continuously fire rounds for as long as the shooter pulls the trigger. As a result, a shooter with a single machinegun can—in a matter of seconds—fire as many deadly bullets as are in the magazine. *See* 26 U.S.C. § 5845(b).

For nearly a century, Congress has responded to that unique danger by strictly regulating and, more recently, banning the possession of newly manufactured machineguns under Title 18, United States Code, Section 922(o). That statute—and the steep sentences that Congress and the Sentencing Commission have prescribed for possessing, using, or trafficking in illegal machineguns—are vital tools for law enforcement to keep these dangerous weapons off the street and out of the hands of criminals. That imperative has become only more vital with the recent and widespread proliferation of cheap and easy-to-use machinegun conversion devices ("MCDs").

Notwithstanding the broad and longstanding consensus about that statutory regime, the District Court dismissed the indictment against the defendant, which charged him with two counts of violating section 922(o). Ignoring the legislative history of that provision, and the salutary principles that led to its passage, the District Court concluded that the statute is inconsistent with the Second Amendment.

That decision is wrong as a matter of law.  And just as important, it will have severe public safety consequences.  In particular, flying in the face of almost a century of congressional intent and public support, the District Court's decision would strip law enforcement of a powerful and widely used tool to combat the growing threat of violence from machineguns and MCDs.

"Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  Rather, the Second Amendment only protects weapons "typically possessed by law-abiding citizens for lawful purposes"[2] and "in common use at the time." *Id.* at 625, 627 (citation omitted).[3]  Clearly, machineguns are not in that category.

Moreover, this common-sense limitation on the Second Amendment is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citation omitted).[4]  For this reason, the *Heller* Court

---

[2] While "lawful purposes" for weapons may include things like sporting uses, collection, and competitions, the constitutional protection exists to protect the individual right to lawful self-defense. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192-93 (7th Cir. 2023).

[3] *See also id.* at 627-28 (noting that the types of weapons protected under the Second Amendment may not always align with the types weapons most useful in warfare).

[4] This well-established exception to the Second Amendment for dangerous and unusual weapons was reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022).  Most recently, in *United States v. Rahimi*, the Court acknowledged again our long history and tradition of banning "dangerous and unusual weapons." 144 S. Ct. 1889, 1897 (2024); *see also id.* at 1923 (Kavanaugh, J. concurring) (stating that "the Second Amendment attaches only to

flatly rejected the idea that regulating machineguns could be deemed unconstitutional and called such an interpretation of the caselaw "startling." *Id.* at 624; *see also* Opening Brief for the United States ("Gov't Br.") at 31-32. Indeed, 90 years after Congress passed the National Firearms Act in response to gang violence and murders committed with machineguns, these weapons have become only more dangerous. The ban on possessing machineguns therefore remains an essential tool for law enforcement to protect the public.

Because Section 922(o) does not implicate the plain text of the Second Amendment,[5] and because it fits squarely within the Nation's longstanding history and tradition of prohibiting dangerous and unusual weapons, this Court should reverse.

---

weapons in common use because that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons") (internal quotation marks omitted).

[5] As the government explains, *see* Gov't Br. 7, 14-17, defendant's challenge to Section 922(o) fails at the first step of the *Bruen* test because Section 922(o) is one of the "presumptively lawful regulatory measures" that "do not implicate the plain text of the Second Amendment." *Rocky Mt. Gun Owners v. Polis*, 121 F.4th 96 , 120 (10th Cir. 2024) (quoting *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024)); *see also* Gov't Br. At 17-22 (discussing why machineguns are "dangerous" and "unusual").

