No. 24-3141

In the United States Court of Appeals
for the Tenth Circuit

———————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

TAMORI MORGAN,
*Defendant-Appellee.*

———————————————

On Appeal from the
United States District Court for the District of Kansas
Case No. 6:23-CR-10047
Honorable John W. Broomes

———————————————

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW CENTER, INC., GUN OWNERS OF AMERICA, INC., GUN OWNERS OF CALIFORNIA, INC., MINNESOTA GUN OWNERS CAUCUS, AND SECOND AMENDMENT DEFENSE AND EDUCATION COALITION, LTD., IN SUPPORT OF APPELLEE AND AFFIRMANCE**

———————————————

C. D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com
*Counsel for Amici Curiae*

March 21, 2025

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Gun Owners of America, Inc., Gun Owners of California, Inc., Minnesota Gun Owners Caucus, and Second Amendment Defense and Education Coalition, Ltd., are nonprofit organizations and thus have no parent corporations and no stock.

Date: March 21, 2025

MICHEL & ASSOCIATES, P.C.

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement............................................................................. i

Table of Contents...................................................................................................... ii

Table of Authorities ................................................................................................ iii

Interest of Amici Curiae ........................................................................................... 1

Introduction ............................................................................................................... 2

Argument.................................................................................................................... 4

I.    The Second Amendment's Plain Text Indisputably Applies to Machineguns, so the United States May Not Skip the Historical Inquiry ...................................... 4

    A.    Machineguns are bearable arms meeting the plain text of the Second Amendment............................................................................................. 4

II.   The United States Failed to Meet Its Historical Burden..................................... 12

    A.    The historical analogues belatedly presented by the United States are unpersuasive because they did not apply to the predecessors of the machinegun or are far too late in time....................................................... 12

    B.    Historical tradition confirms that firearms useful in combat and warfare are protected by the Second Amendment. ............................................... 16

Conclusion................................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) .................................................................... 15

*Aymette v. State*,
  21 Tenn. 154 (1840) .................................................................... 15

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ................................................... 12, 13

*Barnett v. Raoul*,
  671 F. Supp. 3d 928 (S.D. Ill.) ....................................................... 20

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023) ................................................ 5, 10, 11

*Bianchi v. Brown*,
  111 F.4th 438 (4th Cir. 2024) ........................................................ 10

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .................................................................... 7, 8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................ passim

*Duncan v. Bonta*,
  695 F. Supp. 3d 1206 (S.D. Cal. 2023) ..................................... 14, 16, 20

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...................................................... 8, 16

*Harrel v. Raoul*,
  144 S. Ct. 2491 (2024) ........................................................... 5, 6, 11

*Luis v. United States*,
  578 U.S. 5 (2016) ......................................................................... 5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ................................................................... passim

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024) ............................................... 13

*Silveira v. Lockyer,*
  328 F.3d 567 (9th Cir. 2003)............................................................20, 22

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023)................................................................. 13

*United States v. Miller,*
  307 U.S. 174 (1939)............................................................................. 21

*United States v. Brown,*
  No. 23-CR-123-CWR-ASH, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025) ............ 7, 9

*United States v. Rahimi,*
  602 U.S. 680 (2024).....................................................................passim

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020)............................................................................. 12

*Yukutake v. Lopez,*
  No. 21-16756, 2025 WL 815429 (9th Cir. Mar. 14, 2025) ........................... 5

## Statutes

18 U.S.C. § 922.............................................................................passim

U.S. Const. amend. II............................................................................ 6

## Other Authorities

Battlefield Vegas Homepage, https://www.battlefieldvegas.com/ (last accessed March
  18, 2025)............................................................................................ 8

Bishop, Joel, *Commentaries on the Criminal Law* (1868) ...................................... 19

Black, Henry Campbell, *Handbook of American Constitutional Law* (1895) ...................... 14

Burleigh, Joseph Bartlett, *The American Manual: Containing a Brief Outline of the Origin and
  Progress of Political Power and the Laws of Nations* (1852) .................................. 14

Cooley, Thomas M., LL.C., *The General Principles of Constitutional Law in the United States
  of America* (1898) ............................................................................. 19

Coxe, Tench, Letter to the *Philadelphia Gazette*, Feb. 20, 1788 ....................................... 17

https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-
  report/download (last accessed Feb. 5, 2025)................................................ 8

Leider, Robert, *The Individual Right to Bear Arms for Common Defense* (Dec. 17, 2024), available at https://ssrn.com/abstract=4918009 (last accessed March 18, 2025) ................................................................................................................... 19

Michel, C.D. & Konstadinos T. Moros, *Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. (2024) .. 19

