No. 24-3141

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

United States of America,

*Plaintiff-Appellant*,

v.

Tamori Morgan,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court
For the District of Kansas
No. 6:23-cr-10047-JWB, The Honorable John W. Broomes

_____

### BRIEF OF *AMICI CURIAE* THE ATTORNEYS ON RETAINER
### ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLEE

_____

Andrew C. Marcantel
The Attorneys for Freedom Law Firm
3185 South Price Road
Chandler, AZ 85248

Attorney for Amici Curiae
The Attorneys on Retainer Association

## 26.1 DISCLOSURE STATEMENT

Counsel for *amici curiae* The Attorneys on Retainer Association respectfully submit this disclosure statement:

The Attorneys on Retainer Association does not have a parent corporation, nor does it have any stock (meaning that no corporation owns 10% or more of its stock).

 /s/ Andrew C. Marcantel          _
Andrew C. Marcantel

Counsel of Record for Amici Curiae
The Attorneys on Retainer Association

# TABLE OF CONTENTS

26.1 DISCLOSURE STATEMENT .........................................................................2

TABLE OF CONTENTS................................................................................3

TABLE OF AUTHORITIES .........................................................................4

INTEREST OF *AMICI CURIAE* ...............................................................5

SUMMARY ...............................................................................................6

ARGUMENT ...............................................................................................8

  The Framers of the Constitution Did Not Intend for the Commerce Clause to be a Significant Grant of Authority to Congress.........................................................11

  For 130 Years, Congress Understood that Its Authority to Regulate Alcohol Required A Constitutional Amendment .............................................14

  The Supreme Court Views Efforts to Regulate Noneconomic Activity with Skepticism.................................................................................18

  Congressional Authority Over Interstate Commerce Must Yield to the Constitutional Rights of Citizens.........................................................22

CONCLUSION ...........................................................................................24

# TABLE OF AUTHORITIES

**Case**

*A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935) ............................. 20, 21, 23

*County of Mobile v. Kimball*, 102 U.S. 691 (1880)........................................................ 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008). ................................................. 7, 22

*Gibbons v. Ogden*, 22 U.S. 1 (1824) .......................................................................... 13, 14

*Gonzales v. Raich*, 545 U.S. 1 (2005) ................................................................. 8, 9, 19, 22

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)................................................................... 22

*Kidd v. Pearson*, 128 U.S. 1 (1888) .......................................................................... 12, 17

*N.F.I.B. v. Sebelius*, 567 U.S. 519 (2012) ...................................................................... 8, 9

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) ........... passim

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S 639 (2012) .................... 24

*U.S. v. E. C. Knight Co.*, 145 U.S. 1 (1895) .................................................................... 17

*U.S. v. Haney*, 294 F.3d 1161 (10th Cir. 2001).................................................. 6, 9, 10, 16

*U.S. v. Lopez*, 514 U.S. 549 (1995). ........................................................................... passim

*U.S. v. Morrison*, 529 U.S. 598 (2000)....................................................................... passim

*U.S. v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) .................................................... 6, 9, 10, 16

*United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024).......................... 23

**Constitution**

Commerce Clause, Art. 1, Sec. 8, Cl. 3.......................................................................passim

**Statutes**

18 U.S.C. § 922(o)......................................................................................................passim

Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379 (Feb. 4, 1887)......................... 16

Revenue Act of 1791, ch. 15, 1 Stat. 199 (1791)). .......................................................... 15

Wilson Act, ch. 728, 26 Stat. 313 (1890). ....................................................................... 15

**Other Authority**

*Commentaries on the Constitution of the United States*, J. Story, Boston, (1833 ed.) ..... 17

Jefferson's Opinion on the Constitutionality of a National Bank: 1791, T. Jefferson ..... 12

The Commerce Clause of the Federal Constitution, E. Prentice and J. Egan, (1898 ed.).. 6, 10, 11, 13

The Federalist Papers, J. Hamilton, (1998 ed.) ................................................................ 11

*The Papers of Thomas Jefferson* ...................................................................................... 12

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* The Attorneys on Retainer Association is a national nonprofit association comprised of business owners and individuals who sell or provide firearms training and are firearms and self-defense enthusiasts. The Association also provides firearms training and education and advocates for and protects the Second Amendment and other pro-freedom and business rights of its member affiliates.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to fund the preparation or submission of this brief. No one other than the *amici curiae* made any monetary contribution to its preparation and submission. All parties have consented to the filing of this brief.

