No. 24-3141

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

TAMORI MORGAN,
Defendant–Appellee.

———————————

On Appeal from the United States District Court
for the District of Kansas, No. 6:23-CR-10047
(Hon. John W. Broomes)

———————————

**REPLY BRIEF FOR THE UNITED STATES**

———————————

DUSTON J. SLINKARD
Acting United States Attorney

JAMES A. BROWN
Assistant United States Attorney
District of Kansas

MATTHEW R. GALEOTTI
Supervisory Official

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION .......................................................................... 1

ARGUMENT ................................................................................. 1

The District Court Erred by Holding That 18 U.S.C. § 922(o) Violates the Second Amendment.......................................................... 1

A.      Morgan's preservation-related arguments are unavailing....................... 3

    1.      The government preserved the argument that machineguns are not in common use for lawful purposes *today*. ......................... 3

    2.      The government's brief fully complied with Tenth Circuit Rule 28.1(A). ................................................................... 6

    3.      The government did not waive reliance on *Heller*'s statement about machineguns. ............................................................... 8

    4.      This Court's review is not limited to the historical statutes cited below. ................................................................. 9

B.      Machineguns are unprotected by the Second Amendment. ................ 11

    1.      Morgan resists the correct analysis, which considers whether machineguns are constitutionally protected. ........................... 11

    2.      Morgan improperly dismisses *Heller*'s statement about machineguns. ........................................................................ 13

    3.      Machineguns are not in common use for lawful purposes but are instead dangerous and unusual. ........................................ 15

C.      The historical record demonstrates that § 922(o) is consistent with the principles underlying the Second Amendment. ........................... 20

D.      The as-applied nature of Morgan's challenge does not assist him......... 27

CONCLUSION............................................................................ 29

i

CERTIFICATE OF COMPLIANCE .......................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Baca v. Department of the Army*,
    983 F.3d 1131 (10th Cir. 2020) .................................................................. 9

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ................................................................ 19

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................1-4, 8, 10-15, 19-20, 22, 27-28

*Friedman v. City of Highland Park*,
    136 S. Ct. 447 (2015) ............................................................................ 2

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ................................................................ 18

*Garland v. Cargill*,
    602 U.S. 406 (2024) ............................................................................ 16

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ..........................................................18, 20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).............................. 2, 10-11, 17, 21-22, 24, 26

*Nunn v. State*,
    1 Ga. 243 (Ga. 1846) ........................................................................22-23

*Shelby Cnty., Ala. v. Holder*,
    570 U.S. 529 (2013) ............................................................................ 17

*State v. Judy*,
    60 Ind. 138 (Ind. 1877) ........................................................................ 22

*State v. Jumel*,
    13 La. Ann. 399 (1858) ........................................................................ 23

*Tesone v. Empire Marketing Strategies*,
942 F.3d 979 (10th Cir. 2019) ................................................................... 5

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023), *vacated*, 93 F.4th 1150 (2024), *and
appeal vacated as moot on rehearing en banc*, 125 F.4th 1301 (2025) .............. 10

*United States v. Hernandez-Rodriguez*,
352 F.3d 1325 (10th Cir. 2003) .................................................................. 6

*United States v. Miller*,
307 U.S. 174 (1939) ................................................................................. 14

*United States v. O'Brien*,
560 U.S. 218 (2010) ................................................................................. 2

*United States v. Price*,
111 F.4th 392 (4th Cir. 2024) (en banc) ................................................. 18, 20

*United States v. Rahimi*,
602 U.S. 680 (2024) ................................................... 2, 10, 13, 17, 26, 29

*United States v. Simien*,
655 F. Supp. 3d 540 (W.D. Tex. 2023) ..................................................... 19

*United States v. Simpkins*,
90 F.4th 1312 (10th Cir. 2024) ............................................................. 8, 9

**Statutes and Rules**

Fed. R. Evid. 201 ..................................................................................... 10

Tenth Circuit Rule 28.1 ............................................................................ 7

**Other Authorities**

Alexander DeConde, *Gun Violence in America* (2001) ................................... 16

*Chicago Gangsters Slay Prosecutor With Machine Gun*, New York Times,
April 28, 1926 ....................................................................................... 16

H.R. Rep. No. 99-495 (1986) ........................................................... 2

Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer
Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History
in Contemporary Debates on the Second Amendment* (2019) ........................... 21

**Historical Statutes**

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 ............................................... 23

Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200 ......................... 23

Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 52 ....................................... 23

Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404 ................................... 23

Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 ...................................... 23

Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129 .............................22-23

Act of Feb. 19, 1867, No. 259, ch. 2, § 10, 1867 Ala. Laws 263 .................... 23

Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25 ........................... 23

Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57 ........................................ 23

Act of Apr. 16, 1881, §1, 1881 Ill. Laws 73 ................................................... 23

Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ............................ 23

Act of June 5, 1925, ch. 3, 1925 W. Va. Acts (Extraordinary Session)
30-31 ............................................................................................................ 24

Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469 .................................. 24

Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181 ................................. 24

Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201 ................................ 24

Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257 ...................... 24

Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14 ......................... 24

Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938 ................................ 24

Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89 .................. 24

Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777 ............................... 24

Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674 ............................. 24

Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157 .............................. 24

Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170 .............................. 24

Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813 .............................. 24

Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306 .............................. 24

Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033 ............................ 24

Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53 .......................................... 24

Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337 ................................... 24

Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46 ...................... 25

Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335 .............................. 24

Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489 ............................... 24

Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189 ..................................... 25

Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233 ........................... 24

Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219 ........................... 24

Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws (Special Session) 76 ........ 24

Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288 .......................... 24

Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138 .............................. 25

# INTRODUCTION

Contrary to the district court's holding, § 922(o)'s prohibition on possession of a machinegun is consistent with the Second Amendment. Machineguns are not in common use for lawful purposes like self-defense. And § 922(o) is consistent with the nation's historical tradition of regulating a variety of dangerous and unusual weapons.

Morgan fails to effectively rebut the government's arguments. He wrongly contends that the government failed to preserve various arguments on appeal. He tries to avoid the Supreme Court's clear holding that the Second Amendment "does not protect" firearms not typically possessed by law-abiding citizens for lawful purposes. And he advocates an improper standard that would require the government to identify founding-era laws regulating firearms based on their rate of fire. This Court should reject his arguments and reverse.

# ARGUMENT

## The District Court Erred by Holding That 18 U.S.C. § 922(o) Violates the Second Amendment.

The Supreme Court has explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," a limitation that is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *District of Columbia v. Heller*, 554 U.S. 570, 625, 627 (2008). The Court's more

recent cases have continued to recognize this limitation. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022); *United States v. Rahimi*, 602 U.S. 680, 691 (2024).

Machineguns are not "typically possessed by law-abiding citizens for lawful purposes" but are instead "dangerous and unusual." *Heller*, 554 U.S. at 625, 627. The Supreme Court has noted the "immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). Machineguns are also "specially adapted to unlawful uses," *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari), given their value to criminals for intimidation and murder, *see* H.R. Rep. No. 99-495, at 4 (1986). A supermajority of the states—39 at last count—prohibit or strictly regulate the possession of machineguns by private parties. *See* Opening Br. 19-20 & nn.3-5. There are fewer than 176,000 machineguns legally registered to civilians, and the cost of such weapons runs in the tens of thousands of dollars. *Id.* at 20-22. Accordingly, six other circuits have unanimously held that machineguns are not in common use for lawful purposes. *Id.* at 17-18, 22.

The historical record amply supports *Heller*'s conclusion that the Second Amendment protects only firearms in common use for lawful purposes. In England and colonial America, it was a crime to carry dangerous and unusual

weapons.  Opening Br. 23-26.  Many states in the 19th century regulated

dangerous and unusual weapons such as Bowie knives and brass knuckles.  *Id.*

at 26-27.  And when machineguns became publicly available in the 1920s,

states quickly began to regulate their possession, followed by Congress in 1934.

*Id.* at 27-28.  Section 922(o) is therefore part of a longstanding tradition of

regulating dangerous and unusual weapons.

### A.     Morgan's preservation-related arguments are unavailing.

Morgan devotes considerable attention to asserting that the government

forfeited or waived various arguments.  Response Br. 12-14, 23-25, 27-29, 35-

37.  His preservation-related contentions are meritless.

### 1.     The government preserved the argument that machineguns are not in common use for lawful purposes *today*.

Morgan first claims (Response Br. 12-14, 27-29) that the government

"forfeited" its argument that machineguns are unprotected "because they are

not 'typically possessed' or 'in common use' for lawful purposes today."

Response Br. 22.  In doing so, Morgan misconstrues the government's district-

court briefing and misapplies basic preservation principles.

In responding to his motion to dismiss, the government argued that

Morgan had failed to show that "the plain text of the Second Amendment

covers his possession of a machinegun as a firearm 'in common use at the

time' by private citizens."  App. 24 (quoting *Heller*, 554 U.S. at 627).  The

government characterized *Heller* as holding that the Second Amendment "does not protect those weapons that were 'not in common use at the time' of its passage." App. 24 (quoting *Heller*, 554 U.S. at 627). And it later stated that "the Second Amendment protects only those weapons 'in common use' by private citizens at the time of its enactment." App. 26.

Seizing on these latter statements, Morgan claims that the government preserved only an argument that machineguns *were* not in common use at the Second Amendment's "passage" and forfeited the argument that machineguns *are* not in common use "today." Response Br. 27 (italics and quotation marks omitted). Morgan is wrong for at least three reasons.

