FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**September 2, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

TAMORI MORGAN,

     Defendant - Appellee.

------------------------------

BRADY CENTER TO PREVENT GUN
VIOLENCE; GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE;
CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INCORPORATED;
SECOND AMENDMENT LAW
CENTER, INC.; GUN OWNERS OF
AMERICA, INC.; GUN OWNERS OF
CALIFORNIA, INC.; MINNESOTA GUN
OWNERS CAUCUS; SECOND
AMENDMENT DEFENSE AND
EDUCATION COALITION, LTD.; THE
ATTORNEYS ON RETAINER
ASSOCIATION,

     Amici Curiae.

No. 24-3141

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:23-CR-10047-JWB-1)**
_____

William A. Glaser, Attorney, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (Nicole M. Argentieri, Principal Deputy Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C.; Duston J. Slinkard, Acting United States Attorney, James A. Brown, Assistant United States Attorney, and Matthew R. Galeotti, Supervisory Official, Office of the United States Attorney for the District of Kansas, Topeka, Kansas, with him on the briefs), appearing for Appellant.

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Kansas Federal Public Defender, with him on the brief), Office of the Federal Public Defender for the District of Kansas, Kansas City, Kansas, appearing for Appellee.

Michael Kim Krouse and Paul J. Fishman, Arnold & Porter Kaye Scholer LLP, New York, New York, and Joanna McDonough, Arnold & Porter Kaye Scholer LLP, Boston, Massachusetts, filed an Amici Curiae brief for Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence.

C. D. Michel and Anna M. Barvir, Michel & Associates, P.C., Long Beach, California, filed an Amici Curiae brief for California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Gun Owners of America, Inc., Gun Owners of California, Inc., Minnesota Gun Owners Caucus, and Second Amendment Defense and Education Coalition, LTD.

Andrew C. Marcantel, The Attorneys for Freedom Law Firm, Chandler, Arizona, filed an Amicus Curiae brief for The Attorneys on Retainer Association.

_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Tamori Morgan moved to dismiss an indictment charging him with two counts of knowingly and unlawfully possessing a machinegun in violation of 18 U.S.C. § 922(o), arguing § 922(o) violates the Second Amendment as applied to him. The district court agreed and dismissed. The Government appealed.

2

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse. Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) ("*RMGO*"), Mr. Morgan failed to show the machineguns he possessed are "arms" in "common use" for self-defense.

## I. BACKGROUND

### A. *Factual History*

In October 2022, police stopped and searched a car in which Mr. Morgan was riding. They found and seized an Anderson Manufacturing, model AM-15 machinegun, a .357 caliber Glock handgun, and a "Glock switch" machinegun-conversion device. The AM-15 was configured to fire automatically, and the Glock switch attaches to a Glock handgun, enabling it to fire automatically. A Snapchat video showed Mr. Morgan firing a Glock handgun with a Glock switch attached, appearing to "function fully automatically by one pull of the trigger, firing more than one shot." App. at 39-40.

### B. *Legal Background*

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

### 1. Relevant Statutes

Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun," unless "under the authority of" a government entity, or unless the

machinegun "was lawfully possessed before the date this subsection takes effect" in 1986.  18 U.S.C. § 922(o).[1]

A "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24) (incorporating definition from Title 26).  It includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."  26 U.S.C. § 5845(b).

2.  **Supreme Court Cases**

a.  Heller

In *Heller*, the Supreme Court held the Second Amendment protects an individual right to keep and bear arms for self-defense, but it said this right is "not unlimited." 554 U.S. at 592, 595, 626.  Historically, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  It is limited by the "sorts of weapons protected."  *Id.* at 627.

---

[1] Congress enacted § 922(o) as part of the Firearms Owners' Protection Act of 1986.  *See* Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (codified as amended at 18 U.S.C. § 921 et seq.).  Before 1986, under the National Firearms Act of 1934, civilians could legally own machineguns if they were properly registered and taxed.  *See* Pub. L. No. 73-474, §§ 1-3, 48 Stat. 1236, 1237 (codified as amended in scattered sections of 26 U.S.C.).  After 1986, only government entities may legally obtain newly manufactured machineguns.  Firearms Owners' Protection Act § 102(9).  The 1986 Act thus "capped" civilian ownership "at pre1986 levels."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023).