4

# ARGUMENT

## I.    MACHINEGUNS ARE DANGEROUS AND UNUSUAL WEAPONS THAT POSE A PROFOUND THREAT TO PUBLIC SAFETY.

### A. The National Firearms Act was Passed to Address High-Profile Gang Violence

Since the time of John Dillinger and the "Tommy gun," Congress has recognized that machineguns pose a unique danger to the public. *See* Carol Skalnik Leff & Mark H. Leff, *The Politics of Ineffectiveness: Federal Firearms Legislation, 1919-38*, 455 Annals Am. Acad. Pol. & Soc. Sci. 48, 54 (1981) (noting that the image and public fears of the "roving gangster" brandishing a machinegun served as "the essential backdrop for early New Deal gun control efforts"). The 1929 St. Valentine's Day Massacre brought this issue to the forefront of public consciousness after gangsters, dressed as policemen, used machineguns to kill seven rival gang members in one mass shooting. Robert J. Spitzer, *Understanding Gun Law History after* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 62 (2023). Motivated by "public concern with crime and criminals," which had narrowed its focus on "the machine-gun-toting interstate gangster," Congress passed the National Firearms Act of 1934 ("NFA"). Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 137 (1975).

The NFA established a mandatory licensing scheme for "importer[s], manufacturer[s], and dealer[s] in firearms . . . " and imposed a steep tax on

machineguns.  National Firearms Act of 1934, Pub. L. No. 73–474, § 2(a), 48 Stat. 1236, 1237 (1934).  Speaking in support of the bill, Attorney General Homer Cummings described it as dealing "with one of the most serious aspects of the crime situation, namely, the armed underworld."  National Firearms Act:  Hearings on H.R. 9066 Before the H. Comm. on Ways & Means, 73d Cong. 5 (1934).  The Attorney General went on to observe that:

> [Machineguns] of course, ought never to be in the hands of any private individual.  There is not the slightest excuse for it, not the least in the world, and we must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

*Id*. at 6.  The House Report mirrored these sentiments, concluding that "[t]he gangster as a law violator must be deprived of his most dangerous weapon, the machinegun."  H.R. Rep. No. 1780, at 107–08.

Congressional passage of the NFA was therefore premised on the fact that machineguns were *not* in common use by law abiding citizens but, rather, were dangerous and unusual weapons used primarily by criminals.  Many states took similar steps to regulate these dangerous weapons.  Between 1925 and 1934, at least 32 states enacted machinegun regulations.  Spitzer, at 64, n. 38 (compiling laws).  Just five years after the NFA was passed, the Supreme Court upheld the law against a Second Amendment challenge.  *United States v. Miller*, 307 U.S. 174, 183 (1939).

### B. Congress Has Continued to Pass Laws to Address the Danger of Machineguns and to Respond to Technological Advances

In the 1960s, Congress again responded to the rise in crime rates by passing federal gun restrictions. The high-profile assassinations of President John F. Kennedy, Martin Luther King, Jr., and Robert Kennedy brought gun violence once again to the front of the public consciousness and put pressure on Congress to pass comprehensive gun laws. Zimring, at 147–48. One response was to broaden the definition of machinegun to include "any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Pub. L. No. 90-618, § 5845(b), 82 Stat. 1213, 1231. The expanded definition was specifically intended to cover M-2 conversion kits, "which could convert an ordinary surplus M-1 carbine into a fully automatic M-2 version" and were "widely available prior to 1968." David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 668 (1987).

By the 1980s, gun manufacturers were able to exploit loopholes in the statutory definition of "machinegun" by selling a part that could be used to convert a semiautomatic rifle to allow for fully automatic fire. *Id.* Because the manufacturers were selling a single part, as opposed to a "combination of parts," the conversion kit did not fall under the recently expanded definition of "machinegun."

7

*Id.* at 668–69.    The Justice Department under President Ronald Reagan's administration warned of these "dangerous conversions," noting that "[o]ver an 18-month period, 20 percent of machine guns seized or purchased . . . by the ATF had been converted in this way."  Cong. Rsch. Serv., Federal Regulation of Firearms:  A Report Prepared for the Use of the Senate Committee on the Judiciary 26 (May 1982).