Pomeroy, John Norton, *An Introduction to the Constitutional Law of the United States* (1868) .................................................................................................................. 19

*Remarks on the First Part of the Amendments to the Federal Constitution*, "A Pennsylvanian," PHILADELPHIA FEDERAL GAZETTE, June 18, 1789 .................................................... 17

*Slavery Question: Speech of Hon. Edward Wade of Ohio in the House of Representatives*, August 2, 1856 (Buell & Blanchard Publishers, 1856) ............................................................ 18

Suciu, Peter, Yes, Machine Guns Are 'Legal' (But Here Comes All the Catches), The National Interest, (July 2, 2020), https://nationalinterest.org/blog/reboot/yes-machine-guns-are-legal-here-comes-all-catches-163921 (last visited Jan. 29, 2025).. 3

Sumner, Charles, *The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas* (Cincinnati, G.S. Blanchard, 1856) ...................................................................................................................... 19

Webster, Noah, *An Examination into the Leading Principles of the Federal Constitution Proposed by the Late Convention Held at Philadelphia* (1787) ................................. 18

Whiting, Samuel, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2 (1813) ...........................................................................................17, 18

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle & Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Gun Owners of America, Inc. is a nonprofit organization formed in 1976 by the late Sen. H.L. (Bill) Richardson to preserve and defend gun owners' Second Amendment rights. GOA sees firearms ownership as an issue of freedom and works to defend that freedom through lobbying, litigation, and outreach. GOA has served as a party or amicus in Second Amendment challenges in almost every state in the nation to protect gun owner rights.

Gun Owners of California, Inc. is a 501(c)(4) not-for-profit entity founded in

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

1975 to oppose infringements on Second Amendment rights. GOC is dedicated to the unequivocal defense of the Second Amendment and America's extraordinary heritage of firearm ownership. Its advocacy efforts regularly include participation in Second Amendment litigation, having filed amicus briefs in many cases, including cases before the U.S. Supreme Court.

Minnesota Gun Owners Caucus ("MGOC") is a 501(c)(4) non-profit organization incorporated under the laws of Minnesota with its principal place of business in Shoreview, Minnesota. MGOC seeks to protect and promote the right of citizens to keep and bear arms for all lawful purposes. MGOC serves its members and the public through advocacy, education, elections, legislation, and legal action. MGOC's members reside both within and outside Minnesota.

Finally, Second Amendment Defense and Education Coalition, Ltd. ("SADEC"), is an Illinois not-for-profit corporation. SADEC is dedicated to the defense of human and civil rights secured by law including, in particular, the right to bear arms. SADEC's activities are furthered by complementary programs of litigation and education.

## INTRODUCTION

Federal law prohibits individuals from so much as possessing or transferring an unregistered machinegun,[2] regardless of their legal eligibility to possess or own

---

[2] The law technically exempts registered machine guns. But 18 U.S.C. § 922(o)(2)(B) only allows possession and transfer of machine guns "lawfully possessed before the date th[e] subsection took effect" in 1986. Due to their artificially capped number, registered machine guns from before 1986 command prohibitive prices today—to the point that they are effectively banned for all but the wealthiest people. Indeed, § 922(o)(2)(B) "has resulted in the cost of legal machine guns to skyrocket, simply because what is out there is all there can ever be. Today a

firearms generally. 18 U.S.C. § 922(o). Under *Heller* and *Bruen*, the Second Amendment presumptively protects all instruments that constitute bearable arms, and that protection extends to modern weapons. And even if a particular weapon is not "in common use" today, then whether the government ultimately can ban that weapon is still a historical question. And as *Bruen* made clear, the government bears that historical burden. Accordingly, courts cannot relieve the government of its burden simply by declaring that machineguns somehow are not "arms," or by limiting the scope of the Second Amendment to only those arms that are "common" (especially when they are only uncommon because they are so heavily restricted). As justices of the Supreme Court have acknowledged themselves, the outer limits of what types of arms the Second Amendment protects is still an open question, so a full historical analysis is necessary.

A cursory look at our historical tradition quickly reveals that the Second Amendment unquestionably protects arms that are most useful in combat. The United States points to the historical tradition of banning the concealed carry (and sometimes possession) of certain weapons like dirks or brass knuckles. But missing from all those laws are bans on the possession of the prevailing military arms of the era—be they muskets and flintlock pistols or, later in the 19th Century, repeating rifles and revolvers. Given that the Founders intended the Second Amendment to protect the people's ability to resist a foreign invader or a tyrannical government that

---

Thompson submachine gun can cost more than a new car . . . ." *See* Peter Suciu, *Yes, Machine Guns Are 'Legal' (But Here Comes All the Catches)*, The National Interest, (July 2, 2020), https://nationalinterest.org/blog/reboot/yes-machine-guns-are-legal-here-comes-all-catches-163921 (last visited Jan. 29, 2025).

had overthrown our constitutional order, it would make little sense for the Amendment's protections to exclude those arms most useful in combat.