## SUMMARY

Since this Court's decisions in *Haney*[2] and *Wilks*[3], the Second Amendment jurisprudence in the country has changed. *Bruen*[4] requires this Court to examine the historical context of firearm regulations and the government to bear the burden of proving its laws are consistent with that history. In the context of firearm regulation, Congress has justified firearm regulation broadly, and the prohibition on machine gun possession more specifically, under the Commerce Clause of the United States Constitution. *See* 18 U.S.C. § 922(o) and U.S. Const. Art. 1, Sec. 8, Cl. 3. Neither *Wilks* nor *Haney* evaluate the historical context of firearm regulation, and both accept Congress' Commerce Clause justifications in cursory fashion.

While Congress enjoys significant regulatory authority under the Commerce Clause, there are limits to that authority. First, it is axiomatic that the regulation must somehow relate to commerce. *U.S. v. Morrison*, 529 U.S. 598, 608-609 (2000) (citations omitted and cleaned up). Second, Congress's authority is "always limited by the constitutional rights of citizens." E. Prentice and J. Egan, The Commerce Clause of the Federal Constitution, 42 (1898) (hereafter, "Prentice, The Commerce Clause"). Third, although Commerce Clause jurisprudence has evolved

---

[2] *U.S. v. Haney*, 294 F.3d 1161 (10th Cir. 2001).
[3] *U.S. v. Wilks*, 58 F.3d 1518 (10th Cir. 1995).
[4] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

since the time of the Constitution's ratification, the Framers' thoughts and the

actions – or inactions – of Congress over the first nearly 150 years of this

Country's history can inform us as to whether they ever intended for the

Commerce Clause to trump other constitutionally guaranteed rights, such as the

Second Amendment.

Modernly, the Supreme Court when evaluating Congress' authority to

regulate under the Commerce Clause, it distinguishes between economic activity

and activity of a noneconomic, criminal nature. *See, e.g.*, *U.S. v. Morrison*, 529

U.S. 598, 610 (2000) and *U.S. v. Lopez*, 514 U.S. 549, 561 (1995).

Criminalizing the possession of machine guns conflicts with the

"constitutional rights of citizens" as those rights were discussed at length both in

*Bruen* and *District of Columbia v. Heller*. Further, "[t]he Second Amendment 'is

the very *product* of an interest balancing by the people' and it 'surely elevates

above all other interests the right of law-abiding, responsible citizens to use arms"

for self-defense.'" *Bruen*, 597 U.S. at 26 (emphasis original), *citing District of*

*Columbia v. Heller*, 554 U.S. 570, 635 (2008).

## ARGUMENT

Defendant-Appellee moved to dismiss two counts of possessing a machine gun, in violation of 18 U.S.C. § 922(o) under both the Commerce Clause (Art. 1, Sec. 8, Clause 3 of the U.S. Constitution) and under the Second Amendment of the U.S. Constitution. (App. 4). The District Court granted Defendant-Appellee's motion to dismiss under the Second Amendment and denied the motion to dismiss on Commerce Clause grounds as moot. (App. 74).

The Supreme Court has determined "that Congress may regulate 'the channels of interstate commerce,' 'persons or things in interstate commerce,' and 'those activities that substantially affect interstate commerce.'" *N.F.I.B. v. Sebelius*, 567 U.S. 519, 536 (2012) quoting *U.S. v. Morrison*, 529 U.S. 598 (2000). The Court distinguishes between economic activity and activity of a noneconomic, criminal nature. *Morrison* at 610, *citing U.S. v. Lopez*, 514 U.S. 549 (1995). It affords Congress greater deference when regulating purely economic activity, regardless of whether that activity is interstate or intrastate with a significant impact on interstate commerce. *E.g. Gonzales v. Raich*, 545 U.S. 1 (2005). However, the Court treats with skepticism congressional efforts to regulate noneconomic activity, especially where Congress tries to predicate such regulations on a tenuous connection to the Commerce Clause. *Gonzales*, 545 U.S. at 23-24, *Morrison*, 529 U.S. at 610, and *Lopez*, 514 U.S. at 561.

Despite *Morrison* and *Lopez*, this Court has on multiple occasions examined 18 U.S.C. § 922(o) and determined that this statute does not violate Congress' Commerce Clause powers. See e.g. *U.S. v. Haney*, 264 F.3d 1161 (10th Cir. 2001); and *U.S. v. Wilks*, 58 F.3d 1518 (10th Cir. 1995). Both cases addressed the more tenuous connections between the Commerce Clause and the regulation of firearms.