First, Morgan relies on a hyper-technical reading of the government's district-court filing. The government's argument—read in context—was not the (frivolous) contention that machineguns are unprotected because they were not in common use in 1791. Such an argument would mean that nearly all modern firearms, including revolvers and common semi-automatics, would fall outside the Second Amendment's scope. *See Heller*, 554 U.S. at 582 (rejecting as "bordering on the frivolous" the view that "only those arms in existence in the 18th century are protected by the Second Amendment").

The government did not make that argument. Instead, the government cited a half-dozen appellate cases holding that machineguns are not in

4

common use *today*, using the present-tense "are" to describe the holdings in several of them.  App. 25-26.  And the government cited multiple post-*Bruen* district-court cases holding that machineguns *are* not in common use (or *are* dangerous and unusual) *today*.  App. 29-30.  The government's argument focused on machineguns' current status, not their status in 1791.

Second, the district court did not construe the government's argument as Morgan does.  Although Morgan claimed the government was advocating a "common-use-at-enactment" theory, Supp. App. 5, the district court understood the government to "suggest[]" that "the Second Amendment would allow weapons to be prohibited solely on the basis that they *are* 'dangerous and unusual' or 'highly unusual in society at large.'"  App. 72 (emphasis added).  And the district court cited the present-day number of registered firearms when rejecting that argument.  *Id.*  In reviewing the district court's judgment, this Court should follow the district court's construction of the government's argument, not Morgan's.

Third, even if the government failed to press the argument, the district court nonetheless passed on the question.  "[A]ppellate courts can reach issues that were either 'pressed' by the appellant before, or 'passed upon' by, the lower court."  *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 992 (10th Cir. 2019) (some quotation marks omitted).  Thus, "when the district court *sua*

*sponte* raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if [it] failed to raise the issue in the district court." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). In that situation, "review on appeal is not for 'plain error,' but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue." *Id.* Here, the district court unquestionably "passed on" the legal question whether machineguns are protected by the Second Amendment because they are in common use today. *See* App. 72. Accordingly, even if the government had failed to press that argument, review would still be de novo.

Because the issue was preserved, the government had no obligation to argue plain error on appeal. Thus, contrary to Morgan's contention, the government did not waive this theory by "not arguing plain error in its opening brief." Response Br. 14; *see id.* at 27-29.

### 2. The government's brief fully complied with Tenth Circuit Rule 28.1(A).

Morgan also claims the government "waived" its common-use argument "by not complying with Tenth Circuit Rule 28.1(A)." Response Br. 14. Specifically, he points out that the government did "not include an Issue Raised and Ruled On section within its brief." Response Br. 12. But Rule 28.1(A) does not require a separate "section" with that heading. Instead, that

6

rule says, "For each issue raised on appeal, all briefs must cite the precise references in the record where the issue was raised and ruled on." Tenth Circuit Rule 28.1(A). Here, the opening brief did exactly that.

With precise citations to the record, the opening brief explained that the government had raised, among other arguments, the contention that "machineguns are not protected by the Second Amendment's plain text because they are not 'in common use' by private citizens." Opening Br. 4 (citing App. 24-26). And under the unmistakable heading "Ruling Under Review," the government explained (with precise references) the district court's rejection of the view that weapons can be prohibited "on the basis that they are dangerous and unusual or highly unusual in society at large." Opening Br. 6 (quotation marks omitted) (citing App. 72).

That the government "does not cite any portion of the record in the first five subsections . . . of its Argument section," Response Br. 12, is beside the point. Rule 28.1(A) does not require any specific parts of the "Argument section" to include record citations. And the government cited the record both when summarizing the "Ruling Under Review" and in its "Argument" section when explaining the specific reasons that "[t]he district court's reasoning is flawed." Opening Br. 6, 31.

### 3. The government did not waive reliance on *Heller*'s statement about machineguns.

Morgan next contends that the government waived through inadequate briefing "any reliance" (Response Br. 23) on *Heller*'s statement that it would be "startling" to conclude that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624. Morgan claims that the government's "three-sentence argument is inadequately briefed," and he faults the government for "not explain[ing] the context of this dicta from *Heller* or how it relates to section 922(o)(1)." Response Br. 8, 23.

In fact, the government *did* explain the context of *Heller*'s statement, *see* Opening Br. 15-16, and argued that it would be similarly "startling" to conclude that § 922(o)'s restriction on machineguns is unconstitutional, *id.* at 22. The government made its "three-sentence argument" (Response Br. 8) later in the opening brief, pointing out that the district court had "improperly dismissed" *Heller*'s statements as "dicta," even though lower courts are "'bound by Supreme Court dicta.'" Opening Br. 31-32 (quoting *United States v. Simpkins*, 90 F.4th 1312, 1316 (10th Cir. 2024)). The government did not need to expand on this point, which it supported with recent Tenth Circuit precedent.