*Heller* mentioned short-barreled shotguns as one example of a "*type of weapon*" that "was not eligible for Second Amendment protection." *Id.* at 622; *see also United States v. Miller*, 307 U.S. 174, 178-79 (1939) (upholding ban on transporting short-barreled shotguns). The Court said "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. Quoting *Miller*, it said the Second Amendment permits weapons "in common use at the time" that able-bodied men owned and "[o]rdinarily" brought with them when called for militia service. *Id.* at 624. The Court acknowledged that *Miller*'s reference to "ordinary military equipment" might be "[r]ead in isolation" to suggest protection only for "those weapons useful in warfare," but rejected such a reading as "startling," noting "it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624 (quotations omitted). Thus, *Heller* acknowledged that "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Id.* at 627.

  b. Bruen

In *Bruen*, the Supreme Court adopted a two-step burden-shifting framework to analyze Second Amendment claims. 597 U.S. at 24. At step one, the plaintiff must show that "the Second Amendment's plain text covers" the regulated conduct. *Id.* If the plaintiff meets that burden, at step two the government must demonstrate that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.*

Applying this framework, the Court struck down New York's licensing scheme requiring a showing of "proper cause" before a public carry license may issue. *Id.* at 11. First, it held the Second Amendment's plain text protected the right to carry handguns outside the home for self-defense. *Id.* at 32-33. As in *Heller*, the petitioners were "ordinary, law-abiding, adult citizens" and "part of 'the people' whom the Second Amendment protects." *Id.* at 31-32 (quoting *Heller*, 554 U.S. at 580). They wished to carry handguns that were "weapons 'in common use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627).

Second, New York failed to show the proper-cause requirement is consistent with the Nation's historical tradition of firearm regulation. *Id.* at 70.

*Bruen* said nothing about *Heller*'s discussion of the types of weapons within the Second Amendment's scope, and noted that no party disputed "that handguns are weapons 'in common use' today for self-defense" when discussing the Second Amendment's plain text. *Id.* at 32 (quoting *Heller*, 554 U.S. at 627).

    c.  Rahimi

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court upheld the constitutionality of 18 U.S.C. § 922(g)(8), which criminalizes firearm possession by an individual subject to a domestic violence restraining order. *Rahimi*, 602 U.S. at 688. The Court reiterated from *Heller* that the Second Amendment right is not "a right to keep and carry any weapons whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 691 (quoting *Heller*, 554 U.S. at 626).

3. **_RMGO_**

In _RMGO_, this court interpreted and applied these precedents to uphold a

Colorado law that prohibited the sale of a firearm to, or the purchase of a firearm by, a

person under the age of 21. 121 F.4th at 104, 120. Under _Bruen_ step one, we asked

(1) "whether the challenger is 'part of "the people" whom the Second Amendment

protects,'" (2) "whether the item at issue is an 'arm' that is '"in common use" today for

self-defense,'" and (3) "whether the 'proposed course of conduct' falls within the Second

Amendment." _Id._ at 113-14 (quoting _United States v. Alaniz_, 69 F.4th 1124, 1128

(9th Cir. 2023)). We responded as follows:

(1) The plaintiff, "an ordinary, law-abiding citizen under the age of 21," was a part of "the people." _Id._ at 116.

(2) The plaintiff intended to purchase a weapon "commonly used and possessed by law-abiding citizens for lawful purposes"—an "arm[]." _Id._ at 116-17 (citing _Heller_, 554 U.S. at 625, 627).

(3) The challenged law is "an aged-based condition or qualification on the sale of arms" that "falls outside of the scope of the Second Amendment's right to 'keep and bear' arms" because the law regulates the "selling and purchasing [of] firearms," and such "commercial restrictions" are presumptively lawful, _id._ at 119-20 (quoting _B & L Prods., Inc. v. Newsom_, 104 F.4th 108, 119 (9th Cir. 2024)), and because the law does not serve abusive ends, _id._ at 122-27.