Ultimately, Congressional attempts to update the machinegun definition could not outpace technological advances.  Additionally, the failure to raise the once-onerous $200 tax on the transfers of machineguns to keep pace with inflation severely dampened its deterrent effect.  As a result, between 1979 and 1984, sales of machineguns increased by 60 percent.  *See* Armor Piercing Ammunition and the Criminal Misuse and Availability of Machineguns and Silencers:  Hearings on H.R. 641 & Related Bills Before the Subcomm. on Crime of the H. Comm. on the Judiciary, 98th Cong. 107 (1984).  Congress responded by passing the 1986 Firearm Owners Protection Act, which banned civilian ownership of newly manufactured machineguns, and updated the definition of machinegun to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."  Pub. L. No. 99-308, § 109(a), 100 Stat. 449, 460; *Id.* § 102, 100 Stat. at 453.  This new machinegun ban was codified in Title 18, United States Code, Section 922(o).

### C. In Recent Years, There Has Been A Drastic Increase In Use of Machinegun Conversion Devices, Such As "Glock Switches," To Perpetrate Crimes

More recently, technological advances and the advent of 3-D printing have posed new challenges to law enforcement. Small, easily accessible, machinegun conversion devices ("MCDs") have proliferated, and can now be purchased for as little as $200. *See* Ernesto Londoño & Glenn Thrush, *Inexpensive Add-on Spawns a New Era of Machine Guns*, N.Y. Times (Aug. 12, 2023), https://tinyurl.com/53h8mbjt. Between 2018 and 2023, the ATF recovered more than 31,000 MCDs. Press Release, U.S. Department of Justice Office of Justice Programs, *Justice Department Releases New Training to Focus on Detecting Machine Gun Conversion Devices* (Sept. 6, 2024). As Deputy Attorney General Lisa Monaco noted earlier this year, MCDs are now "the most frequently recovered type of illegal firearm." Deputy Attorney General Lisa Monaco, *Remarks on Combating the Production of Unlawful Machinegun Conversion Devices* (Sept. 6, 2024). And current ATF Director Steven Dettelbach has explained that these metal or plastic devices are primarily used by gang members and drug traffickers to make their weapons more deadly. *See* Perry Stein, *Taking Aim at Devices that Change Legal Weapons to Illegal Machine Guns*, Washington Post (Sept. 6, 2024), https://tinyurl.com/yc4rrs3k.

The rapid proliferation of MCDs has led—predictably—to a significant increase in the use of dangerous machineguns. According to statistics compiled by the gunfire detection company, ShotSpotter, Inc., incidents of machinegun fire increased by approximately 1,400% between 2019 and 2021. *See* Scott Glover & Curt Devine, *A Device That Can Turn A Semi-Automatic Weapon Into A Machine Gun In Moments Is Wreaking Havoc On American Streets*, CNN (Aug. 30, 2022), https://tinyurl.com/2p8mrmnc. As just one of many devastating examples, in September 2024, firearms equipped with MCDs were used to commit an attack in Birmingham, Alabama, that injured 17 people and killed four. *See* Victor Hagan, *Birmingham Mass Shooting: Alabama Officials Call for Glock Switch Ban*, Montgomery Advertiser (Sept. 22, 2024), https://tinyurl.com/w2v3znnm.

## II.    PROSECUTORS RELY ON § 922(O) TO PROSECUTE VIOLENT CRIMINALS AND TO PROTECT PUBLIC SAFETY.

### A. Crimes Involving Machineguns Lead to Longer Sentences

Because of the obvious, indiscriminate, and widely recognized mayhem that machineguns can cause, Congress and the U.S. Sentencing Commission have been resolute that significantly longer sentences are justified for defendants who threaten public safety by using or possessing illegal machineguns. Indeed, the U.S. Sentencing Guidelines ("USSG") contain several provisions that enhance sentences for defendants who commit crimes with machine guns.