## ARGUMENT

### I.    THE SECOND AMENDMENT'S PLAIN TEXT INDISPUTABLY APPLIES TO MACHINEGUNS, SO THE UNITED STATES MAY NOT SKIP THE HISTORICAL INQUIRY

#### A.    Machineguns are bearable arms meeting the plain text of the Second Amendment.

By its plain language, *Bruen* eschews a two-step analytical test for deciding Second Amendment challenges: "Despite the popularity of th[e] two-step approach, it is one step too many." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022). Indeed, just last year, the Supreme Court reiterated its one-step analysis: "In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the United States must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" *United States v. Rahimi*, 602 U.S. 680, 689 (2024) (citing *Bruen*, 597 U.S. at 24); *see also id.* at 691 ("when the Government regulates arms-bearing conduct, . . . it bears the burden to 'justify its regulation.'"). It is hard to be any clearer than that. When a firearm law is challenged, it must be justified with history, period. There is no tortured "plain text analysis."

To be sure, a Second Amendment challenge requires that the restriction at issue at least *implicate* the right to keep and bear arms. *Bruen*, 597 U.S. at 17. Just as a First Amendment free speech case must involve speech, so too must a Second Amendment case involve the acquisition, ownership, possession, carry, use of, or commerce in,

arms.[3] But this does not demand an independent "step" that requires in-depth analysis. This is critical because, ever since *Bruen* was decided, courts have exploited this manufactured "first step" to dodge the historical analysis altogether, shifting the burden away from the government. Under these "extremely narrow reading[s]," the Second Amendment is "wrongly reduced to 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Yukutake v. Lopez*, No. 21-16756, 2025 WL 815429, at *12 (9th Cir. Mar. 14, 2025) (citing *Bruen*, 597 U.S. at 70). The fabricated "plain text analysis" approach ultimately allows lower courts to treat obvious arms-related questions as though they are not, making a mockery of both the Second Amendment and *Bruen*.[4]

That is precisely the outcome the United States seeks when it claims that, because machineguns are not "in common use" for lawful purposes, no further analysis is needed. Opening Br. for the United States ("US.Br.") at 17. The government treats this question as decided by *Heller*'s dicta, but even *Bruen*'s author does not think such "hardware" questions have been decided: "We have never squarely addressed what types of weapons are 'Arms' protected by the Second Amendment." *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., statement concerning denial of certiorari). Indeed, the "minimal guidance" the Supreme Court

---

[3] *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise.").

[4] For example, in *Bevis v. City of Naperville*, 85 F.4th 1175, 1191 (7th Cir. 2023), the Seventh Circuit ruled that any weapon used by the military is not covered by the Second Amendment. This reasoning would lead to absurd results. For instance, muskets—the quintessential arms of the founding era—would not be protected due to their widespread military use at the time.

has provided "is far from a comprehensive framework for evaluating restrictions on types of weapons, and it leaves open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or 'unusual.'" *Id.*

Thus, lacking definitive Supreme Court guidance on this topic, this Court must begin its own analysis with the plain text of the Second Amendment, which guarantees individuals the right "to keep and bear Arms." U.S. Const. amend. II. That, of course, includes the right to use them "for offensive or defensive action." *Bruen*, 597 U.S. at 32. It is not even a close question whether machineguns are "arms" because they are undoubtedly "weapon[s] of offence" that a person "takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (citing founding-era dictionaries). And as one 1794 thesaurus observed, "*all firearms* constituted 'arms.'" *Id.* (emphasis added). Regardless of the ultimate constitutionality of machinegun bans or other restrictions on the use of such firearms, it is unserious to assert that they are not even "arms" presumptively protected by the Second Amendment. They clear—at least—that low bar.

Arguments about whether machineguns are "dangerous and unusual" therefore fall into the historical inquiry, not the plain text. Such debates are irrelevant to whether an item is an "arm" within the Second Amendment's text and thus deserving of that historical inquiry. That is because the text of the Second Amendment reaches *all* arms, even those that are dangerous and unusual. Indeed, it "extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 28 (emphasis added) (quoting *Heller*, 554 U.S. at 582); *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (describing *Bruen* as "explaining

6

that the Amendment does not apply only to the catalogue of arms that existed in the 18th century, but rather to all weapons satisfying the '*general definition*' of 'bearable arms'.")