In *Wilks*, this Court first evaluated whether 18 U.S.C. 922(o) was unconstitutional in light of the Supreme Court's recent ruling in *U.S. v. Lopez*, 514 U.S. 549 (1995). This Court determined "§ 992(o) embodies a proper exercise of Congress' power to regulate 'things in interstate commerce.'" *Wilks* at 1521. Similarly, in *Haney*, this Court evaluated § 922(o) in light of the Supreme Court's decision in *Morrison*, and determined that *Morrison* did not undermine this Court's reasoning in *Wilks,* summarily concluding that Congress could regulate machine guns because they "are inherently 'things in interstate commerce.'"

More recent cases, though, demand a reevaluation of *Wilks* and *Haney* with an eye towards the historical interpretation both of historical firearm tradition of firearm regulation and application of the Commerce Clause.

In *N.F.I.B.*, the Court further refined its Commerce Clause jurisprudence. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court clarified the type of analysis necessary to sustain laws impinging on the Second Amendment. And in *Gonzales* the Court clarified the type of analysis

9

necessary when Congress attempts to enact noneconomic, criminal standards under its Commerce Clause authority. These clarified analyses require this Court not only to reevaluate its prior decisions regarding 18 U.S.C. § 922(o) under the Second Amendment, but also a reevaluation of the Congress's authority to criminalize firearm ownership under the Commerce Clause.

In *Bruen*, the Court recognized the importance of courts relying upon "history to inform the meaning of constitutional text." *Bruen*, 597 U.S. 1, 25 (2022). The *Bruen* Court found that this historical analysis is required for First, and Sixth Amendment protections, and expanded this analysis to include the Second Amendment. Amicus believes this historical analysis also needs to be applied to the Commerce Clause.

Neither *Wilks* nor *Haney*, nor similar cases from other circuits predating *Bruen* evaluate the historical context of firearm regulation. Neither do the cases examine any potential interplay between the Commerce Clause and the Second Amendment. "In interstate commerce the power of the Federal Government is always limited by the constitutional rights of citizens." Prentice, The Commerce Clause, 42.

Now that *Bruen* requires a historical review of "the meaning of constitutional text" this Court must determine if 18 U.S.C. § 922(o) exceeds the authority the Constitution granted to Congress under Art. 1, Sec. 8, Cl. 3. Amicus

believes that the answer to this historical review will result in § 922(o) being found to exceed Congress Commerce Clause authority.

**The Framers of the Constitution Did Not Intend for the Commerce Clause to be a Significant Grant of Authority to Congress**

The Continental Congress adopted the Commerce Clause out of necessity. Under the Articles of Confederation, the States discriminated against each other with respect to trade between each other. As Alexander Hamilton noted in Federalist No. 22, "The interfering and unneighbourly [sic] regulations of some states, contrary to the free spirit of the union, have, in different instances, given just cause of umbrage and complaint to others; and it is to be feared that examples of this nature, if not restrained by national control, would be multiplied and extended till they become not less serious sources of animosity and discord, than injurious impediments to the intercourse between the [states]." The Federalist Papers, (John C. Hamilton, ed., 1998) at 185. Thus it was that the Commerce Clause "grew out of the abuses of the importing States in taxing the non-importing, and was intended to be a remedial power given to the federal government to prevent injustice and commercial war among the States." Prentice, The Commerce Clause, 11.

The Supreme Court recognized this when they held that "it is a matter of public history that the object of vesting in congress the power to regulate

commerce with foreign nations and among the several states was to insure uniformity for regulation against conflicting and discriminating state legislation." *Kidd v. Pearson*, 128 U.S. 1, 21 (1888) quoting *County of Mobile v. Kimball*, 102 U.S. 691, 697 (1880).

From the very beginning, Thomas Jefferson made clear that he did not see the Commerce Clause as a huge grant of power to Congress. On February 15, 1791, Thomas Jefferson wrote to President Washington a legal opinion regarding the United States Bank bill in which he highlighted the limitation on Congress under the Commerce Clause. Jefferson wrote that "the power given to Congress by the Constitution does not extend to the internal regulation of the commerce of a State, (that is to say of the commerce between citizen and citizen,) which remain exclusively with its own legislature …".[5]

On December 26, 1825, Thomas Jefferson wrote a letter to William Branch Giles (U.S. Senator for Virginia) in which he warned that Congress was "advancing towards the usurpation of all the rights reserved to the states."[6]

---

[5] Jefferson's Opinion on the Constitutionality of a National Bank: 1791, made available by Yale Law School, https://avalon.law.yale.edu/18th_century/bank-tj.asp, last reviewed on March 21, 2025.
[6] *The Papers of Thomas Jefferson: Retirement Series*, made available by the National Archives, https://founders.archives.gov/documents/Jefferson/98-01-02-5771, last reviewed on March 21, 2025.