Contrary to Morgan's contention, the government did not "flout[]" this Court's rules by "attempt[ing] to incorporate by reference an argument made

in the district court." Response Br. 24. The opening brief separately explained that *Bruen* and *Rahimi* "did not call into question" the "'common use' limitation." Opening Br. 16. The citation to the government's district-court briefing (Opening Br. 32) was merely to show that the district court, too, had been fully apprised of the argument that *Heller*'s dicta was not "enfeebled by later statements." *Simpkins*, 90 F.4th at 1316 (quotation marks omitted). That record citation was entirely proper.

### 4. This Court's review is not limited to the historical statutes cited below.

Morgan argues that this Court should limit its review to "the historical record compiled below, without considering the government's new sources cited for the first time on appeal." Response Br. 37. He is mistaken for at least two reasons.

First, because the government fully preserved the *argument* that the common-use limitation is consistent with history, it is entitled to produce additional *authority* in support of that argument on appeal. This Court "allow[s] a party to provide new legal authority on appeal for the position that [it] advanced below." *Baca v. Department of the Army*, 983 F.3d 1131, 1140 (10th Cir. 2020) (quotation marks and brackets omitted). This Court's role is to reach the correct result on all adequately preserved issues; it should not blind itself to relevant authorities that were not cited below. Indeed, *Bruen* and

*Rahimi* both evaluated a broad range of historical sources, including some not cited by the parties. *See Bruen*, 597 U.S. at 32-70; *Rahimi*, 602 U.S. at 693-98.

Contrary to Morgan's claim, the historical sources relevant to the Second Amendment inquiry are not "evidence" in the ordinary sense of that word. Response Br. 37. The "text-and-history test" that applies in the Second Amendment context is a "legal inquiry." *Bruen*, 597 U.S. at 25 n.6 (quotation marks omitted). And "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process'" as distinct from the "'facts of the particular case.'" *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (quoting Fed. R. Evid. 201), *vacated*, 93 F.4th 1150 (2024), *and appeal vacated as moot on rehearing en banc*, 125 F.4th 1301 (2025). The historical sources cited below were simply authority—not case-specific "evidence" to which this Court is confined on appeal.

Second, recourse to additional historical authority is particularly appropriate here, where the district court rejected the government's reliance on *Heller*'s own interpretation of history. Below, the government cited two of the 12 historical sources cited by *Heller*, App. 27-28, but saw no need to pile up historical authorities in support of a legal principle that *Heller* already had said was "fairly supported" by the historical record, *Heller*, 554 U.S. at 627.

10

Because the district court chose to reject that well-established principle, the government is entitled to point to additional historical support for that principle on appeal.

**B.   Machineguns are unprotected by the Second Amendment.**

As the opening brief explains, machineguns are not protected by the Second Amendment.  Opening Br. 17-22.  Morgan's contrary arguments, Response Br. 29-36, are unpersuasive.

**1.    Morgan resists the correct analysis, which considers whether machineguns are constitutionally protected.**

Morgan resists the proper analytical framework.  *Heller* established that the Second Amendment "does not protect" firearms not in common use for lawful purposes.  *Heller*, 554 U.S. at 625.  *Bruen*, too, recognized that "the Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'"  *Bruen*, 597 U.S. at 47 (emphasis added).

Morgan tries to cast doubt on this binding precedent.  He argues, for example, that "it is implausible to think that all 'arms' not 'in common use' for lawful purposes today are necessarily excluded from Second Amendment protection," as that would exclude antique firearms such as "[m]uskets." Response Br. 34.  Similarly, he contends that "dangerous and unusual weapons" are not an "unprotected category," and claims the Supreme Court

has "only identified a *possible* historical tradition" of regulating such weapons. Response Br. 29-30, 41 (emphasis added).

This Court should reject Morgan's attempts to evade the Supreme Court's clear holdings. *Heller* authoritatively held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," and it explained that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 625, 627. This Court should not second-guess those conclusions.

Morgan wrongly focuses on whether machineguns are "arms." Response Br. 15-16, 22, 35. Although machineguns are "[w]eapons of offence," *Heller*, 554 U.S. at 581, that does not mean they are arms protected by the Second Amendment. *Heller* makes clear that "the Second Amendment right . . . extends only to certain types of weapons." *Id.* at 623. For example, short-barreled shotguns are "[w]eapons of offense," *id.* at 581-82, yet "the Second Amendment does not protect" them because they "are not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625. The same is true of machineguns.