4. **Other Circuits**

Other circuits have addressed how to determine whether a regulated weapon is in

common use for a lawful purpose. The Fourth Circuit said courts may "apply common

sense and consider whether there are any reasons a law-abiding citizen would want to use

a particular weapon for a lawful purpose," _United States v. Price_, 111 F.4th 392, 405

(4th Cir. 2024) (en banc) (citing *Heller*, 554 U.S. at 629),[2] or may "look to statistics regarding weapons commonly used in crimes versus weapons commonly chosen by law-abiding citizens for self-defense," *id.* The Fifth Circuit noted that "statistics—raw number, percentage and proportion, jurisdiction-counting—identify potentially relevant data for the common use inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449-50 (5th Cir. 2016) (holding that under any "set of numbers we adopt," "[n]one of them allow a conclusion that a machine gun is a usual weapon"). Courts have cautioned that the answer is "not to be found solely by looking to the number of a certain weapon in private hands," *Hanson v. District of Columbia*, 120 F.4th 223, 232-33 (D.C. Cir. 2024), and that "only instances of 'active employment' of the weapon should count," *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc). *Accord United States v. Bridges*, --- F.4th ---, 2025 WL 2250109, at *7-8 (6th Cir. Aug. 7, 2025) (noting the common-use inquiry focuses on "machinegun-ownership data," excluding law-enforcement equipment and unlawfully

---

[2] In *Heller*, the Supreme Court said:

> There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.

554 U.S. at 629.

owned weapons, and whether machineguns are "typically possessed by law-abiding citizens for lawful purposes" (quoting *Heller*, 554 U.S. at 625)).

## C. *Procedural History*

The indictment charged Mr. Morgan with possession of the AM-15 machinegun (Count 1) and of the Glock switch (Count 2) in violation of § 922(o).  He moved to dismiss the indictment, arguing that § 922(o) violates the Second Amendment under *Bruen*.

Mr. Morgan contended that machineguns are "arms" protected by the Second Amendment's plain text and that the Government could not show a historical tradition of banning machinegun possession.

The Government responded that the Second Amendment's plain text does not cover machineguns because they are not in common use by private citizens.  It also argued that § 922(o) is consistent with the historical tradition of regulating dangerous and unusual weapons.

The district court held that § 922(o) is unconstitutional as applied to Mr. Morgan and granted his motion.[3]  It said, "[T]he [AM-15] machinegun and Glock switch are

---

[3] The district court denied that § 922(o) violates the Second Amendment on its face and denied as moot that it violates the Commerce Clause.  Mr. Morgan does not appeal these rulings.  Amici Attorneys on Retainer Association argue § 922(o) exceeds Congress's Commerce Clause authority.  *See generally* Br. of Amici Curiae Att'ys on Retainer Ass'n in Supp. of Def.-Aplee.  Because "the amicus is not a party, and we ordinarily decline to consider arguments raised only by an amicus," *Sierra Club v. EPA*, 964 F.3d 882, 897 n.15 (10th Cir. 2020), we do not address this issue.

bearable arms within the plain text of the Second Amendment." App. at 68. It rejected the Government's reliance on *Heller*'s dicta that suggests the Second Amendment's plain text does not cover machineguns because *Heller* predated *Bruen* and concerned handguns rather than machineguns.

The district court then found the Government did not show § 922(o) is "consistent with the nation's history of firearm regulation." *Id.* at 73. It rejected the Government's reliance on the English common-law and nineteenth-century American laws prohibiting individuals from "going armed" with dangerous or unusual weapons. *See Rahimi*, 602 U.S. at 697 (noting "going armed" laws "punish[ed] those who had menaced others with firearms"). The district court said these laws focused on "the manner in which arms were carried or displayed," while § 922(o) "criminalizes the mere possession" of machineguns. App. at 70-72. "[T]o the extent that the Second Amendment would allow weapons to be prohibited solely on the basis that they are 'dangerous and unusual' or 'highly unusual in society at large,'" the Government had "not made that showing here." *Id.* at 72 (quoting *Bruen*, 597 U.S. at 47).