Section 2K2.1, for example, establishes the offense levels for crimes involving the unlawful receipt, possession, or transportation of firearms or ammunition.  Although that guideline ordinarily creates a base offense level of 6 or 12 for such crimes, the base level jumps to 18 if the defendant received or possessed a "firearm that is described in 26 U.S.C. § 5845(a)," which includes "a machinegun." And, if the defendant has already sustained one or two "felony convictions of either a crime of violence or a controlled substance offense," the base level jumps from 20 to 22 (one conviction) or 24 to 26 (two convictions) simply because the weapon involved was a semiautomatic weapon or machine gun.  *See* USSG § 2K2.1(a)(1) (U.S. Sentencing Comm'n 2024).  Additionally, the commentary to that provision provides for an "upward departure" if the offense involved "multiple National Firearms Act weapons," including machineguns.  *Id.* at cmt. 11.

Congress has echoed the same restrictions by prescribing enhanced mandatory minimum penalties for crimes that involve the use of machineguns.  For instance, 18 U.S.C. § 924(c) provides a fixed mandatory prison term for defendants who use or carry a firearm during and in relation to any crime of violence or any drug trafficking crime, or who possess a firearm in furtherance of such an offense.  While the mandatory minimum penalty under this statute is ordinarily five years, the mandatory minimum is multiplied sixfold to 30 years if the firearm is a "machinegun or destructive device, or is equipped with a firearm silencer or firearm muffler."  18

U.S.C. § 924(c)(1)(B)(ii).  Similarly, for second or subsequent convictions under the statute, the mandatory minimum penalty is increased from 25 years to life in prison if the firearm that the defendant used or possessed is a machinegun.  18 U.S.C. § 924(c)(1)(C).

**B. Prosecutions Under Section 922(o) Have Increased Significantly**

Section 922(o) has become an increasingly important tool to combat the proliferation of machineguns and MCDs.  For instance, there were 251 prosecutions under that statute in 2022—an increase of more than 350% from the 70 prosecutions in 2010.  *See* United States Code Statistics, Bureau of Justice Statistics Federal Criminal Case Processing Statistics Tool, https://tinyurl.com/yydxnjfs.

That trend has continued.  Indeed, over the past thirteen months, federal prosecutors across the country have announced major initiatives targeting illegal MCDs:

**Project Switch Off –** On November 23, 2023, the U.S. Attorney for the Western District of Oklahoma announced "Project Switch Off" to "target prosecutions related to these conversion devices and take illegal machineguns off the streets."  Press Release, U.S. Attorney's Office for the Western District of Oklahoma, *United States Attorney and ATF Discuss Emerging Threat of Machinegun Conversion Devices* (Nov. 29, 2023).  As a result, that Office has

12

charged nearly 40 individuals with MCD-related offenses in the last year.  Monaco, *Remarks*, *supra* at 9.

**Operation Kill Switch** – On June 10, 2024, U.S. Attorneys for the Eastern, Northern, Southern, and Western Districts of Texas announced "Operation Texas Kill Switch."  In an op-ed published that same day, those four officials declared that "[w]ithout serious intervention, it's only a matter of time until these devices wreak more havoc in our communities."  Leigha Simonton, et al., *We're U.S. Attorneys for Texas. We Need Your Help Fighting This Rising Gun Violence Threat*, Austin American-Statesman (June 10, 2024), https://tinyurl.com/4y5xnw8r.  *Id.*  And they emphasized the "dramatic uptick" in the number of switches that law enforcement officials had recovered in the several past years.  Over the past few months, several individuals have already been charged and sentenced in these districts under Section 922(o) for possession of such devices.[6]

---

[6] *See, e.g.*, Press Release, U.S. Attorney's Office for the Northern District of Texas, *Dallas Gang Member Charged With Possessing Glock Switches* (June 27, 2024); Press Release, U.S. Attorney's Office for the Eastern District of Texas, *Harrison County Man Charged With Federal Firearms Violations* (Aug. 5, 2024);; Press Release, U.S. Attorney's Office for the Western District of Texas, *12 Arrested in San Antonio for Alleged Possession and Trafficking of Stolen Firearms, Machinegun Conversion Devices* (Aug. 28, 2024); Press Release, U.S. Attorney's Office for the Northern District of Texas, *Violent Felon Armed With Switch Charged With Firearm Crime* (Aug. 12, 2024); Press Release, U.S. Attorney's Office for the Southern District of Texas, *Houston "Problem Gang" Member Heads to Prison for Possessing Machine Gun* (Sept. 27, 2024); Press Release, U.S. Attorney's Office for the Western District of Texas, *Three Arrested, Facing Up To 10 years in Federal Prison for Possession of Machinegun Conversion Devices* (Oct. 9, 2024); Press