The Supreme Court has repeated the same principle several times. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (reaffirming *Heller*'s holding about which arms the Second Amendment extends to); *see also Rahimi*, 602 U.S. at 691 (again reaffirming the same). *Bruen* confirmed this understanding as well and added that *Heller*'s "general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added). And if there were any question as to where in *Bruen*'s framework a court is to analyze a weapon's protection, the Court explained that "*we use history* to determine which modern 'arms' are protected by the Second Amendment." *Id.* (emphasis added).

The lower courts are bound to accept the message and conduct a full historical analysis to determine the constitutionality of any firearm restriction, including the federal ban on machineguns. The district court ruled correctly, and it has since been joined by another district court, which ruled similarly. *See United States v. Brown*, No. 23-CR-123-CWR-ASH, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025).

The United States makes three other arguments to avoid its burden under the historical inquiry. All three lack merit.

First, the government argues that machineguns are uncommon, pointing out that "there are fewer than 176,000 legally registered machineguns in civilian hands." [5]

---

[5] This figure is disputed, as hundreds of thousands more machineguns—including new models—are owned *by* "civilians" through privately held business entities legally exempt from 18 U.S.C. § 922(o). Some 741,146 machineguns are

US.Br.8. But really, there are fewer than 176,000[6] in civilian hands *because the government effectively banned them in 1986*. It is self-serving for the government to declare a class of arms "uncommon," and thus unprotected, because of a ban on that class of arms that the government itself implemented. Even courts that are generally hostile to the Second Amendment have rejected this tactic. As the Seventh Circuit reasoned, "It [is] absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). And the significant demand to recreationally shoot registered machineguns—for a very high price—helps support entire businesses in Las Vegas and elsewhere.[7] If such firearms had remained legal to acquire, they would be much more common today. In any event, as already established, the rarity of an arm does not make it "not an arm" as it relates to the plain text of the Second Amendment.

Second, the United States also relies heavily on *Heller*'s dicta noting that it would be "startling" if machineguns were protected by the Second Amendment. US.Br.16 (citing *Heller*, 554 U.S. at 624.) But what *Heller* was actually calling "startling" was the idea that "*only* those weapons useful in warfare are protected." *Heller*, 554 U.S. at 624 (emphasis added).[8] Similarly, *Heller*'s discussion of the M16, just one

---

registered as of 2021 alone. *See* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download at 16 (last accessed Feb. 5, 2025).

[6] The Supreme Court already held that the Second Amendment's protection extends to stun guns, of which there were only about 200,000 in circulation. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).

[7] "From handguns and pistols to fully automatic rifles, sub-machine guns to belt-feds and .50 calibers, we have it all here at Battlefield Vegas!" *See* Battlefield Vegas Homepage, https://www.battlefieldvegas.com/ (last accessed March 18, 2025).

[8] Moreover, its reference to machine guns spoke of "restrictions on" machine

paradigmatic machinegun, did not hold that the Second Amendment definitively does not protect machineguns. Instead, the *Heller* Court was anticipating concerns that the application of its historical "common use" test might conflict with the Second Amendment's stated militia purpose. 554 U.S. at 627. By referencing the M16, the Court provided an example of a *military* weapon whose ban the Court assumed *might* be consistent with the Second Amendment despite the militia clause, *assuming* the ban fits in the tradition of regulating the "carrying" of "dangerous and unusual" weapons.

Third, the United States argues that machineguns can be banned because they are "extraordinarily lethal." US.Br.18. But there is no lethality exception to the Second Amendment,[9] and "dangerousness is not the end of the matter, because firearms can be dangerous and constitutionally protected." *United States v. Brown*, 2025 WL 429985, at *4. At most, such technological advancement allows for the application of a "more nuanced approach" to the historical inquiry. *Bruen*, 597 U.S. at 27; *but see id.* (citing *Heller*, 554 U.S. at 629) (invalidating bans on modern handguns, which feature rates of fire, capacities, and precision that were unknown at the founding, with a "straightforward" historical analysis.)

Moreover, it is not the first time in our history that newer firearm technology has been much more lethal than what came before. Arguably, a more significant relative jump in firepower happened during the 19th century. By the end of that

---

guns under the 1930s National Firearms Act, *id.*, a taxation and registration scheme which would not become (effectively) a ban until much later, in the 1980s.

[9] Any dangers arising from machineguns can also be mitigated with other regulations far short of a full ban, such as those found in the National Firearms Act (to the extent historical tradition supports those regulations). What is at issue in this case is not such regulations, but rather a law that effectively *bans* machine guns, save for those registered before 1986.