Jefferson was concerned that if Congress used the power to regulate commerce, it would assume control over agriculture and manufacturing, something Jefferson believed was wholly outside Congress' purview.

Indeed, the early view of the Commerce Clause was that it granted to Congress authority to legislation within three distinct "branches" of commerce: interstate, foreign, and trade with Indian tribes. Those branches differ "widely in nature and extent." Prentice, The Commerce Clause, 41. Two of the branches relate to each other. "Interstate commerce is national, while foreign commerce is international in character." *Id*. Commenting on the further natures of interstate and foreign commerce, "over foreign commerce Federal power is necessarily limited by the equal power of the foreign government" while "[i]n interstate commerce the power of the Federal government is always limited by the constitutional rights of citizens," though is unlimited by "any other governmental authority." *Id*. at 41-42.

1824 was the first time the Supreme Court had the opportunity to decide a case under the Commerce Clause, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824). The debate in *Gibbons* was the extent to which congressional authority over navigation reached under the Commerce Clause. The Court struck down a New York State law providing one company (Livingston and Fulton) the exclusive right to navigate the rivers of New York by steamboat as "repugnant" to the Constitution and its Commerce Clause. 22 U.S. at 240. When defining "commerce," Chief

13

Justice Marshall refused to be bound by the definition proposed by the Appellee's narrow interpretation, accepting instead the broader definition. "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." 22 U.S. at 189-190.[7] Though Chief Justice Marshall adopted a broad definition of commerce, he still recognized the limitation to congressional authority inherent in the Constitution. Congressional authority under the Commerce Clause. That is, any exercise of legislative authority must be "connected with commerce… among the several states." *Id*. at 197.

**For 130 Years, Congress Understood that Its Authority to Regulate Alcohol Required A Constitutional Amendment**

To understand how Congress historically understood its limitations under the Commerce Clause, one only needs to turn to the history of the 18th and 21st Amendments. For the first 130 years of United States' history, Congress made no attempt to control the manufacture, sale, or transportation of intoxicating liquors until it passed a constitutional amendment. While Congress did not control the manufacturing, sale, or transportation of alcohol, it could, and did, tax alcohol.

---

[7] The Appellee's counsel's narrow definition would have limited commerce "to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation." 22 U.S. at 189.

The very first Congress passed the Revenue Act of 1791 which was signed by President Washington on March 3, 1791. This act placed a tax on domestically distilled spirits to generate revenue for the federal government. (Revenue Act of 1791, ch. 15, 1 Stat. 199 (1791)). But it did not otherwise restrict or regulate the manufacturing, sale, or transportation of alcohol.

The American people started calling on politicians to prohibit the manufacture, sale and importation of alcoholic beverages. The American Temperance Society formed in 1826, and it was not until 50 years later in 1876 that Senator Henry W. Blair of New Hampshire introduced a proposed constitutional amendment to prohibit the manufacture, sale and importation of alcoholic beverages. In 1890, nearly 100 years after the ratification of the Constitution, Congress passed the Wilson Act of 1890, utilizing its authority under the Commerce Clause. Rather than the Federal government, though, regulating liquor, the Act enabled states to regulate imported liquor as soon as it crossed their borders. Wilson Act, ch. 728, 26 Stat. 313 (1890).

Amicus is unaware of any attempt prior to the passage of the 18th Amendment where Congress sought to use their power under the Commerce Clause to regulate the manufacture, sale, or transportation of alcohol other than to prohibit its transportation into, or through, states that had used their own police powers to ban its sale. Even though The American Temperance Society attempted

to end the sale of liquor for almost 100 years, Amicus can find no evidence during this time that any Federal legislator or court thought that Congress' broad Commerce Clause powers provided a tool to curb the trade of alcohol. This lack of evidence, or even the attempt to use the Constitution's Commerce Clause to restrict the manufacture or sale of alcohol is itself strong evidence that the Framers never intended for Congress to regulate, pursuant to the Commerce Clause, "things in interstate commerce-*i.e.* machineguns." *Haney*, 264 at 1167 (cleaned up, quoting *Wilks*).