Under Morgan's preferred mode of analysis, a court would apparently *never* consider whether the weapon possessed was a type the Second

Amendment "does not protect." *Heller*, 554 U.S. at 625. Morgan would go straight to what he calls the "ultimate question," Response Br. 31 (emphasis omitted), and require the government to establish a "historical tradition related to machineguns or weapons with higher rates of fire," Response Br. 33. His analysis would improperly bypass the question whether machineguns are the "types of weapons" protected by the Second Amendment—*i.e.*, those "in common use . . . for lawful purposes." *Heller*, 554 U.S. at 624. And it would improperly demand a "historical twin," instead of asking whether § 922(o) "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692. This Court should reject that approach.

## 2. Morgan improperly dismisses *Heller*'s statement about machineguns.

Morgan claims (Response Br. 25) that this Court "should not rely" on *Heller*'s statement that it would be "startling" to conclude that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624. He points out that *Heller* "only reference[d] the National Firearms Act, which is a taxation and registration scheme that does not prohibit the possession of machineguns." Response Br. 25. In context, however, *Heller* indicates that the National Firearms Act's "restrictions on machineguns" are constitutional, not because the Act is a taxation and

13

registration scheme, but because machineguns are not the "types of weapons" protected by the Second Amendment. *Heller*, 554 U.S. at 624.

Morgan also asserts that *Heller*'s statement "is about the meaning of the Court's opinion in [*United States v.*] *Miller*, [307 U.S. 174 (1939)]," and "not about the meaning of the Second Amendment." Response Br. 25. That is a false distinction, given that *Heller* considered *Miller* for what it said about "the Second Amendment right" and the "types of weapons" to which that right "extends." *Heller*, 554 U.S. at 623; *see id.* at 625.

Morgan's focus on *Heller*'s "criticism of *Miller*" also misses the point. Response Br. 26. *Heller* made these "criticism[s]" when rejecting the dissent's attempt to "read *Miller* for more than what it said." *Heller*, 554 U.S. at 623. But *Heller* expressed no criticism of the "only" thing *Miller* did say: that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Indeed, *Heller* affirmatively endorsed that part of *Miller*, which "accords with the historical understanding of the scope of the right." *Id.*

All that said, the government agrees that this Court need not "reverse based *solely* on *Heller*'s dicta." Response Br. 27 (emphasis added). Although *Heller*'s statement about machineguns is binding on this Court and highly persuasive, there are other strong bases to uphold § 922(o). Unanimous circuit

14

precedent, the nature of machineguns, the legislative landscape, and the statistical evidence all show that machineguns are not protected by the Second Amendment.  Opening Br. 17-22.

### 3. Machineguns are not in common use for lawful purposes but are instead dangerous and unusual.

As the opening brief established, machineguns are not "typically possessed by law-abiding citizens for lawful purposes," but are instead "dangerous and unusual weapons." *Heller*, 554 U.S. at 625, 627.  Morgan's responses cannot overcome that straightforward conclusion.

First, Morgan argues that *other* weapons are also dangerous, pointing out that handguns are "responsible for the vast majority of gun violence in the United States" and that semi-automatic weapons can, when bump-fired, achieve a high rate of fire.  Response Br. 32, 41-42 (quotation marks omitted). Morgan also states, tautologically, that "*any* firearm is 'extraordinarily lethal' if used to kill."  Response Br. 41.  These arguments all miss the point.  The fact that other types of firearms are lethal or often used in violence says nothing about whether *machineguns* are "dangerous and unusual."  As many courts have recognized, they are.  *See* Opening Br. 18, 22.  And the fact that a small class of civilians possesses registered machineguns for lawful purposes like recreation or firearm collecting, Response Br. 32, does not refute the point that machineguns are quite dangerous and particularly adapted to criminal activity.

Second, Morgan claims that there is no "significant history in this Nation of crimes committed with handheld machineguns." Response Br. 32. He is simply incorrect. Soon after becoming publicly available in the mid-1920s, automatic weapons became favorites among criminals. Take just a few examples. In April 1926, a Chicago prosecutor was killed "when gangsters poured more than a hundred machine gun bullets into the automobile in which he and four other men were riding." *Chicago Gangsters Slay Prosecutor With Machine Gun*, New York Times, April 28, 1926. Later that year, Chicago gangsters fired "thousands of bullets and slugs from machine guns, pistols, and shotguns" in a failed attempt to kill Al Capone. Alexander DeConde, *Gun Violence in America* 127 (2001). On Valentine's Day in 1929, four of Capone's men gunned down seven rival gang members with Thompson submachine guns. *Id.* at 129. In 1931, a New York City gangster killed a child and wounded five others when shooting a Tommy gun at a rival. *Id.* at 131. In 1933, gangsters in Kansas City used Tommy guns to kill three policemen and a federal agent. *Id.* at 138. Throughout this period, "[n]ewspaper headlines across the country flashed 'Gangsters Use Machine Guns,' 'Machine Gun Used in Bank Hold-Up,' and 'Machine Gun Thugs Kill Postal Employee.'" *Garland v. Cargill*, 602 U.S. 406, 431 (2024) (Sotomayor, J., dissenting) (some quotation marks omitted).