## II.  DISCUSSION

Mr. Morgan has not met his burden under *Bruen* step one to show that his machineguns are "arms" protected by the Second Amendment—that they are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S.

at 627); *see also RMGO*, 121 F.4th at 116 (citing *Heller*, 554 U.S. at 625, 627).  We

therefore reverse the district court's dismissal of the indictment against Mr. Morgan.[4]

### A.  *Standard of Review*

We review an as-applied constitutional challenge to a statute de novo,

*United States v. Cox*, 906 F.3d 1170, 1178-79 (10th Cir. 2018), analyzing it under "the

particular circumstances of his case," *United States v. Carel*, 668 F.3d 1211, 1217

(10th Cir. 2011); *see also Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 225-26 (4th Cir.

2024) (en banc) ("In an as-applied challenge, the court focuses on the circumstances of

the particular plaintiffs and whether, in light of those circumstances, the challenged law

was unconstitutionally applied to *those* plaintiffs.").  We must "presume that the statute is

constitutional."  *Carel*, 668 F.3d at 1216.

### B.  *Analysis*

As noted above, under *RMGO*, at *Bruen* step one we ask (1) "whether the

challenger is 'part of "the people" whom the Second Amendment protects,'" (2) "whether

the item at issue is an 'arm' that is '"in common use" today for self-defense,'" and

(3) "whether the 'proposed course of conduct' falls within the Second Amendment."

*RMGO*, 121 F.4th at 113-14 (quotations omitted); *see also Bruen*, 597 U.S. at 31-32.  "If

not, the inquiry ends:  self-evidently, if the people, weapons, or conduct at issue are

outside the Second Amendment's protection, then the government may regulate them

---

[4] Mr. Morgan's contention that the Government forfeited certain arguments lacks
merit.  *See* Aplee. Br. at 12-14, 23-25, 27-29.

without infringing upon the Second Amendment." *RMGO*, 121 F.4th at 114.  That is

where the inquiry ends here because Mr. Morgan has not shown that the machineguns he

possessed—an AM-15 machinegun and a Glock switch—let alone any types of

machineguns, are arms "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32

(quoting *Heller*, 554 U.S. at 627); *RMGO*, 121 F.4th at 114 (quotations omitted).

1. **Failure to Show Common Use**

Mr. Morgan argues that "he (a law-abiding citizen who is not prohibited from

possessing firearms) possessed the handheld machineguns for self-defense."  Aplee. Br.

at 33.  Even if this is so, § 922(o) is constitutional as applied to him if his machineguns

are not the "*type of weapon*" protected by the Second Amendment, *Heller*, 554 U.S.

at 622 (citing *Miller*, 307 U.S. at 178), meaning a weapon "not typically possessed by

law-abiding citizens for lawful purposes," *id.* at 625, and not "'in common use' today for

self-defense," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627); *RMGO*, 121 F.4th

at 114 (quotations omitted).

Mr. Morgan has not shown that law-abiding citizens commonly use any type of

machinegun for self-defense, let alone the types he possesses.  Instead, he faults the

Government for not "cit[ing] any statistics to support" its arguments that machineguns

are *not* in common use for lawful purposes, Aplee. Br. at 32, inverting the burden he

bears at *Bruen* step one, *see RMGO*, 121 F.4th at 113-14.

As noted above, in determining common use, courts have counted weapons, *see*

*Hollis*, 827 F.3d at 449-50; considered common-sense weapons use, *see Heller*, 554 U.S.

at 629; *Price*, 111 F.4th at 405-06; and compared laws of other states, *Hollis*, 827 F.3d

at 450; *see also Bruen*, 597 U.S. at 11 (New York's law inconsistent with the laws of

43 other states).[5]  Mr. Morgan has not met his burden through any of these approaches.

    a. *Weapons in use*

The parties provided machinegun numbers from the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF"), which maintains firearm registration records in the

National Firearms Registration and Transfer Record.  *See* Gun Control Act of 1968,

Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1229.  The statistics do not help Mr. Morgan

meet his burden.