**Operation Flip the Switch** – On July 18, 2024, the U.S. Attorney for the Northern District of Alabama announced "Operation Flip the Switch" to target the proliferation of MCDs.  *See* Press Release, U.S. Attorney's Office for the Northern District of Alabama, *U.S. Attorney's Office Announces "Operation Flip the Switch" Aimed at Machinegun Conversion Devices* (July 18, 2024).  In announcing this initiative, federal law enforcement officials in that district committed to using "every tool in our toolbox to aggressively prosecute those who possess such deadly devices."  *Id.*  Just one month later, in August, four defendants in that district received serious sentences for violating section 922(o).  Press Release, U.S. Attorney's Office for the Northern District of Alabama, *Five Individuals Sentenced for Possession of Glock Switches and Other Gun Crimes* (Aug. 20, 2024).

These examples will continue to multiply.  On September 6, 2024, Deputy Attorney General Monaco directed all 94 U.S. Attorneys' Offices to prioritize comprehensive and district-specific MCD enforcement strategies.  *See* Monaco, *Remarks*, *supra* at 9.  She also instructed each U.S. Attorney's Office to meet with their federal, state, local, Tribal, and territorial law enforcement partners to identify promising MCD-related enforcement practices.  *Id.*  As part of this directive, the Justice Department also established the Action Network to Terminate Illegal

---

Release, U.S. Attorney's Office for the Northern District of Texas, *Switch Dealer Pleads Guilty to Possessing Machinegun* (Oct. 25, 2024).

Machinegun Conversion Devices ("ANTI-MCD") Committee and announced the creation of a national MCD Training Initiative. These initiatives and results reflect the overwhelming consensus among law enforcement officials that the federal ban on the possession of machineguns is a powerful and successful tool to combat the growing threat of violence from machineguns and MCDs. The District Court's decision flies in the face of that experience and expertise, as well as the clear Congressional mandate that machineguns are dangerous weapons that should not be available for criminals to possess and use.

## CONCLUSION

The District Court's decision is wrong under the Second Amendment and poses a direct threat to public safety. This Court should reverse.

Respectfully submitted,

/s/ *Michael Kim Krouse*
Michael Kim Krouse
Paul J. Fishman
ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
michael.krouse@arnoldporter.com
paul.fishman@arnoldporter.com

Joanna McDonough
ARNOLD & PORTER
    KAYE SCHOLER LLP

15

200 Clarendon Street, 53rd Floor
Boston, MA 02116
(617) 351-8050
joanna.mcdonough@arnoldporter.com

*Counsel for Amici Curiae*
*Giffords Law Center to Prevent Gun*
*Violence and Brady Center to Prevent Gun*
*Violence*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 3,443 words, excluding the parts of the brief exempted by Fed. R. App. P. 32.

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. 32(a)(5), (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Executed this 19th day of December, 2024.

/s/ *Michael Kim Krouse*
Michael Kim Krouse

**CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS**

I certify that all required privacy redactions have been made in this brief per 10th Cir. R. 25.5.  I further certify that hard copies of this brief to be submitted to the Court are exact copies of the version submitted electronically and that the electronic submission of this brief was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Executed this 19th day of December, 2024.

/s/ *Michael Kim Krouse*
Michael Kim Krouse

**CERTIFICATE OF SERVICE**

I certify that on December 19, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Executed this 19th day of December, 2024.


/s/ *Michael Kim Krouse*
Michael Kim Krouse