9

century, repeating, cartridge-fed firearms were ubiquitous, yet rarely regulated and never banned. Many of the most popular rifle models had magazines that held more than ten or fifteen rounds, while revolvers gave Americans five or six rounds (of cartridge ammunition) in a compact package. These firearms were, therefore, exponentially more capable than the single-shot flintlock rifles and pistols (where powder, patch, and ball were loaded individually) from the founding generation.

Even when setting aside historical firearms and comparing machineguns to the lethality of modern semiautomatic rifles, the United States' argument runs into problems. Very recently, courts have ruled that semiautomatic firearms are not significantly different than machineguns. In upholding an Illinois ban on common semiautomatic rifles, the Seventh Circuit decided that "[b]ased on the record before us, we are not persuaded that the AR-15 is materially different from the M16." *Bevis v. City of Naperville*, 85 F.4th 1175, 1197 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). In a similar case about another such law, the Fourth Circuit sitting en banc wrote that "[t]he primary difference between the M16 and AR-15—the M16's capacity for automatic fire, burst fire, or both, depending on the model—pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi v. Brown*, 111 F.4th 438, 456 (4th Cir. 2024).

The United States' amici only reiterate the United States' unpersuasive lethality argument, claiming that machineguns pose a "unique danger," and so § 922(o) must be upheld. *See* Giffords-Brady Amicus Br. at 2. But when arguing that the Seventh Circuit should uphold Illinois' ban on common *semi*automatic rifles, the Giffords Law Center wrote that the recently-banned firearms are "far outside the category of

10

'quintessential self-defense weapons' at issue in *Heller*, and more akin to virtual machine guns" and that "the AR-15 is functionally the same as the M16, an automatic weapon designed for military combat." *See* Br. for Giffords Law Ctr. as Amicus Curiae at 14-16, *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) (No. 23-1353). While that brief acknowledged that the AR-15 is not capable of fully automatic fire, it downplayed that difference. *Id.* at n.51. It seems disingenuous to argue in one amicus brief that semiautomatic rifles can be banned because they are basically indistinguishable from machineguns, but then when the law at issue is a machinegun ban, argue in another brief that they are a dramatically different and unique danger distinct from semiautomatic firearms.

In sum, whether machineguns can be banned is an undecided question that must receive the full *Bruen* analysis. Whatever it may have said in dicta, the *Heller* Court was clear that it was "not undertak[ing] an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626; *see also Bruen*, 597 U.S. at 31 (same). This sort of uncertainty is why Justice Thomas called on his colleagues to answer these questions soon. *Harrel,* 144 S. Ct. at 2492 (2024) (Thomas, J., statement concerning denial of certiorari).

Of course, Amici do not seek to mislead this Court. It is true that the *Heller* majority at least hinted that the Supreme Court may someday uphold 18 U.S.C. § 922(o) or a law like it, after a review of the historical record. But the Court's intervening decisions in *Caetano*, *Bruen*, and *Rahimi* have undermined *Heller*'s dicta. What the Supreme Court may rule in the future is not a license for lower courts to skip the test that *Bruen* demands *today*. The historical inquiry must proceed.

II.    **THE UNITED STATES FAILED TO MEET ITS HISTORICAL BURDEN**

A.    **The historical analogues belatedly presented by the United States are unpersuasive because they did not apply to the predecessors of the machinegun or are far too late in time.**

Even if there is some other historical record out there in some other case under which the United States meets its burden, it has not met that burden here. As the district court correctly observed, "the government has barely tried to meet [its] burden." App. 73. Nor should the district court have attempted to rescue the United States by doing its own historical inquiry (and neither should this Court). As the Ninth Circuit has explained, "[a] district court should not try to help the government carry its burden by 'sift[ing] ... historical materials' to find an analogue. The principle of party presentation instead requires the court to 'rely on the parties to frame the issues for decision.' " *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). The government's threadbare historical evidence presented below should doom it in this case, and this Court may end the analysis there as it pertains to Mr. Morgan, leaving open the possibility, as the district court did, that "the government could, in some other case, meet its burden to show a historically analogous restriction that would justify § 922(o)." App. 73-74.

But even if this Court were to consider the historical laws the United States now belatedly presents, those laws do not meet the government's burden. For one, many of the laws cited generally only applied to the *carry* (and often just *concealed* carry) of certain weapons, and usually not their mere possession. *Bruen* teaches that "how" and "why" a proposed analogue burdened the Second Amendment right are critical metrics of comparison, 597 U.S. at 29, and laws that regulated only the carry of certain

12

weapons are dissimilar to full-blown possession bans like § 922(o).