Congress' first law to regulate private industry under Art. I, Sec. 8, Cl. 3 was the Interstate Commerce Act of 1887. Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379 (Feb. 4, 1887). This landmark law set forth a regulatory framework specifically targeting the railroad industry. The law sought to curb widespread abuses by railroad companies, such as monopolistic practices, discriminatory pricing, and unfair treatment of shippers. Such an exercise of its authority to regulate interstate commerce falls under what the Supreme Court would now classify as the regulation or uses "of the channels of interstate commerce." *Lopez*, 514 at 558.

In 1895, The Supreme Court examined the difference between the federal commerce clause power and a state's police power. The Court determined that just because "an article is manufactured for export to another state does not of itself

16

make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state and belongs to commerce." *U.S. v. E. C. Knight Co.*, 145 U.S. 1, 13 (1895). The Court explained the difference of manufacture and commerce as follows: Manufacture is transformation, –the fashioning of raw materials into a change of form for us. The functions of commerce are different. The buying and selling, and the transportation incidental thereto, constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. *Id.* at 14, quoting *Kidd v. Pearson*, 128 U.S. 1, 10 (1888).

This view was perfectly consistent with Joseph Story's view of the Commerce Clause. In his *Commentaries on the Constitution*, he wrote that the "power to regulate manufacturers is no more confided to Congress, than the power to interfere with the system of education, the poor laws, or the road laws of the states." *See Commentaries on the Constitution of the United States*, Boston, 1833, Vol. 3, §1075. Story contended that agriculture, capital, machinery, wages, and rents were all powers that belonged to the state even though they "bear an intimate relation to commerce." *Id.*

///

17

**The Supreme Court Views Efforts to Regulate Noneconomic Activity with Skepticism**

Modernly, the Supreme Court has distinguished between economic activity and activity of a noneconomic, criminal nature. *Lopez*, 514 U.S. at 561 ("Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce") and *Morrison*, 529 U.S. at 610 ("But a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case").[8] While the Court may defer greatly to Congress with respect to the regulation of economic activity, since *Lopez*, *Morrison*, and their

---

[8] In a footnote in *Lopez*, the Court explained that part of the distinction draws from States' "primary authority for defining and enforcing criminal law" and that when Congress acts to "criminalize conduct already denounced as criminal by the States" it affects a change in the "sensitive relation between federal and state criminal jurisdiction." *Lopez*, 514 U.S. at 561 n.3. When Congress displaces state police powers under constitutional provisions not so designed by the Framers, the Supreme Court expresses increased skepticism of Congress' justifications for enacting such legislation.

progeny, the Court treats noneconomic, criminal statutes predicated on Congress'
Commerce Clause authority with skepticism.

The late Justice Scalia acknowledged that when Congress regulates
noneconomic activity, such regulations must rest in something additional to the
Commerce Clause, such as the Necessary and Proper Clause. *Gonzales v. Raich*,
545 U.S. 1, 36 (2005) (Scalia, J., concurring). Despite *Gonzales* addressing the
manufacturer and use of marijuana in a wholly intrastate manner, both Justice
Scalia and the majority opinion acknowledged Congress had the authority "to
extinguish the interstate market [for] Schedule I controlled substances, including
marijuana." *Id.* at 39; see also *id.* at 23 (permitting intrastate manufacturing of
marijuana "would leave a gaping hole in the [Controlled Substances Act]").

While Justice Scalia thought *Gonzales* was a pure exercise of congressional
Commerce Clause authority, he distinguished it from scenarios like *Lopez* and
*Morrison*. Both cases, Justice Scalia expressed, limited Congress' ability to enact
noneconomic, criminal statutes based on inferences of remote impact on interstate
commerce. Highlighting how the "substantial affects" test limits Congress'
Commerce Clause authority, he noted that *Lopez* and *Morrison*, "rejected the
argument that Congress may regulate *noneconomic* activity based solely on the
effect that it may have on interstate commerce through a remote chain of
inferences… Thus, although Congress's authority to regulate intrastate activity that

substantially affects interstate commerce is broad, it does not permit the Court to 'pile inference upon inference,' in order to establish that noneconomic activity has a substantial effect on interstate commerce." *Id*. at 35-36 (citations omitted) (emphasis original).

In the instant case, Congress is attempting to regulate the possession of machine guns by creating a jurisdictional hook that enables them to regulate anything that may be placed into interstate commerce. This type of jurisdictional hook fails when looking to a historical understanding of where congressional Commerce Clause power ends. Assuming for the sake of argument, Congress may regulate something placed in commerce, the jurisdiction is not necessarily complete or permanent.