It was to address this rash of "crimes committed with handheld machineguns," Response Br. 32, that Congress enacted the National Firearms Act's taxing and registration requirement in 1934, *see* Opening Br. 28-29. That Act, in combination with state laws and § 922(o), has been remarkably effective in preventing the widespread use of machineguns in crime. But using the efficacy of those laws as a reason to invalidate § 922(o) would be "like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

Third, Morgan contends that "the Supreme Court has already rejected the argument that the Second Amendment's protections turn on 'public safety implications.'" Response Br. 32. But the Court's rejection of a standalone "interest-balancing inquiry," *Bruen*, 597 U.S. at 23 (quotation marks omitted), does not mean public safety is irrelevant. As the Court recently confirmed, "[w]hy and how the regulation burdens the right" remain "central to th[e Second Amendment] inquiry." *Rahimi*, 602 U.S. at 692. Applying that analysis, *Rahimi* held that historical laws "confirm what common sense suggests": that a person who "poses a clear threat of physical violence to another . . . may be disarmed." *Id.* at 698. Similarly, considering whether a firearm is "dangerous and unusual" necessarily requires considering the danger

that the firearm poses.  *See United States v. Price*, 111 F.4th 392, 406 (4th Cir. 2024) (en banc).

Fourth, Morgan suggests that the "common use" inquiry cannot consider "the prevalence and availability of machineguns in the United States" because the limited availability of machineguns is a "direct byproduct" of § 922(o)(1).  Response Br. 34.  He cites the Seventh Circuit's observation, in the context of semi-automatic weapons, that "[a] law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).

Here, the government is not relying on § 922(o)'s existence to support its validity.  Machineguns are not typically possessed by law-abiding citizens for many reasons unrelated to and long predating § 922(o), including state laws from the 1920s and 1930s and the National Firearms Act of 1934.  *See* Opening Br. 27-28.  The Court should not assume, counterfactually, that machineguns are in common use for lawful purposes simply because various laws similar to § 922(o) have limited their availability for the last 100 years.  *See Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016).

Fifth, Morgan contends that machineguns are in common use for lawful purposes even though fewer than 176,000 machineguns are registered to civilians.  Morgan first suggests (Response Br. 42) that this number is wrong,

citing a district court's statement that "the number of civilian-owned machineguns has increased to about 740,000." *United States v. Simien*, 655 F. Supp. 3d 540, 553 (W.D. Tex. 2023). That decision is simply mistaken, confusing the total number of registered machineguns (approximately 740,000) with the number of machineguns registered to civilians. *See* Opening Br. 20, 35. Section 922(o) "capped" civilian ownership "at pre[-]1986 levels." *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023).

Morgan also suggests that the "common use" inquiry should count "unregistered machineguns (like Morgan's)." Response Br. 43. But machineguns possessed in violation of state and federal law are not "possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And, in any event, Morgan fails to show that including unregistered machineguns would significantly change the "common use" calculus.

Morgan also suggests that even 176,000 civilian-registered machineguns is enough to establish common use. Response Br. 42-43. As an initial matter, a firearm legally owned by less than 0.05% of the population is hardly in common use. Moreover, the "common use" inquiry is not simply a numbers game. Otherwise, any weapon—from machineguns to portable grenade launchers—could become constitutionally protected if manufacturers could quickly flood the market with enough of them. Instead, courts should consider

19

additional factors, such as the danger posed by the weapon, its adaptability to unlawful purposes, and the regulatory response to the weapon over time. *See Price*, 111 F.4th at 406-07; *id.* at 421-22 (Quattlebaum, J., concurring); *Hollis*, 827 F.3d at 448-50. All those factors show that machineguns are not in common use, and Morgan fails to demonstrate otherwise.

**C.      The historical record demonstrates that § 922(o) is consistent with the principles underlying the Second Amendment.**

Because *Heller* held that the Second Amendment's "common use" limitation is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627, this Court need not re-weigh the historical record. But to the extent this Court wants to double-check *Heller*'s work, history confirms that legislatures may prohibit dangerous and unusual weapons like machineguns.

As the opening brief demonstrates, there is a long tradition of regulating dangerous and unusual weapons. Opening Br. 23-29. The weapons that fall into that category have, of course, changed over time. There were no founding-era laws regulating machineguns for the simple reason that machineguns had not been invented. Indeed, repeating weapons of any kind were uncommon until the mid-1800s. See Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 121-23

(2019).  But § 922(o) is consistent both with a 100-year-old tradition of regulating machineguns and with a centuries-old tradition of regulating dangerous and unusual weapons.