Mr. Morgan told the district court "[t]here are over 740,000 legally registered

machineguns in the United States today."  App. at 72 (quotations omitted).[6]  The

Government countered that most are registered to government entities and that 2016 ATF

data showed "175,977 pre-1986 civilian-owned machineguns in existence."  Aplt. Br. 20

---

[5] *See also Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (concluding "stun guns are commonly possessed by law-abiding citizens for lawful purposes" because 45 states allowed lawful possession of stun guns and hundreds of thousands were sold to private citizens); *Snope v. Brown*, No. 24-203, 605 U.S. ---, 2025 WL 1550126, at *1 (June 2, 2025) (Kavanaugh, J., respecting the denial of certiorari) (noting there was a "strong argument that AR-15s are in 'common use'" because "millions of Americans own AR-15s" and they "are legal in 41 of the 50 states"); *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 579 (4th Cir. 2025) (noting that *Heller* and *Bruen* struck down "outlier[]" laws), *petition for cert. filed*, 2025 WL 1908029 (U.S. July 3, 2025) (No. 25-24).

[6] He took this number from ATF's 2021 report of "National Firearms Act Registered Weapons by State."  ATF, Firearms Commerce in the United States—Annual Statistical Update 2021, at 15-16 (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download [https://perma.cc/5ND5-FG4C].

(quoting *Hollis*, 827 F.3d at 449); *see also* Aplt. Reply Br. at 2, 18-19.  After oral

argument, the Government provided an update:  "ATF has recently clarified that, as of

June 2025, the total number of registered machineguns that are 'transferable to a private

individual or between private individuals is approximately 234,718.'"  Aplt. 28(j) Letter,

Dkt. 70, at 1.[7]  But, the Government explains, this number may be "substantially lower"

because, according to ATF, it may include "machineguns that 'no longer function,' that

are in fact possessed by government or licensed entities, or that are possessed by

individuals outside the United States."  *Id*. (quotations omitted)

Even if Mr. Morgan could establish an accurate count of privately-held registered

machineguns,[8] that would not tell us how many are in use or for what purpose.[9]  *See*

*Heller*, 554 U.S. at 625 (explaining the Second Amendment does not protect weapons not

---

[7] The Government conveyed this information in its July 18, 2025 letter to the court filed under Federal Rule of Appellate Procedure 28(j).  Aplt. 28(j) Letter, Dkt. 70.  It cited to and quoted from ATF, *Machineguns Registered in the National Firearms Registration and Transfer Record*, Data & Stat., https://www.atf.gov/resource-center/data-statistics [https://perma.cc/YBH4-FAQR] (last updated July 7, 2025).

[8] Mr. Morgan argues we should consider both registered and unregistered machineguns.  *See* Aplee. Br. at 43.  But unregistered machineguns are not "possessed by law-abiding citizens," *Heller*, 554 U.S. at 625, because their possession has been unlawful since Congress passed the National Firearms Act of 1934, *see* §§ 5-6, 48 Stat. at 1238; *see also* § 201, 82 Stat. at 1234.

[9] More accurate data may be available on how many people use machineguns for self-defense compared to how many use them for criminal purposes, but Mr. Morgan has not provided it.  For his as-applied challenge, *Heller*, *Bruen*, and *RMGO* require him to show his types of weapon are commonly used for self-defense.  *See Heller*, 554 U.S. at 625, 627; *Bruen*, 597 U.S. at 32; *RMGO*, 121 F.4th at 114.