Courts must also consider whether modern law and its proposed analogues "impose a comparable burden" on the right. *Id.*[10] The historical carry laws presented fall short because they still allowed for possession—and often even carry so long as it was done openly. These laws are simply not "relevantly similar" to a ban on the possession of an entire class of arms. For instance, a ban on *carrying* arms in a threatening way regulates in a dramatically different way than a ban on *possessing* certain types of arms does; the "comparable burden" is much greater with the latter. *See Bruen*, 597 U.S. at 29 (explaining that because everything is similar in infinite ways to everything else, there must be metrics in place to assess relevant similarities). It is also notable that even in a case upholding a ban on common semiautomatic AR-type rifles, a court determined that laws pertaining to carry were not relevantly similar under *Bruen* "because they employ a different 'how.'" *Rupp v. Bonta,* 723 F. Supp. 3d 837, 865 (C.D. Cal. 2024). Or as a Ninth Circuit panel explained, "[m]any of these statutes excepted the carry of prohibited weapons for self-defense, for 'lawful purposes,' while traveling, or in their owners' homes." *Teter v. Lopez,* 76 F.4th 938, 953 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), and *remanded on mootness grounds*, 125 F.4th 1301 (9th Cir. 2025).

Yet for the sake of argument, Amici will assume, as the United States does, that historical laws restricting the carry of certain weapons are analogous to full possession

---

[10] In explaining how California could meet its burden in a case concerning open carry, the Ninth Circuit explained that "California must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to California's open-carry ban." *Baird*, 81 F.4th at 1047.

bans. US.Br.23. Even then, the government's proposed historical analogues fail because the sorts of weapons restricted by the 19th-century laws it cites are not analogous to machineguns. As the United States explains in its brief, many states restricted the carry of "Bowie knives, Arkansas toothpicks, dirks, and daggers," and "slung shots, brass knuckles, and billy clubs." US.Br.26. These are not analogous to machineguns, or even the prevailing firearms of *their own* time.[11]

In fact, a few legal commentators of the era did not consider such weapons to be in the same category as firearms and other weapons of combat and warfare: "Arms ... is used for whatever is intentionally made as an instrument of offence...." Joseph Bartlett Burleigh, *The American Manual: Containing a Brief Outline of the Origin and Progress of Political Power and the Laws of Nations* 31 (1852). Burleigh contrasted "arms" with the term "weapons," which are instruments of offense or defense: "We say fire-arms, but not fire-weapons; and weapons offensive or defensive, but not arms offensive or defensive." *Id.* Henry Campbell Black, the original author of the renowned *Black's Law Dictionary* wrote that the arms protected are "those of a soldier … the citizen has at all times the right to keep arms of modern warfare." Henry Campbell Black, *Handbook of American Constitutional Law* 403-04 (1895). He contrasted such arms with "other weapons as are used in brawls, fights, and riots." *Id.*

---

[11] As at least one court has observed, no state banned the possession of any type of firearm before 1900. "It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind." *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1242 (S.D. Cal. 2023).

Court decisions of the era agreed. In an 1871 case about a law restricting the carry of a "dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver," the Supreme Court of Tennessee upheld the law—*except* as it pertained to revolvers:

> We know there is a pistol of that name which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the repeater is a soldier's weapon—skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand.

*Andrews v. State*, 50 Tenn. 165, 187 (1871); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) ("[T]he arms the right to keep which is secured are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment.")

The 19th-century analogues to the modern machinegun are not bowie knives or brass knuckles; they are repeating arms like the Winchester repeater, Colt revolver, Gatling gun, and eventually, the Maxim machinegun. And yet the category of "dangerous and unusual" weapons never historically included such firearms or, for that matter, any firearms useful in combat and warfare, because that is exactly what the Second Amendment was meant to protect most of all. *See* Part II.B., *infra*.

The United States' remaining proposed analogues fare no better. It presents historical "trap gun" restrictions, US.Br.27, but such laws were not bans on arms but rather bans on a manner of placing an arm such that it would fire without human intervention if a trap was sprung. What the United States "does not admit or seem to recognize is that 'trap guns' are not guns at all. They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other

atypical triggering mechanism without needing an operator." *Duncan*, 695 F. Supp. 3d at 1251.

Finally, the United States argues that the analogue to modern machinegun bans is 20th-century machinegun bans. US.Br.27-29. But again, "[a] law's existence can't be the source of its own constitutional validity." *Friedman*, 784 F.3d at 409. In *Bruen*, the fact that the law at issue dated back to 1911—even older than the state and federal machinegun laws the United States defends here—was not enough to save it because it was adopted too late in time. As the Supreme Court explained: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66, n.28. Here, 20th-century laws restricting machineguns contradicted earlier evidence that no state ever banned the mere possession of firearms. Additionally, they did not establish any lasting historical tradition; even today, as the United States acknowledges, a huge majority of states (38) do not ban possession of machineguns, so long as federal registration requirements are followed. US.Br.8. The "legislative consensus" (US.Br.20) the United States relies on is much weaker than it would like this Court to think.