A state's police powers recommence at some point. *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935) is such a case where the Court analyzed when the Federal Commerce Clause power ended, and a state's police powers recommenced. The Court held that the "mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce had ceased." *Id.* at 543. The end of federal Commerce Clause power and the reattachment of a State's

police power is especially applicable when the "the effect of intrastate transactions upon interstate commerce is merely indirect." *Id.* at 546.When congressional over goods in commerce is direct, "such transactions remain within the domain of state power. If the Commerce Clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government." *Id*. The Court found that while it "is not the province of the Court to consider the economic advantages or disadvantages of such a centralized system. It is sufficient to say that the Federal Constitution does not provide for it. Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state." *Id*. at 549-550.

This limitation, including the recommencement of a state's police power, ought to be especially true when Congress is regulating noneconomic activity and criminalizing it. That is, when a Court turns to analyzing the second or third

categories of activity Congress may utilize under its Commerce Clause power

under *Morrison* and *Lopez*, must determine "whether the means chosen are

'reasonably adapted' to the attainment of a legitimate end under the commerce

power" rather than a cursory examination or conclusory statement that it is.

*Gonzales*, 545 U.S. at 37 (Scalia, J., concurring).

**Congressional Authority Over Interstate Commerce Must Yield to the
Constitutional Rights of Citizens**

Congress's authority over interstate commerce has limits. At the very least,

as mentioned above, it is "always limited by the constitutional rights of citizens."

Prentice, The Commerce Clause, 42. And this brings the discussion full-circle to

*Bruen*. Building on *District of Columbia v. Heller*, the Second Amendment applies

to "the people" rather than to things. "The Second Amendment 'is the very *product*

of an interest balancing by the people' and it 'surely elevates above all other

interests the right of law-abiding, responsible citizens to use arms" for self-

defense.'" *Bruen*, 597 U.S. at 26 (emphasis original), *citing District of Columbia v.
Heller*, 554 U.S. 570, 635 (2008).[9]

---

[9] *See also Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)
("It is one thing to say that certain weapons or activities fall outside the scope of
the [Second Amendment] right. It is another thing to say that *people* fall outside of
the Amendment's scope. Arms and activities would always be in or out. But a
person could be in one day and out the next") (internal citations and quotes
omitted) (emphasis original).

Yet, § 922(o) attempts to regulate *a thing* pursuant to the Commerce Clause and the law criminalizes the possession of a certain type of weapon, without regard for *the person* who may possess it. Beyond that, "§ 922(o) criminalizes the mere possession of [machine guns] without regard to how the possessor uses them. If an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner. The statute requires no more than possession." *United States v. Morgan*, 2024 WL 3936767, *4 (D. Kan. Aug. 26, 2024). The machine gun need not enter the stream of commerce, which in turn, re-raises the question of whether the weapon's "flow in interstate commerce [has] ceased." *A.L.A. Schechter Poultry Corp*., 295 U.S. at 543.

When Congress's attempt to regulate things conflicts with the constitutional rights of citizens, the Commerce Clause must yield to the more specific guarantee of a person's rights. "A well established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction that the specific governs the general' … The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general

one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S 639, 645 (2012) (citations omitted). *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183-188 (Ch. 28, General/Specific Canon) (2012).

## CONCLUSION

For the foregoing reasons, Amicus asks this Court to conduct a historical review of the Commerce Clause as is prescribed by *Bruen* and determine that its prior decisions in *Wilks* and *Haney* must be overturned. Amicus asks that this Court conclude that 18 U.S.C. §922(o) is a misuse of Congress' commerce powers.

<u>/s/ Andrew C. Marcantel</u>
Andrew C. Marcantel

Counsel of Record for Amici Curiae
The Attorneys on Retainer Association

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4.221 words, excluding the parts of the brief exempted by Fed. R. App. P. 32.

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. 32(a)(5), (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 21st day of March, 2025.

/s/ Andrew C. Marcantel
Andrew C. Marcantel

## CERTIFICATE OF SERVICE

I certify that on March 21, 2025, I emailed copies of this brief as follows:

Daniel_Hansmeier@fd.org

melody_brannon@fd.org

William.Glaser@usdoj.gov

James.Brown2@usdoj.gov

I certify that on March 24, 2025, I electronically filed this brief with the

Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by

using the appellate CM/ECF system. Participants in the case who are registered

CM/ECF users will be served by the appellate CM/ECF system.

Executed this 21st day of March, 2025.

/s/ Andrew C. Marcantel
Andrew C. Marcantel