Morgan's attempts to downplay this robust historical tradition are unpersuasive.  He first contends that historical affray or "going armed" laws "simply prohibit[ed] individuals from terrorizing others with 'dangerous and unusual weapons.'"  Response Br. 40.  He relies on *Bruen*, which rejected the view that those laws prohibited "the public carry of all firearms."  *Bruen*, 597 U.S. at 47.  But *Bruen* also recognized that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons.'"  *Id*.  *Bruen* did not suggest that these "dangerous and unusual" weapons bans were limited to "terrorizing others" or to "weapons that look terrifying."  Response Br. 40.

Morgan next dismisses 19th-century laws regulating dangerous and unusual weapons such as Bowie knives and slungshots.  He argues that the government "doesn't provide any insight into these statutes" and leaves to this Court "the work in trying to analogize the statutes to section 922(o)(1)."  Response Br. 44.  On the contrary, the government cited those 19th-century laws to bolster *Heller*'s observation that there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Heller*, 554

U.S. at 627.  The government did not need to specifically analogize those laws to § 922(o) in order to support that broader principle.

Morgan argues that "at least one" of these 19th-century statutes required "'the intent or avowed purpose of injuring'" another.  Response Br. 44 (citing Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129).  In fact, that statute "create[d] two offences: *first*, the carrying or wearing" of a dangerous or unusual weapon "'concealed;' and, *second*, the carrying or wearing of such weapon openly . . . but with the intent or avowed purpose of injuring his fellow-man."  *State v. Judy*, 60 Ind. 138, 139-40 (Ind. 1877).  Thus, the Indiana statute did not require intent to injure another person where the weapon was concealed.  And the government cited dozens of other laws without a similar intent requirement.

Morgan also claims the government made no "effort to confirm that the statutes themselves are constitutional."  Response Br. 45.  He points out that "*Bruen* itself recognized that the 1837 Georgia statute cited by the government is unconstitutional because it prohibited the open (as opposed to concealed) carry of weapons."  *Id.* (citing *Bruen*, 597 U.S. at 54).  But, as *Bruen* recognized, that same statute's prohibition on concealed carry was "'valid.'"  *Bruen*, 597 U.S. at 54 (quoting *Nunn v. State*, 1 Ga. 243, 251 (Ga. 1846)).  And the decision *Bruen* cited considered only the statute's application to carrying a

*pistol*, not to carrying dangerous and unusual weapons. *Nunn*, 1 Ga. at 246, 251. So that decision does nothing to undermine the historical tradition of regulating dangerous and unusual weapons.

Finally, Morgan says that, "[a]s best [he] can tell, this laundry list of statutes involved concealed carry bans." Response Br. 45. Thus, he says, "it wasn't because the weapons were 'dangerous and unusual'" that these laws survived constitutional scrutiny, but "because the mode of bearing the weapons was 'dangerous to the peace of society.'" *Id.* (quoting *State v. Jumel*, 13 La. Ann. 399, 400 (1858)). In fact, many of the cited laws prohibited sale, possession, or all forms of carry.[1] Moreover, those that regulated only concealed carry are still highly relevant. Those laws were not aimed at using weapons to terrorize others, because concealed weapons would not cause fear, but instead target the weapons themselves. And although courts reached "a

---

[1] *See, e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 (sale, carry, and possession); Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200 (sale); Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 52 (taxing possession of Bowie Knife knives); Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404 (carry and possession); Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 (sale, carry, and possession); Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129 (concealed carry or open carry with intent to injure); Act of Feb. 19, 1867, No. 259, ch. 2, § 10, 1867 Ala. Laws 263 (taxing possession of Bowie knives); Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25 (carry); Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57 (carry); Act of Apr. 16, 1881, §1, 1881 Ill. Laws 73 (sale and possession); Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 (carry).

consensus that States could not ban public carry altogether," *Bruen*, 597 U.S. at 53 (emphasis omitted), those decisions did not suggest that there was a right to carry dangerous and unusual weapons.

Turning to 20th-century laws regulating machineguns, Morgan levels several claims. First, he faults the government for not "bother[ing] to identify the number of 'comprehensive bans'" between 1925 and 1934. Response Br. 46. Of the 26 state laws cited in the opening brief, 19 were bans on private machinegun possession[2] and seven were licensing requirements or other similar restrictions.[3] But both types of laws—bans and registration schemes—

---

[2] Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674 (banning sale to private persons and "possession for any unlawful purpose"); Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws (Special Session) 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288.

[3] Act of June 5, 1925, ch. 3, 1925 W. Va. Acts (Extraordinary Session) 30-31; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws

show that legislatures responded swiftly to regulate and limit machineguns when they became publicly available.