14

typically possessed "for lawful purposes"). We agree that "the [Supreme] Court's choice of the phrase common *use* instead of common *possession*," *Bianchi*, 111 F.4th at 460, means more than "the number of a certain weapon in private hands," *Hanson*, 120 F.4th at 233. *Accord Bridges*, 2025 WL 2250109, at *7-8. Although Mr. Morgan posits he uses his machineguns for self-defense, Aplee. Br. at 33, he provides little or no evidence to show that private individuals commonly use his type of machineguns for self-defense. As discussed below, the evidence suggests they use machineguns primarily for unlawful purposes.

### b. *Common-sense weapons use*

Mr. Morgan has not shown that using a machinegun for self-defense makes sense as a common use, especially given that self-defense does not commonly require "fir[ing] more than 1,000 rounds per minute." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45 (1st Cir. 2024) ("[C]ivilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots, much less more than ten."); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018) ("[M]ost homeowners only use two or three rounds of ammunition in self-defense.").

Although "one could imagine Hollywood-inspired scenarios in which a homeowner would need to fend off a platoon of well-armed assailants" with a machinegun, *Ocean State Tactical*, 95 F.4th at 45, "*Heller* and *Bruen* direct us to analyze not only whether a weapon might have some conceivable lawful use, but also whether such use is *common*," *Price*, 111 F.4th at 408; *see id.* ("That a law-abiding citizen *could*

15

use a gun with an obliterated serial number for lawful self-defense isn't evidence that guns with obliterated serial numbers are *typically* used by law-abiding citizens for lawful self-defense." (quotations omitted)).  Mr. Morgan provides no reason why it would be common to need "the rapid and uninterrupted discharge of many shots" for self-defense. *Ocean State Tactical*, 95 F.4th at 45.

Courts have recognized that machineguns "would be preferable only to those seeking to use them for illicit activities."  *Price*, 111 F.4th at 406.  As the Sixth Circuit said, "[M]achineguns—unlike stun guns, nunchaku, and tasers—are designed for a specific function:  to fire as many bullets in as little time as possible.  That function makes this type of weapon exceedingly dangerous and uniquely adapted for unlawful purposes."  *Bridges*, 2025 WL 2250109, at *8 (citation omitted).[10]  "With its very limited ability to serve the defensive needs of the average citizen yet its extraordinary capability to advance the offensive purposes of criminals," the machinegun "is exactly the type of firearm that is 'most useful in military service' and 'may be banned' consistent with the Second Amendment."  *Bianchi*, 111 F.4th at 453 (quoting *Heller*, 554 U.S. at 627).

---

[10] A weapon's dangerousness is not "the sole *determinative* factor" of "whether it is in common use for a lawful purpose," but it is "a *relevant* factor."  *Price*, 111 F.4th at 406.  Indeed, the Supreme Court has recognized the "immense danger posed by machineguns," *United States v. O'Brien*, 560 U.S. 218, 230 (2010), leading some courts to "conclude that such weapons are best suited for war, not self-defense," *Price*, 111 F.4th at 406; *see also Bianchi*, 111 F.4th at 451 ("What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection.").

c. *State laws*

Mr. Morgan cannot establish common use by pointing to a lack of machinegun regulation at the state or federal levels. The statute books show just the opposite.

At least 38 jurisdictions strictly regulate machinegun possession—12 states and the District of Columbia ban machinegun possession[11] and 25 states ban private machineguns unless the weapon is legal under federal law.[12] Two additional states require registration of machineguns and make their public carry presumptively unlawful. *See* Md. Code Ann., Crim. Law §§ 4-402, -403, -405; Va. Code Ann. §§ 18.2-290, -291, -295. At least half of states began prohibiting the possession of machineguns soon after their introduction to the public in the 1920s, *see* Aplt. Br. at 27-28, 28 n.21, followed shortly by the federal government's strict regulation and eventual ban of machineguns in

---

[11] Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code Ann. tit. 11, § 1444(a)(5); D.C. Code Ann. § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Iowa Code §§ 724.1, 724.3; Mass. Gen. Laws ch. 140, § 131(f); Minn. Stat. § 609.67(2); N.J. Stat. Ann. § 2C:39-5(a); N.Y. Penal Law § 265.02(2); R.I. Gen. Laws § 11-47-8(a); Wis. Stat. § 941.26(1g)(a).