**B.      Historical tradition confirms that firearms useful in combat and warfare are protected by the Second Amendment.**

*Rahimi* confirms that modern firearm regulations must be "consistent with the principles that underpin [the Nation's] regulatory tradition." 602 U.S. at 692. One

such principle is as old as the Second Amendment itself and, indeed, was the main impetus for its adoption: Preserving the ability of the People to resist tyranny or foreign invasion that threatened our constitutional order.

With all the modern focus on *personal* self-defense, which is no doubt a critical aspect of the Second Amendment, it is easy to forget that the Second Amendment was written by people who had just revolted against a tyrannical government and were also concerned with *societal* self-defense. They sought to guarantee that the People would have a final recourse should the new government they were forming turn tyrannical, or if a foreign invader toppled the Republic. Tench Coxe, delegate to the Continental Congress and the Annapolis Convention, wrote that "[w]hereas civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, ... the people are confirmed by the article in their right to keep and bear their private arms." *Remarks on the First Part of the Amendments to the Federal Constitution*, under the pseudonym "A Pennsylvanian" in the Philadelphia Federal Gazette, June 18, 1789, p. 2 col. 1 (as quoted in the *Federal Gazette*, June 18, 1789). He also wrote that "Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are the birthright of an American." Tench Coxe, Letter to the *Philadelphia Gazette*, Feb. 20, 1788. Coxe reaffirmed this view in 1813, writing that "militia" members,[12] "have all the right, even in profound peace, to

---

[12] While Coxe defined "militia members" as "all the free white males of the proper ages," he made clear that the right was not limited to just them. "Independently to own and to use their arms, is another of the rights of *all* Americans, which they have caused to be solemnly engraven on the immutable tablet of their public liberties." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 662 (1813) (italics in original).

purchase, keep and use arms of every description," deeming this militia "the army of the constitution." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 652 (1813).

Several other founders and their contemporaries felt similarly. For example, Noah Webster, the famous early American lexicographer and a member of the Connecticut House of Representatives from 1802 to 1807, wrote that "[b]efore a standing army can rule, the people must be disarmed; as they are in almost every kingdom of Europe." Noah Webster, *An Examination into the Leading Principles of the Federal Constitution Proposed by the Late Convention Held at Philadelphia* (1787), reprinted in *Pamphlets on the Constitution of the United States* at 56 (Paul Ford ed., 1888). And James Madison considered being armed an advantage "the Americans possess over the people of almost every other nation," which guards against the rise of tyrants. The Federalist No. 46 (James Madison).

This view not only dominated the founding era but continued into the 19th century through Reconstruction. In a speech to the House of Representatives, Abolitionist Representative Edward Wade said the "right to 'keep and bear arms,' is thus guarantied, in order that if the liberties of the people should be assailed, the means for their defence shall be in their own hands." *Slavery Question: Speech of Hon. Edward Wade of Ohio in the House of Representatives, August 2, 1856*, at p.7 (Buell & Blanchard Publishers, 1856). Senator Charles Sumner's "The Crime Against Kansas" speech likewise bristled at the notion that slavery opponents in Kansas should be disarmed of their then-cutting edge Sharps rifles by the pro-slavery government: "Never was this efficient weapon more needed in just self defence, than now in

Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." Charles Sumner, *The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas* 22-23 (Cincinnati, G.S. Blanchard, 1856).

Thomas Cooley, the longtime Michigan Supreme Court Justice, added "[t]he right declared was meant to be a strong moral check against the usurpation and arbitrary powers of rulers, and as necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, LL.C., *The General Principles of Constitutional Law in the United States of America* 298 (1898). And many of his contemporary legal commentators agreed that the arms of modern warfare are what the Second Amendment protected most of all. *See*, *e.g.*, John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152 (1868) ("[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."); Joel Bishop, *Commentaries on the Criminal Law* 75 (1868) ("[T]he [Second Amendment] protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and brawls and fights between maddened individuals....").[13]

---

[13] Many additional examples of this sort of historical commentary abound and have been detailed in a recent law review article by Amici's counsel. *See* C.D. Michel & Konstadinos Moros, *Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. 89, 90 (2024). While the focus of that article was the Second Amendment's anti-tyranny purpose, another forthcoming article covers the common defense rationale. *See* Robert Leider, *The Individual Right to Bear Arms for Common Defense* (Dec. 17, 2024), available at https://ssrn.com/abstract=4918009 (last accessed March 18, 2025).