Second, Morgan wrongly claims that "only 13 jurisdictions (and the federal government) have comprehensive bans today." Response Br. 46. Although only 13 jurisdictions ban all machineguns, including those possessed in compliance with federal law, another 25 states regulate or ban private machinegun possession while accommodating the possession of machineguns legally possessed under federal law. *See* Opening Br. 19 & nn.3-4 (citing statutes). Thus, at least 37 states (plus the District of Columbia) have laws that are at least as strict as federal law, which Morgan labels a "comprehensive ban." Response Br. 46. Two more states, without reference to federal law, require registration of machineguns and make their public carry presumptively unlawful. Opening Br. 20 n.5. And the fact that the remaining 11 states have not enacted laws regulating machineguns hardly suggests legislative approval of such weapons, given that federal law—which operates with full force in their borders—has severely limited the possession of machineguns since 1934.

Third, Morgan contends that this Court should follow *Bruen* in "refus[ing] to address '20th-century historical evidence.'" Response Br. 46

---

245-46; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.

(quoting *Bruen*, 597 U.S. at 67 n.28). *Bruen*, however, was unwilling to rely on 20th-century laws primarily because they "contradict[ed] earlier evidence." *Bruen*, 597 U.S. at 66 n.28. This case involves no earlier, contradictory evidence indicating that dangerous and unusual weapons were protected.

Moreover, the statute in *Bruen* addressed "a general societal problem that has persisted since the 18th century"—"handgun violence." *Bruen*, 597 U.S. at 26-27 (quotation marks omitted). This case, by contrast, involves dramatic changes in firearm technology since the founding. The automatic weapons that became publicly available in the 1920s were worlds away from the cumbersome flintlocks of the 1790s. *See* Opening Br. 30-31. And *Bruen* recognized that "unprecedented societal concerns or dramatic technological changes" can justify new regulations, as "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 27-28. As *Rahimi* put it, the Second Amendment does not require "a law trapped in amber" and "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92.

Morgan resists this analysis, insisting that the government must identify a "historical tradition related to machineguns or weapons with higher rates of fire." Response Br. 33; *see id.* at 11, 46. The government has not done so for

the simple reason that nothing remotely like machineguns existed in 1791. But 20th-century laws regulating machineguns are fully in line with 18th- and 19th-century laws regulating *other* dangerous and unusual weapons. Thus, the government has established a regulatory tradition with a "discernible through-point," Response Br. 46, namely, the regulation of dangerous and unusual weapons.

### D. The as-applied nature of Morgan's challenge does not assist him.

That Morgan presses only an as-applied challenge does not mean he should prevail. He confusingly claims that "[t]he government's arguments have more to do with a facial challenge." Response Br. 33; *see id.* at 35. In fact, the opening brief demonstrates that § 922(o) is constitutional *regardless* of the circumstances of a particular offender's possession because machineguns are "not protect[ed]" by the Second Amendment. *Heller*, 554 U.S. at 625. That is directly responsive to Morgan's claim that the statute is unconstitutional as applied to him.

Morgan does little to distinguish his own machinegun possession from other applications of § 922(o). Morgan asserts that the government has "never disputed" that he is "a law-abiding citizen" or that he "possessed the handheld machineguns for self-defense." Response Br. 33; *see id.* at 41 ("Morgan is a law-abiding citizen . . . ."). The government has not disputed those points only

because the record is undeveloped in this pretrial posture. But investigative reports tell a very different story, which would likely come out at trial. And even assuming Morgan was an otherwise law-abiding citizen, possession of a machinegun for any purpose is not protected by the Second Amendment.

Finally, Morgan claims that "[t]his very well might be a class-of-one case" because "[i]t's entirely possible that the government will meet its burden in other as-applied section 922(o)(1) challenges." Response Br. 47. The Court should not trust this assurance. To establish that machineguns are unprotected by the Second Amendment, the government has cited the uniform precedent of other circuits, a century-old legislative consensus regulating machineguns, statistics about the number of legally owned machineguns, and courts' common-sense acknowledgement that machineguns are highly dangerous. *See* Opening Br. 17-22. To confirm *Heller*'s conclusion that the "common use" limitation accords with history, *Heller*, 554 U.S. at 625, 627, the government has cited dozens of 18th- and 19th-century laws regulating dangerous and unusual weapons, Opening Br. 23-28. If the government has not carried its burden here, it is unclear how it could carry its burden in a future case.

This Court should not wait for another case to determine Congress's authority to regulate fully automatic weapons. It should reject Morgan's

insistence on a "historical twin" and uphold § 922(o) as consistent with "the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

## CONCLUSION

This Court should reverse the judgment of the district court.

Respectfully submitted,

DUSTON J. SLINKARD
Acting United States Attorney

MATTHEW R. GALEOTTI
Supervisory Official

JAMES A. BROWN
Assistant United States Attorney
District of Kansas

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser<br>
WILLIAM A. GLASER