[12] Alaska Stat. § 11.61.200(a)(3), (c), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3), (F); Ark. Code Ann. §§ 5-73-204, 5-73-205; Conn. Gen. Stat. § 53-202(g), (h); Fla. Stat. § 790.221; Ga. Code Ann. §§ 16-11-122, 16-11-124; Ind. Code §§ 35-47-5-8, 35-47-5-10; Kan. Stat. Ann. § 21-6301(a)(5), (h); La. Stat. Ann. § 40:1752; Me. Stat. tit. 17-A, §§ 1051, 1052; Mich. Comp. Laws § 750.224(1)(a), (3)(c); Mo. Rev. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350(1)(b); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11(K)(1), 923.17(A), (C)(5); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330; S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3), (d); Tex. Penal Code Ann. § 46.05(a)(1)(B); Wash. Rev. Code § 9.41.190(1), (4); W. Va. Code § 61-7-9.

the National Firearms Act of 1934, Pub. L. No. 73-474, §§ 2-3, 48 Stat. 1236, 1237, and

the Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 102, 100 Stat. 449,

453.

Unlike stun guns in *Caetano* and AR-15s in *Snope*, the lawful possession of

machineguns is strictly limited, undermining Mr. Morgan's argument that machineguns

are in common use.[13]

## 2.  Supreme Court Dicta and Machinegun History and Legislation

Mr. Morgan's failure to show common use is enough to reverse.  Supreme Court

dicta and machinegun history and legislation provide further support for reversal.

### a.  Heller *dicta*

In *Heller*, the Supreme Court said it would be "startling" to suggest that

"restrictions on machineguns . . . might be unconstitutional."  554 U.S. at 624.  "[W]e are

'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings,

particularly when the dicta is recent and not enfeebled by later statements.'"  *RMGO*,

121 F.4th at 119 (quoting *Bonidy v. USPS*, 790 F.3d 1121, 1125 (10th Cir. 2015)).  And

*Bruen* said nothing contrary to *Heller*'s "in common use" language.  *See Bruen*, 597 U.S.

at 21, 32 (noting "the Second Amendment protects the possession and use of weapons

_____

[13] Mr. Morgan and amici argue that the 1986 enactment of § 922(o)'s prohibition on machineguns explains why they are not used more today.  *See* Aplee. Br. at 34; Br. of Amici Curiae Cal. Rifle & Pistol Ass'n et al. in Supp. of Aplee. & Affirmance at 7-8. But the record lacks evidence of how the possession and use of machineguns "would have evolved, had they remained legal and readily available."  *Bevis*, 85 F.4th at 1195. Rather than indulge this invitation to speculate, we apply *Heller*, *Bruen*, and *RMGO*.

that are 'in common use at the time'" and stating that "handguns are weapons 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)).

The *Heller* dicta aligns with the Supreme Court's earlier observation that machineguns are "weapons used principally by persons engaged in unlawful activities." *Haynes v. United States*, 390 U.S. 85, 87 (1968); *see also Staples v. United States*, 511 U.S. 600, 611-12 (1994) (classifying "machineguns" as weapons that share "the same quasi-suspect character" as hand grenades); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality) (observing that the National Firearms Act, which regulates machineguns, was intended "to regulate certain weapons likely to be used for criminal purposes").

    b.  *Machinegun history and legislation*

Congress recognized that machineguns are not commonly used for lawful purposes, but rather are used mostly for unlawful purposes.  *See Bridges*, 2025 WL 2250109, at *6-9.