There can be no historical tradition of barring firearms just because they may be useful in combat, when one of the main purposes of the Second Amendment was as a "doomsday provision" for the People to protect themselves from a tyrannical government. *See Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). "Once one understands the history of tyrants resorting to taking away people's arms to suppress political opposition, *Heller* explains, one can see that the militia clause fits perfectly with the operative clause." *Duncan*, 695 F. Supp. 3d at 1219.

A district court in Illinois said the same:

> During the founding era, "[i]t was understood across the political spectrum that the right ... might be necessary to oppose an oppressive military force if the constitutional order broke down." Therefore, although "most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting" the additional purpose of securing the ability of the citizenry to oppose an oppressive military, should the need arise, cannot be overlooked.

*Barnett v. Raoul*, 671 F. Supp. 3d 928, 940 (S.D. Ill.), *vacated sub nom. Bevis*, 85 F.4th 1175. For this reason, neither the Founders nor their immediate descendants drew any distinction between purportedly "military" and "civilian" weaponry, as they were "one and the same." *Heller*, 554 U.S. at 625.

This understanding persisted well into the 19th century. Indeed, as one Oregon court recently observed, "[t]he court finds, and all the experts agree, there was no clear distinction between private and military use at the time of statehood [in 1859]." *Arnold v. Kotek*, Case No. 22CV41008 (Harney Co. Cir. Ct. Nov. 21, 2023) at 6, *appeal docketed*, Case No. A183242 (Or. Ct. App.); *see also Bruen*, 597 U.S. at 37 ("19th-century

20

evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'").

Ironically, the United States previously not only acknowledged this anti-tyranny purpose but argued it was the *sole* purpose of the Second Amendment:

> [I]t would seem that the early English law did not guarantee an unrestricted right to bear arms. Such recognition as existed of a right in the people to keep and bear arms appears to have resulted from oppression by rulers who disarmed their political opponents and who organized large standing armies which were obnoxious and burdensome to the people. This right, however, it is clear, gave sanction only to the arming of the people as a body to defend their rights against tyrannical and unprincipled rulers. It did not permit the keeping of arms for purposes of private defense.

Br. for United States at 11-12, *United States v. Miller*, 307 U.S. 174, 178 (1939). (citations omitted). And of course, in *Miller*, the Supreme Court ruled that what the Second Amendment protects is "the ordinary military equipment or that its use could contribute to the common defense." 307 U.S. 174, 178 (1939). Given that all modern militaries equip their infantry with firearms capable of automatic fire, machineguns certainly constitute "ordinary military equipment."

Most importantly, the modern Supreme Court has acknowledged this anti-tyranny purpose; history showed "that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents." *Heller*, 554 U.S. at 598. That the United States may today be far removed from an imminent threat of tyrannical government or foreign invasion should not temper the courts' understanding of the importance of the anti-tyrannical underpinnings of the Second Amendment. "However improbable these contingencies

21

may seem today, facing them unprepared is a mistake a free people get to make only once." *Silveira*, 328 F.3d at 570 (Kozinski, J., dissenting from denial of rehearing en banc).

Given this critical purpose of the Second Amendment, a ban on the prevailing military rifles of the modern age is inconsistent with "the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Arms may be restricted if they fall within the historical tradition of regulating "dangerous and unusual" weapons, but an arm having the characteristic of being useful in combat, without more, does not fall within that tradition.

## CONCLUSION

For these reasons, Amici urge this Court to affirm the district court's ruling.

Dated: March 21, 2025                    Respectfully submitted,

/s/ C.D. Michel
C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*

22

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limitation of Fed. R.

App. P. 32(a)(5) and (6) and the word limit of Fed. R. App. P. 29(a)(5) because,

excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document

contains 6,455 words.

2.      This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word 365 in font size 14 and font type style Garamond.

Dated: March 21, 2025                          Respectfully submitted,

                                               /s/ C.D. Michel
                                               C.D. Michel
                                               Anna M. Barvir
                                               Konstadinos T. Moros
                                               MICHEL & ASSOCIATES, P.C.
                                               180 East Ocean Blvd., Suite 200
                                               Long Beach, CA 90802
                                               Telephone: (562) 216-4444
                                               Email: cmichel@michellawyers.com
                                               *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW CENTER, INC., GUN OWNERS OF AMERICA, INC., GUN OWNERS OF CALIFORNIA, INC., MINNESOTA GUN OWNERS CAUCUS, AND SECOND AMENDMENT DEFENSE AND EDUCATION COALITION, LTD., IN SUPPORT OF APPELLEE AND AFFIRMANCE with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on March 21, 2025, using the Court's Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: March 21, 2025

/s/ C.D. Michel
C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*