Machinegun history as recounted in court opinions provided the backdrop for machinegun legislation.  Soon after machineguns became publicly available in the 1920s, gangsters and other criminals used them to commit crimes.  *See id.* at *8 (explaining that, after World War I, machineguns became popular "with criminals, especially bootleggers" (quoting *Bianchi*, 111 F.4th at 469)); *see also Garland v. Cargill*, 602 U.S. 406, 430-31 (2024) (Sotomayor, J., dissenting); Aplt. Reply Br. at 16-17 (citing news articles from 1926 to 1933 reporting on the use of machineguns by gangsters).  "When the guns were used, 'they exacted a devastating toll and garnered extensive national attention,'

19

becoming inextricably linked to notorious crimes including the St. Valentine's Day Massacre (seven gang members and associates killed) and the Kansas City Massacre (four law enforcement officers and one prisoner killed)." *Bianchi*, 111 F.4th at 469 (quotations omitted); *see also Cargill*, 602 U.S. at 430-31 (Sotomayor, J., dissenting) ("Gangsters like Al Capone used machineguns to rob banks, ambush the police, and murder rivals. Newspaper headlines across the country flashed '"Gangsters Use Machine Guns,"' '"Machine Gun Used in Bank Hold-Up,"' and '"Machine Gun Thugs Kill Postal Employee."'" (citation omitted)).

Congress responded in 1934 by sharply restricting civilian ownership of machineguns. *See* National Firearms Act § 3; *Mock v. Garland*, 75 F.4th 563, 569 (5th Cir. 2023) (noting the National Firearms Act's $200 transfer tax "was explicitly intended to tax these weapons out of existence"). The Senate Report explaining the National Firearms Act emphasized that the "gangster as a law violator must be deprived of his most dangerous weapon, the machine gun." S. Rep. No. 73-1444, at 1-2 (1934). It further said, "[W]hile there is justification for permitting the citizen to keep a pistol or revolver for his own protection . . . , there is no reason why anyone except a law officer should have a machine gun." *Id.* at 2; *see also Haynes*, 390 U.S. at 87 n.4 (noting that a 1959 House Report stated that the "primary purpose of (the Firearms Act) was to make it more difficult for the gangster element to obtain certain types of weapons").

Congress has continued to restrict civilian ownership, repeatedly observing that machineguns "could be used readily and efficiently by criminals or gangsters." H.R. Rep. No. 83-1337, at A395 (1954). In enacting § 922(o) in 1986, it emphasized "the

need for more effective protection of law enforcement officers from the proliferation of machine guns" that were "increasingly being used by criminals."  H.R. Rep. No. 99-495, at 1333 (1986); *see also id.* at 1330 (discussing proposed H.R. 3155, which "prohibited the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime").

*     *     *     *

Because Mr. Morgan has not shown law-abiding citizens commonly use the machineguns he possesses for self-defense, he has not met his burden to show they "fall[] under the protection of the Second Amendment."  *RMGO*, 121 F.4th at 117.[14]  His as-applied challenge to § 922(o) fails under *Bruen* step one.

---

[14] At least six circuits, post-*Heller* and pre-*Bruen*, held that the Second Amendment does not protect possession of machineguns because they are not commonly used by law-abiding citizens for lawful purposes.  *See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016); *Hollis*, 827 F.3d at 451; *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *Henry*, 688 F.3d at 640; *see also United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (unpublished).  The Sixth Circuit recently held that *Bruen* did not abrogate its precedent and, even analyzing the issue anew, § 922(o) is constitutional.  *See Bridges*, 2025 WL 2250109, at *4-9 (affirming § 922(o)'s constitutionality under *Bruen* step two).  And two other circuits have upheld machinegun possession convictions on plain error review post-*Bruen*.  *See United States v. Mena*, No. 23-10144, 2023 WL 7314349, at *1 (5th Cir. Nov. 6, 2023) (unpublished) (citing with approval *Hollis*, 827 F.3d at 447-51); *United States v. Dolphin*, No. 24-2040, 2024 WL 4799546, at *1 (8th Cir. Nov. 15, 2024) (unpublished) (citing with approval *Fincher*, 538 F.3d at 874).

## III.  **CONCLUSION**

We reverse the district court's dismissal of Mr. Morgan's indictment because § 922(o) is constitutional as applied to him.  We remand to the district court to proceed consistent with this opinion.